**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| GREENWOOD LEFLORE HOSPITAL | ) | Case No. 26-11337-SDM |
| | ) | Chapter 9 |
| Debtor. | ) | |
| | ) | |

**DISCLOSURE STATEMENT**
**TO ACCOMPANY PLAN OF ADJUSTMENT**

Greenwood Leflore Hospital, a community hospital ("**GLH**"), the above-captioned debtor, submits this *Disclosure Statement* (the "**Disclosure Statement**") for solicitation of acceptances and rejections of the *Plan of Adjustment* [Dkt #50] filed on June 7, 2026 (the "**Plan**"). Capitalized terms used and not otherwise specifically defined herein shall have the meaning ascribed to them in the Plan.

## I.   INTRODUCTION

The purpose of a Disclosure Statement is to set forth information (1) regarding the background of the Debtors and their businesses and the procedural history of these chapter 9 Case; (2) concerning the Plan; (3) advising the holders of Claims of their rights under the Plan; (4) assisting the holders of Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan; (5) providing rules and instructions for completing ballots and casting of votes on the Plan; and (6) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

No representations concerning GLH or the Plan, other than as set forth in this Disclosure Statement. Any representations or inducement made to secure your acceptance of the Plan that are other than as set forth in this Disclosure Statement should not be relied upon by you in arriving at your decision.

Accompanying this Disclosure Statement are the following (collectively, with the Disclosure Statement, the "**Solicitation Package**")[1]:

- the Plan (with Exhibits), attached hereto as Exhibit 1;

- the Procedures Order and Combined Notice, attached hereto as Exhibit 2; and

- Ballots for members of the voting classes.

---

[1] A Plan Supplement comprised of any additional materials not otherwise included or to be provided later, modifications or revisions to any of the documents included, or any other documents or information deemed by GLH to be necessary or beneficial for inclusion, shall be filed by the date set in the Procedures Order.

Article 1 of the Plan contains definitions of certain terms.  Where those capitalized terms are used in this Disclosure Statement, they have the meaning set forth in Article 1 of the Plan.  Those defined terms are very important to fully understand this Disclosure Statement.

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY.  HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

### A.      Procedures Order and Combined Notice

By entry of the Procedures Order, a copy of which together with the Combined Notice is attached hereto as Exhibit 2, the Bankruptcy Court conditionally approved this Disclosure Statement, in accordance with § 1125 of the Bankruptcy Code, for consideration of approval as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against GLH, to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes on the Plan. Final approval of the Disclosure Statement will be considered simultaneously with Confirmation of the Plan as provided in the Combined Notice.  The Procedures Order also establishes the following dates and deadlines:

- the deadline for filing objections to the adequacy of the Disclosure Statement;

- the deadline for filing objections to the Plan;

- the deadline for filing objections to assumption of Executory Contracts and Unexpired Leases;

- the deadline for voting on the Plan; and

- the date on which a final hearing on Confirmation of the Plan will be held.

**CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and § 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims should not rely on any information relating to GLH other than that contained in this Disclosure Statement, the Plan and all exhibits to either.

### B.      Voting on the Plan

Pursuant to the provisions of the Bankruptcy Code, only classes of claims s that are (i) "impaired" by a plan, and (ii) entitled to receive a distribution under such a plan are entitled to vote on the plan.  If you are entitled to vote to accept or reject the Plan (*see* Article III of this Disclosure Statement), accompanying this Disclosure Statement should be the Ballot for casting your vote on the Plan and instructions for return of the Ballot to the Voting Agent.  BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

GLH RECOMMENDS THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN. GLH believes that the prompt confirmation and implementation of the Plan is in the best interests of the estates, all holders of Claims and all persons who may be affected by the confirmation or denial of the confirmation of the Plan.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY GLH AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY GLH. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY, IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.**

**THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THEN THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.[2] ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD CAREFULLY READ AND CONSIDER FULLY THE ENTIRE DISCLOSURE STATEMENT AND PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

Most of the historic and current financial and other information contained in this Disclosure Statement has been derived from GLH, GLH's books and records, or other filings made or information obtained in this Case. GLH believes the information to be correct; however, it has not been independently verified in every instance, nor has it been subjected to a certified audit.

## II. BACKGROUND AND SIGNIFICANT EVENTS IN THE CASES

### A. GLH History of Operations and Events Leading to Bankruptcy

1. *Hospital History.*

GLH was established in 1906 through the efforts of the King's Daughter's Circle, Leflore County and the City of Greenwood. The hospital was relocated to a River Road location in 1918 and expanded in 1936. The hospital was relocated a second time to its current location at 1401 River Road in 1952 and was operating 133 beds. GLH has been providing medical services to nearby communities for the past 120 years. GLH's primary service area covers five counties, including Leflore, Carroll, Montgomery, Sunflower, and Holmes in the Central Mississippi Delta.

---

[2] This Disclosure Statement may not be relied upon by any person for any purpose other than by holders of Claims entitled to vote for the purpose of determining whether to vote to accept or reject the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving GLH or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on GLH the holders of Claims.

Expansions in 1969 and 1975, brought the beds in service to 230 with an ICU, inpatient and outpatient services, maternity, emergency room, laboratory, pharmacy, radiology, cardiopulmonary, physical therapy services and several areas of surgical care (including general surgery, orthopedic surgery, neurosurgery, vascular surgery, gastroenterology and obstetrics and gynecology).  An expansion in 1985 included new surgical suites and room renovations.  The last renovation was completed in 2000 and included expanded outpatient services and procedure rooms for endoscopy and cystoscopy.  In addition to the main hospital facility, GLH owns 12 clinic buildings, 7 vacant lots, and 1 business center. GLH also operates a Wellness Center for local residents since 1999.

GLH is managed by the Board of Commissioners consisting of five (5) members. Two (2) members are appointed by the County, two (2) are appointed by the City, and one (1) is appointed jointly by the County and City.

2. *Conditions Causing Financial Distress*

Prior to the COVID-19 pandemic, GLH had sufficient cash reserves and had a strategic plan to invest in new or expanded services and capital projects.  When the pandemic arrived, GLH maintained its services and doubled the number of ICU beds allowing it to serve as a Level III facility which authorized GLH provide access to patients from any region of the state.  During this time, GLH utilized existing cash reserves, along with federal and state grants and Medicare Advance Payment ("**MAP**") loans, to fund operations through the initial, Delta and Omicron waves of the virus.

By September 2022, GLH had seriously depleted its cash reserves and were indebted to Centers for Medicare & Medicaid Services ("**CMS**") under $16,500,000 in MAP loans obtained during the pandemic. In response, GLH closed its labor and delivery unit due to labor shortage and increased specialized labor costs.   GLH  sought  designation  as  a  Critical  Access  Hospital  which  would  allow  GLH  increased reimbursements.  CMS denied GLH this status, and its appeal was also unsuccessful.  GLH later applied to CMS for designation as a newly formed Rural Community Hospital Demonstration ("**RCHD**"), which request was granted.  This designation allowed GLH to begin receiving increased reimbursements in fall of 2025, but a significant portion of higher skilled care payments would not be expected until late in calendar year 2026.

During 2023 and 2024, GLH's owners provided a combined $11.4 million of capital in the form of cash, utilities and a $7.5 million working capital line of credit.  During State Fiscal Year ("**SFY**") 2024, GLH received an increase in the annual amount of Medicaid supplemental payments for a total annual amount of $21.1 million. Without this funding, GLH would have been unable to continue operations.  GLH also sold unused capital assets which generated $3.6 million of proceeds which were also used to support operations.  These measures provided much-needed liquidity to sustain GLH and its ability to continue providing the level of care it historically provided to the Delta region. These measures, however, proved to be temporary and non-recurring remedies.

The Division of Medicaid ("**DOM**") reduced the supplemental payments to GLH in SFY 2025 from $21.1 million to $17 million and further reduced these payments to $12 million for SFY 2026. Coupled with worsening reductions in revenues, in June 2025, DOM issued a recoupment demand of $5.5 million for overpayments made in SFY 2024 which would be repaid as dollar-for-dollar reductions in Medicaid supplemental payments made in the following SFY. DOM has advised but has not formally demanded additional recoupments for SFY2025 in the amount of $1.8 million. These Medicaid supplemental payments constitute a substantial portion of GLH's annual operating revenues.

In June when the SFY 2024 recoupment demand was made, GLH met with DOM and initially agreed to a 90-day stay of recoupments.  GLH provided financial information to support GLH's request to

delay recoupments until January 2027 to allow for the increased revenues expected from the RCHD designation to be collected. DOM began recoupments of $1.1 million later in June. In September, DOM recouped another $900,000 and announced future scheduled quarterly recoupments of $900,000 to begin in December. DOM, however, only recouped $447,000 in December.

The impact of DOM's reduction in payments and its recoupment activities has left GLH with insufficient operating cash to sustain long-term viability. GLH has only remained viable since that time due to extraordinary, one-time infusions of cash described above. Furthermore, GLH's revenues have continued to dramatically decrease. Ultimately, as described more fully in this Disclosure Statement, GLH has no means to pay its debts as they come due prospectively. This is true even with imposition of an automatic stay and accounting for the continued stay of recoupments by DOM.

### 3.    *Litigation with Mississippi Department of Medicaid*

Due to the unfortunate series of events with DOM discussed above, GLH filed an appeal to DOM's Office of Appeals on October 9, 2025, seeking an administrative hearing on the rejection of GLH's proposed recoupment scheduled. On October 29, 2025, DOM denied GLH's appeal for an administrative hearing. On November 10, 2025, GLH filed an appeal to the Chancery Court for the First Judicial District of Hinds County seeking to reverse DOM's denial of its request for administrative hearing. GLH also sought a stay of DOM's recoupments during the pendency of the appeal because the recoupment schedule being applied by DOM, which is the basis for the requested administrative hearing, was about to cause the permanent closure of GLH. On March 11, 2026, the Chancery Court granted GLH's emergency request and ordered that all recoupments be stayed pending a final appeal decision as to whether GLH was entitled to an administrative hearing.

After the Petition Date, DOM removed GLH's appeal to the Hinds County Chancery Court to the United States District Court for the Southern District of Mississippi. GLH believes the removal is statutorily prohibited and that no federal jurisdiction exists to permit valid removal of the DOM Litigation.

### B.    Negotiations with UMMC

Over the course of the last several years, GLH and UMMC have explored potential transactions and operating relationships intended to preserve and improve access to hospital services in the Mississippi Delta. Earlier discussions did not result in a completed transaction, but, during 2025, the parties resumed negotiations in light of GLH's continuing financial distress and the need for a broader operational solution. Those negotiations ultimately resulted in the Contribution and Asset Transfer Agreement and the Escrow Agreement that form the basis of the UMMC Transaction contemplated by this Plan.

### III.    SUMMARY OF THE PLAN

The following summary and the other descriptions in the Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is attached hereto as Exhibit 1. It is urged that each holder of a Claim carefully review the terms of the Plan. In the event of any inconsistency between the provisions of the Plan and the summary contained in this Disclosure Statement, the terms of the Plan shall control.

In general, a Chapter 9 plan (i) divides claims into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to confirm the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified, rather than classification as "creditors" and "shareholders," because such entities may hold claims or equity interests in more than one

class.  For purposes of this Disclosure Statement, the term "holder" refers to the holder of a Claim in a particular class under the Plan.

A Chapter 9 plan may specify that certain classes of claims are either to be paid in full when the plan becomes effective or are to remain unchanged by the treatment prescribed in the plan.  Such classes are referred to as "unimpaired," and because of such favorable treatment, the holders in such classes are deemed to accept the plan and are not entitled to vote.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A Chapter 9 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.

### A.    GLH Assets

GLH believes that the properties and assets available to fund the Plan will be sufficient to satisfy the actions and obligations required of it hereunder.  These assets are described more particularly below, but GLH believes it will have or be able to collect up to $7,000,000 to fund its performance of the Plan.  As discussed more fully below, such amounts should be sufficient to fund Post-Closing Expenses through closure of this Case.

#### 1.    *Cash*

GLH presently holds approximately $250,000 in operating Cash but expects to continue to receive and spend funds in the normal course of operations.  GLH expects that sufficient amounts will exist for payment on the Effective Date of all amounts required under the Plan.  Future collections through the Effective Date and resulting Cash on hand at that time will be used to pay amounts payable on the Effective Date, for Post-Closing Expenses and to fund the Escrow Account.

#### 2.    *Other Assets*

Other assets which will remain property of GLH from and after the Effective Date include real and personal property assets not transferred to UMMC (defined in the UMMC Transaction as "Excluded Assets").  "Excluded Real Property" is property owned by the City and/or County the GLH estimates will realize $500,000 net Cash upon liquidation.  These properties will be contributed under the Plan for liquidation and distribution to holders of Allowed Claims under the Plan and in accordance with the Contribution Agreement and Escrow Agreement.  Net Cash received from the sale of these properties will not constitute Escrow Funds and shall remain property of GLH. "Excluded Receivables" likewise remain property of GLH, but collections of Excluded Receivables and other qualifying Excluded Asset proceeds must be handled and deposited as required by the Escrow Agreement. By contrast, Transferred Cost Report Settlement Rights and other amounts expressly transferred to UMMC under the Contribution Agreement are not Excluded Assets, Excluded Receivables, or Escrow Funds and must be remitted directly to UMMC. GLH estimates current accounts receivable constituting Excluded Receivables to be approximately $6,500,000 and remain subject to GLH's efforts to enforce and collect.

GLH may hold other intangible assets of value, including Causes of Action whether known or unknown, contractual and other rights of recovery, and the authority to object to Claims.  Causes of Action will include all Bankruptcy rights and Causes of Action arising under Chapter 5 of the Bankruptcy Code.  Unless specifically abandoned by GLH prior to the Effective Date, all such rights in intangible assets and other rights of recovery are preserved.

**B.**      **Debtors' Liabilities and Claims Asserted**

GLH has no bank or bond indebtedness. GLH's indebtedness is largely owed to holders of Unsecured Claims and parties to Executory Contracts and Unexpired Leases.  GLH estimates that it owes approximately $10,500,000 to suppliers and vendors. This amount does not include any excess amounts that may be asserted by Tort Claims or Pension Claims against GLH that will be discharged as Class 2 and Class 3 Claims in the Plan.  Rejection Claims are expected to be substantial but are presently unknown and not quantifiable by GLH.

Mississippi Department of Medicaid ("DOM") asserts rights of recoupment in excess of $7,800,000 under its contract with GLH.  Any obligation, recoupment, overpayment, offset, repayment, audit liability, cost report liability, or other reimbursement liability attributable to periods, services, reports, filings, acts, omissions, facts, circumstances, or payment periods occurring on or before Closing is treated under the Contribution Agreement as an Excluded Liability, except only to the limited extent expressly assumed by UMMC under the Contribution Agreement, imposed on UMMC by operation of law, or separately negotiated in writing by UMMC with the applicable Governmental Authority, and is subject to the escrow and other protections provided in the Contribution Agreement, Escrow Agreement, Plan, and Confirmation Order.

**C.**      **Classification of Claims**

The Plan divides the Claims against GLH into the following classes:

| Class | Consolidated Debtors Claims/Interests | Status | Voting Rights |
|---|---|---|---|
| Unclassified | Administrative Claims | | Not entitled to vote |
| 1 | Convenience Claims | Impaired | Entitled to vote |
| 2 | Pension Claims | Impaired | Not entitled to vote |
| 3 | Tort Claims | Impaired | Some entitled to vote |
| 4 | Unsecured Claims | Impaired | Entitled to vote |

**D.**      **Treatment of Unclassified Claims**

1.      *Administrative Claims*

Administrative Claims are expected to consist of Professional fees and other post-petition payables not otherwise paid in the ordinary course of business prior to the Effective Date (or as they would become due and payable thereafter).

a.      <u>Administrative Bar Date</u>.

GLH will request that the Confirmation Order establish the date that is thirty (30) days after the Effective Date as the Administrative Bar Date.  Requests for allowance of Administrative Claims must be filed by this date or will be barred.  GLH will not be able to estimate the number or aggregate dollar amount of Administrative Claims until passage of the Administrative Bar Date.

b.      <u>Professional Fees</u>.

Professionals will hold Allowed Administrative Claims for unpaid fees and expenses incurred through the Effective Date.  All Professionals holding a Claim for unpaid fees and expenses for services shall have filed, within five (5) days prior to the Confirmation Hearing, a declaration stating all amounts

paid or to be paid by GLH.  Unpaid compensation and expenses shall be paid on the Effective Date if GLH determines them to be reasonable, failing in which such declaration shall serve as request for Allowance of an Administrative Claim to which GLH may object and have resolved by the Court.

GLH estimates that as of the Effective Date, Allowed and unpaid Claims of Professionals will be approximately $100,000.

### E.        Treatment of Classified Claims

#### 1.        *Class 1:  Convenience Claims*

Class 1 consists of Convenience Claims and shall have a maximum amount of $50,000 in Cash available to pay holders of such Claims.  Class 1 Claims will consist of holders of Allowed Unsecured Claims (a) equal to or less than $5,000, or (b) of a greater amount but which the holder elects to reduce to $5,000 to participate in Class 1 and be treated as a Convenience Claim.  Convenience Claims shall be entitled to receive either (i) 10% of the face amount of the Allowed Claim, or (ii) if the aggregate amount distributable to Class 1 Claims exceeds $50,000, their *pro rata* share of 10% of the Convenience Claim of the $50,000, which shall be paid in Cash on the Effective Date.  If the holder of an Allowed Unsecured Claim otherwise classified as a Class 4 Claim elects on its Ballot to reduce its Claim and to be treated as a Class 1 Claim, then such election shall also constitute the holder's vote in favor of the Plan.

Class 1 is Impaired and entitled to vote to accept or reject the Plan.

#### 2.        *Class 2:  Pension Claims*

Class 2 consists of former and current employees of GLH that are valid participants in the Pension Plan.  Such participants include (a) approximately 500 former employees who are vested under the Pension Plan and are receiving distributions thereunder, and (b) approximately 584 former and 122 current employees who are not yet vested and/or eligible to receive distributions.

The Pension Plan was formed in 1974 and has been amended and restated thereafter.  In March 2012, eligibility for the Pension Plan was closed to new participants. In May 2025, the Board of Commissioners voted to terminate further funding of the Pension Plan.  Presently, $36,000,000 is held in the Pension Plan, which fund is held, invested and managed by the Regions Bank trust department where they will remain.  Based on current estimates and actuarial assessments, the Pension Plan is 78% funded. After the Effective Date if the Plan is confirmed, the Pension Plan will terminate by its own terms.

Under the Plan, the holders of Class 2 Pension Claims will be entitled to receive payments as, when and to the extent qualified and permitted as provided under the Pension Plan. GLH expects this process to take at least twelve (12) months, and determinations as to distributions to participants will be subject to approval by the Pension Plan's actuaries and the Internal Revenue Service.  All participants will be notified of any proposed action relating to their benefits under the Pension Plan. GLH will continue to operate and administer the Pension Plan after the Effective Date.

The sole recourse for payment of Class 2 Claims shall be payments under the Pension Plan.  Any Allowed amounts that may be claimed or owed to Holders of Class 2 Claims after exhausting their rights to payment under the Pension Plan shall be deemed waived and relinquished, and such holders will be precluded from asserting any further Claim against GLH or its assets or properties under the Plan.

Class 2 is Impaired.  Class 2 Claims shall be paid solely from trust fund assets held in the Pension Plan but shall receive nothing from GLH under the Plan, so Class 2 is deemed to reject the Plan.

3.      *Class 3: Tort Claims*

Class 3 consists of Tort Claims asserted against GLH or that may accrue before the Effective Date but are not yet known to exist.

GLH is self-insured and, as a political subdivision of the state, is thus required under § 11-46-17(3) of the Mississippi Code, to establish and maintain a liability coverage plan subject to the annual approval of the Mississippi Tort Claims Board as to the sufficiency of funding reserves and estimation of the claims. Approval is dependent upon GLH setting aside funds to pay liability claims based upon the Allocated Loss Adjustment Expenses estimated by GLH to be necessary to pay claims.  Review and approval by the Mississippi Tort Claims Board is required on an annual basis, and GLH has always obtained its Certificate of Coverage for its liability plan.  The Tort Claim Reserves serve to satisfy GLH's statutory obligations.

 GLH has engaged a qualified plan administrator to assist with the maintenance and administration of the Tort Claim Reserves. As part of the actions to be taken under the Plan, GLH expects to contract with a qualified insurer to assume liability for all current and future Tort Claims, in which case the Tort Claim Reserves will be dissolved and terminated in exchange for a typical third-party insured arrangement.  As with the current arrangement under the Tort Claim Reserves, the third-party insurer will administer all claims and bear all costs of defense, including legal fees, for defending Tort Claims.  GLH expects no prejudice to or adverse effects upon the rights or ability of holders to assert or collect on their Allowed Tort Claims.

Under the Plan, the holders of Class 3 Tort Claims will be granted immediate relief from the automatic stay by operation of the Confirmation Order to permit such holders to liquidate their Tort Claims. The sole recourse for payment of any amount on an Allowed Tort Claim shall be that recoverable from the Tort Claim Reserves. Any Allowed amounts owed to Holders of Class 3 Tort Claims after exhausting their rights to payment from the Tort Claim Reserves shall be deemed waived and relinquished, and such holders will be precluded from asserting any Claim against GLH or its assets or properties under the Plan.

Class 3 Tort Claims are Impaired under the Plan. Class 3 Claims that were not fully liquidated prior to the Petition Date are Disputed Claims, and holders of such Tort Claims are not entitled to vote on the Plan.  Class 3 Claims fully liquidated and resolved prior to the Petition Date shall be entitled to vote on the Plan.

4.      *Class 4: Unsecured Claims*

Class 4 consists of Unsecured Claims that are not classified as Convenience Claims, Pension Claims or Tort Claims.  Holders of Class 4 Claims may elect to be treated as Class 1 Convenience Claims by making the election on their Ballot. If the holder of an Allowed Unsecured Claim otherwise classified as a Class 4 Claim elects on its Ballot to reduce its Claim and to be treated as a Class 1 Claim, then such election shall also constitute the holder's vote in favor of the Plan as a Class 1 Convenience Claim.  If such election is made, such electing holder shall not be entitled to vote in Class 4.

Each holder of an Allowed Class 4 Claim shall receive its *pro rata* share of Cash realized from the collection and liquidation of assets and properties by GLH after the Effective Date.  Distributions shall first be made of net Cash realized from the disposition of the "Excluded Real Property" as defined in the UMMC Transaction.  Class 4 Claims shall be entitled to their *pro rata* share of such amounts.  Upon expiration or termination of the Escrow Agreement, and to the extent of any remaining Escrow Funds in the Escrow Account at such time, Class 4 Claims shall also be entitled to their *pro rata* share of such amounts. Distributions shall be made in such times and amounts as determined by GLH.

Class 4 is Impaired and entitled to vote to accept or reject the Plan.

## IV. DESCRIPTION OF PLAN

### A. UMMC Transaction

Under the Contribution Agreement, GLH, the City, and the County will transfer specified hospital assets to UMMC on the Effective Date, including designated real and personal property, inventory, selected contracts and leases, designated provider agreement rights to the extent permitted by law, certain post-Closing reimbursement rights, and specified cost report settlement rights. In exchange, UMMC will assume only the limited liabilities expressly identified in the Contribution Agreement. All other liabilities of GLH and the Transferor parties, including retained operational, reimbursement, cost report, employment, and other pre-Closing liabilities, remain excluded liabilities and are not assumed by UMMC.

The Contribution Agreement further provides that the UMMC Transaction shall occur only pursuant to the Confirmation Order and that the transferred assets shall vest in UMMC free and clear of claims, liens, interests, and liabilities, other than permitted liens and the specifically assumed liabilities pursuant to § 363 of the Bankruptcy Code. The transaction documents are intended to ensure that UMMC is not deemed a successor to GLH or any other Transferor party and has no responsibility for excluded liabilities, except to the limited extent expressly set forth in the Contribution Agreement. The Plan and Confirmation Order are intended to implement and enforce those protections.

To support those retained obligations, the Escrow Agreement requires the establishment of an escrow account for the sole benefit of UMMC to secure payment and reimbursement of excluded liabilities affecting UMMC. The Escrow Account is to be funded from specified proceeds of excluded assets other than "Excluded Real Property," including cash on hand, collections of excluded receivables, and other qualifying liquidation proceeds, all as more particularly provided in the Escrow Agreement and the Contribution Agreement. Following the Effective Date, GLH will continue to administer its remaining affairs, including retained assets and liabilities, post-Closing billing and collection responsibilities, and required escrow funding, in accordance with this Plan and the transaction documents. In the event of any inconsistency, the terms of the Contribution Agreement and the Escrow Agreement shall control.

Notwithstanding any description of the UMMC Transaction in this Disclosure Statement or the Plan, UMMC shall have no obligation to close the UMMC Transaction unless and until all conditions to UMMC's obligations under the Contribution Agreement have been satisfied or waived in writing by UMMC, and all UMMC termination, consent, approval, designation, and discretion rights under the Contribution Agreement are expressly preserved.

### B. GLH Administration of Plan

#### 1. *Collection and Liquidation of Assets and Properties*

The assets and properties available to fund the Plan consist of Cash, accounts receivable and other intangible rights of payment, the "Excluded Real Property," and any Causes of Action. These assets are quantified in Article III, Section A, above.

#### 2. *Funding of Post-Closing Budget and Escrow Account*

GLH describes in Section 6.3 of the Plan the administrative and operational tasks that will be required of it to perform the Plan. GLH has prepared a Post-Closing Budget that quantifies its estimates the costs to accomplish all such necessary tasks. These Post-Closing Expenses will be limited to $1,750,000

except to the extent that additional expenses are deemed necessary and approved by UMMC under the Escrow Agreement.  The Post-Closing Budget is attached hereto as Exhibit 3.

As provided in the Escrow Agreement and discussed in Section IV.A, above, GLH will establish and fund the Escrow Account with all net Cash subject to GLH's ability to use available Cash to fund its obligations under the Plan and to pay Post-Closing Expenses.  GLH and UMMC will mutually agree to approval, modification and management of the Post-Closing Budget and the handling of funds necessary to perform the Plan and to comply with the Escrow Agreement.

### 3.      *Post-Closing Administration*

GLH will continue its corporate existence and will be managed by the Board of Commissioners, each of whom will continue to serve and govern in accordance with GLH's by-laws.  In order to perform the Plan from and after the Effective Date, GLH will administer its affairs in keeping with the Post-Closing Budget to address the tasks required or necessary to transition services to UMMC, to transition liabilities and employee benefits to third-parties, to conduct audits and cost share reports as required by law, locate employees to facilitate their noticing and participation in the Pension Plan in connection with termination of the Pension Plan, and related financial and corporate matters required throughout the process.

GLH will continue to employ persons necessary to accomplish these tasks.  Initially, GLH expects to retain two (2) senior management persons and forty (40) administrative employees. These people will be employed on such terms as are determined by senior management and/or the Board of Commissioners. From time to time, GLH will gradually reduce the number of employees that will be required to fulfill these tasks.

### 4.      *Distributions to Creditors*

When Cash is available and both available and permitted to be distributed under the Plan, the Escrow Agreement, the Post-Confirmation Budget or any applicable agreement or order, GLH may make distributions to holders of Allowed Claims.  GLH will make determine whether and when to make distributions in its sole discretion based on the economics and efficiencies affecting GLH.  GLH expects that distributions not otherwise required to be made on the Effective Date will be made to Allowed Class 4 Claims (a) upon liquidation of the "Excluded Real Property" and (b) upon expiration or termination of the Escrow Account.

Claimants may be required to provide certain information to GLH (Social Security number, Federal Tax I.D. number, etc.) and to complete a Form W-4, Form W-9 or other form or document in order to receive a distribution.  GLH shall be entitled to make written demand on a claimant to provide such information as is necessary to complete such forms or to meet other requirements prior to making a distribution.  If a claimant fails to provide the requested information within ninety (90) days, such Claim shall be barred and all right to payment thereunder shall be deemed waived.

Any funds remaining after diligent efforts to effect delivery of distributions to the holder of any Allowed Claim have failed shall escheat to the City and County to share equally.

### C.      Claims Administration

### 1.      *Allowance of Claims*

GLH shall determine whether and to what extent a Claim is Allowed subject to the provisions for resolution of objections to Claims as described below and in Section 8.3 of the Plan.

2.      *Objections to Claims*

GLH may file with the Bankruptcy Court an objection to any Claim.  The Bankruptcy Court shall determine the amount of any Disputed Claim, unless GLH stipulates as to its amount, or withdraw, compromise, settle or dismiss the objection to the Disputed Claim prior to the determination by the Bankruptcy Court.  GLH shall retain all defenses and any right of setoff under § 553 of the Bankruptcy Code or otherwise and shall be entitled to assert any such rights in connection with any Claim objection or to the amount of Allowance of any Claim.

3.      *Tort Claims*

As provided in the Plan, all Tort Claims are Disputed Claims, unless and until they are Allowed, and no objection thereto shall be required to have been filed by GLH.  The holder of a Tort Claim will be granted relief from the automatic stay to pursue its Claim in the appropriate forum or jurisdiction to the extent of recovery from the Tort Claim Reserves.  Any residual Claim amount shall be deemed waived.  Upon liquidation to final judgment or settlement, such Tort Claim shall become an Allowed Unsecured Claim in the liquidated amount, subject to payment thereof as provided in the Plan.

4.      *Disallowed Claims*

In the event GLH holds or has asserted a Cause of Action under Chapter 5 of the Bankruptcy Code against the holder of a Claim, then such Claim shall be deemed disallowed pursuant to § 502(d) of the Bankruptcy Code.  Consequently, the holders of such Claims may not vote to accept or reject the Plan until the Cause of Action against the holder of such Claim has been settled or adjudicated by the Bankruptcy Court and any amounts payable to GLH have been received.

5.      *Estimated Claims*

GLH may estimate the Allowed amount of any contingent or Disputed Claim under § 502(d) of the Bankruptcy Code for any purposes other than for voting (*see* Section VI.B, below).

6.      *No Interest*

Except as expressly stated in the Plan or otherwise allowed by Final Order of the Bankruptcy Court, no holder of an Allowed Claim will be entitled to recover interest from and after the Petition Date or any other penalties, assessments or late charges on account of such Claim for any purpose.

7.      *Modification of Payment Terms*

GLH shall have the right to modify the treatment of any Allowed Claim, as provided in Bankruptcy Code § 1123(a)(4), at any time after the Effective Date, upon the consent of the holder of such Allowed Claim.

**D.      Executory Contracts and Unexpired Leases**

1.      *Assumption*

GLH has identified in Schedule 9.1 to the Plan the Executory Contracts and Unexpired Leases it will assume under the Plan.  UMMC has identified in Schedule 9.1 the Executory Contracts and Unexpired Leases GLH will assume and assign to UMMC under the UMMC Transaction. In connection with such assumptions and assignments, GLH and UMMC, as applicable, will take all actions necessary to satisfy the requirements of § 365 of the Bankruptcy Code with respect to such Executory Contracts and Unexpired Leases.  At the present time, all the Executory Contracts and Unexpired Leases shown on Schedule 9.1 to the Plan are intended to be assumed by GLH, and GLH will pay the cure amounts identified on Schedule 9.1 to the Plan.  Similarly, as to those Executory Contracts and Unexpired Leases identified by UMMC to be assumed and assigned, UMMC will cure or make arrangements for repayment terms and conditions as may be mutually agreed with those respective counterparties. The assumptions and assignments shall occur under the Plan and without the filing of any additional motion.  Schedule 9.1 may be amended by GLH and UMMC, as applicable, prior to the Confirmation Hearing.

2.      *Rejection*

Pursuant to the Plan, any Executory Contract or Unexpired Lease not previously assumed or rejected by an Order of the Bankruptcy Court during the pendency of these Cases, or otherwise expressly assumed in the Plan, shall be deemed rejected upon entry of the Confirmation Order.  Any Rejection Claim arising as a result of rejection of an Executory Contract or Unexpired Lease by virtue of the entry of the Confirmation Order shall be filed on or before thirty (30) days from the Effective Date.  Any Rejection Claim not timely filed shall be deemed waived without further action by GLH.  If any Rejection Claim becomes an Allowed Claim, it shall be treated as an Unsecured Claim under Class 4.

**E.      Post-Effective Date Governance**

1.      *Corporate Existence*

GLH shall continue its corporate existence as a community hospital under § 41-13-10, *et seq.*, of the Mississippi Code for purposes of performing the Plan and administering its assets and affairs until this Case is closed and it can be dissolved.  Such determinations will be made by the Board of Commissioners who shall continue to manage the affairs of GLH pursuant to its corporate charter and by-laws.  All members of the Board of Commissioners shall continue to serve in such capacities from and after the Effective Date.

2.      *Employment of Management and Personnel*

GLH shall continue its operations after the Effective Date under what GLH expects to be two (2) senior management persons and approximately forty (40) administrative employees. Until UMMC determines who it intends to employ upon assumption of hospital operations, such determinations cannot be made by GLH.  Other persons may be employed at the direction of GLH senior management under such terms and for such purposes as may be deemed necessary for GLH to carry out the Plan.  Professionals and other third-parties may be engaged as and when deemed necessary or desirable in the carrying out of the tasks required to perform the Plan.

3.      *Case Closing*

GLH will close this Case at such time as the Plan is fully performed or such other time as may be deemed necessary and appropriate.

### V.      FINANCIAL MATTERS UNDER THE PLAN

### A.      Plan is Best Financial Alternative

The founding mission and purpose of GLH is to provide quality healthcare to the residents of Leflore County and the surrounding areas of the Delta.  The UMMC Transaction presents the only viable option to ensure continuity of readily available healthcare to these residents. GLH currently provides access to diagnostic and outpatient treatments for emergency care, cancer care, radiology, laboratory and pharmacy services. GLH's emergency room is staffed 24 hours a day with emergency medicine physicians and is the only hospital in the five-county service area with 24-hour on-site physicians.  Preservation of similar levels of care is of utmost importance.

The economic and regulatory headwinds adversely affecting all community hospitals are insurmountable impediments that in the judgment of the Board of Commissioners and senior management of GLH, make GLH's long-term viability unsustainable. *See* Section C, below.  As a substantial and financially sound institution that shares the mission of ensuring quality healthcare to residents of Mississippi, UMMC is the only possible successor that can continue providing a similar level of services and that has the operational and financial strength to ensure continuation of operations and long-term viability.

For these reasons, GLH believes that the UMMC Transaction serves as the lynchpin of the Plan which provides the best alternative for all stakeholders.  Financially, the prospect of effective and efficient performance of the Plan provides holders of Allowed Claims with a greater likelihood of recovery than they would receive if operations cease and the UMMC Transaction was not undertaken.

### B.      Risks Potentially Affecting Plan Performance

1.      *Sale of Property; Realization on Assets*

Consummation of the UMMC Transaction is not assured. Under the Contribution Agreement, UMMC's obligation to close remains subject to satisfaction or waiver by UMMC of all closing conditions, and UMMC may terminate the Contribution Agreement at any time before Closing, in its sole and absolute discretion, for any reason or no reason. Accordingly, confirmation of the Plan, approval of this Disclosure Statement, solicitation of votes, or entry of the Confirmation Order will not require UMMC to close or waive any right, condition, protection, or termination right under the Contribution Agreement. If UMMC does not close, GLH may be unable to consummate the Plan as proposed.

Generally, the material uncertainties and risk factors regarding GLH's performance of the Plan relate to the timing, efficiency and success in collecting and liquidating assets and properties.  Collection of accounts receivable after primary operations cease can be a protracted and difficult process.  Inherent in the nature of uncertainty associated with liquidation of property and assets is both timing and value.  GLH will move as expeditiously as possible, within reason and subject to market determinations, to liquidate property and monetize assets and properties. Projecting an ultimate sale price or value recoverable is not feasible.  These same material uncertainties will exist even if the Plan is not confirmed.

Also, after the Effective Date, GLH will evaluate any Causes of Action and make determinations and cost/benefit analyses as to the viability, costs and expenses of prosecution, likelihood of success and other considerations with respect to assertion, settlement, abandonment or election not to prosecute any Causes of Action.  The projected amounts of recovery based on these Causes of Action are, like any type of litigation, uncertain and inherently unable to be determined.

### 2. *Post-Confirmation Budget Variances*

While GLH has undertaken to thoroughly compile the Post-Confirmation Budget and to identify all post-confirmation actions that will be necessary to administer its affairs through closing of the Case, GLH cannot guarantee the outcome or accuracy of its projections and assumptions.  Increased or unknown Post-Confirmation Expenses will affect how much net Cash is deposited into the Escrow Account and, potentially, available for payment of Allowed Claims.

### 3. *Claim Objections*

Material uncertainties can exist regarding whether and to what extent objections to Claims will be meritorious and reduce the body of Allowed Claims entitled to recovery under the Plan.  Evaluation and determination as to whether pursuit of such objections, or the extent to which such objections result in a net benefit to GLH, will be a determination made by GLH on a case-by-case basis at the appropriate time.

### C. **Consequences if Plan Not Confirmed**

#### 1. *Consequences to GLH*

If the Plan is not confirmed, GLH would be forced to immediately begin the necessary steps to close the hospital.  GLH would expect to deplete operating cash in mid-August. Upon compliance with all notification and statutory requirements to patients, the Mississippi Department of Health, the Division of Licensure and Certification, and the public, GLH would be forced to cease all inpatient, outpatient and clinical services and close the hospital.  All licenses would be surrendered to the Department of Licensure and Certification.

#### 2. *Consequences to City and County*

Aside from the loss of healthcare services, closure of GLH would be disastrous for the local economy.  GLH is one of the largest employers in Leflore County with an annual payroll in excess of $25,000,000 including physicians, hospital and clinic staff.  GLH would be forced to terminate 27 employed and contracted physicians and up to 375 more employees effective with the cessation of services.  These employees constitute an estimated 90% of GLH's annual payroll expenses. GLH will gradually terminate an additional 40 or more employees throughout the estimated 18-month post-confirmation period.  It must be expected that these employees would be forced to relocate to another community to find gainful employment, which renders further adverse effects on vibrancy and future economic health of the City and County.

Additionally, the hospital campus would be unoccupied. UMMC will perform significant deferred maintenance/capital expenditures that are critical to the ongoing integrity of the structure, without which the habitability of the hospital could quickly become jeopardized.  These expenses, if required to be funded by GLH to preserve the basic integrity of the physical plant, would deplete Cash otherwise available and necessary to perform the Plan. *See* Section C.3., below.

- 15 -

3.      *Financial Consequences to Holders of Claims*

There is no currently projected use or prospective occupant for the hospital's main campus. Nevertheless, improvements will be required to be performed to, at minimum, preserve the integrity of the building(s) for any future use.  These expenses are estimated to be $3,500,000 and include repair and/or replacement of outside structures/brick veneer, chiller, HVAC system, and roofs.  Utilities, insurance and security costs would easily exceed $1,000,000 annually to preserve and maintain the physical facility. These expenses would be addressed only if the UMMC Transaction closes and then only in accordance with the express Assumed Liabilities, conditions, and limitations in the Contribution Agreement but would fall to GLH if the Plan is not confirmed.

In addition to the matters constituting Post-Closing Expenses that will be required under the Plan, GLH would under this circumstance retain all additional liabilities to be assumed by UMMC in the UMMC Transaction. Additional liabilities would further dilute any prospect of recovery by the increased number of Claims for such amounts against GLH. For the avoidance of doubt, UMMC is not assuming pre-Closing DOM recoupment obligations, cure costs, cost report liabilities, reimbursement liabilities, Excluded Liabilities, or other GLH obligations except to the limited extent expressly constituting Assumed Liabilities under the Contribution Agreement or otherwise imposed by law or separately agreed in writing by UMMC. GLH estimates that the total costs to properly and effectively wind down the affairs of GLH will exceed $5,000,000.

GLH would be responsible for migration of electronic patient care records to comply with legal and regulatory requirements to preserve them for up to 10 years.  These costs are estimated to reach $350,000.  Additional costs relating to preservation of software systems and licenses, in addition to the personnel, occupancy and related operational costs, would also be incurred by GLH to administer the matters that would otherwise be performed by UMMC under the Plan.

Under no scenario does GLH believe that any variation of such an outcome presents a better result for creditors or the community.  This further supports its belief that the Plan is in the best interests of all creditors and all parties.

## VI.      VOTING PROCEDURES

The Plan cannot be consummated unless it is confirmed by the Bankruptcy Court.  Confirmation of the Plan requires that, among other things, either (i) each class of Claims that is Impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Bankruptcy Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to classes of Claims s that have rejected the Plan.  The Bankruptcy Code also requires that the Confirmation of the Plan be in the best interests of creditors and is feasible. GLH believes that the Plan meets the Confirmation requirements of the Bankruptcy Code.

### A.      Manner of Voting

IT IS IMPORTANT THAT HOLDERS OF CLAIMS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.  All known holders of Claims entitled to vote on the Plan will receive a Ballot contained in the Solicitation Package. <u>Holders should read the Ballot carefully and follow the Voting Instructions and other information contained therein</u>.  In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement.  Additional copies of the Plan, the Disclosure Statement, Procedures Order, or any documents or exhibits relating to solicitation and voting on the Plan may be obtained without charge from counsel for GLH identified above.

- **You are encouraged to complete your Ballot and return an electronically scanned copy** *via* e-mail to counsel for GLH at the following e-mail address:

  Email:   DNOBLE@MMQNLAW.com

- You may also complete your Ballot and return it via First Class U.S. Mail, overnight courier, or hand delivery as follows:

> **If by U.S. Mail, Hand Delivery or Express Courier:**

Douglas C. Noble, MS Bar No. 10526
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile:  (601) 510-2939

Your ballot must be actually received before **5:00 p.m., prevailing central time, on _____, 2026 (the "Voting Deadline").**

ANY BALLOT WHICH IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED AN ACCEPTANCE OF THE PLAN.

## B.      Creditors Eligible to Vote

Subject to the provisions of the Procedures Order, any holder of a Claim as of the Petition Date which has not been disallowed by order of the Bankruptcy Court and is not otherwise a Disputed Claim is entitled to vote to accept or reject the Plan if (i) such Claim is Impaired under the Plan and is not of a Class that is deemed to have accepted or rejected the Plan pursuant to §§ 1126(f) and 1126(g) of the Bankruptcy Code and (ii) such holder has filed a Proof of Claim on or before the applicable Bar Dates.

Unless otherwise permitted in the Plan, the holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim, unless the Bankruptcy Court, upon timely application by such holder in accordance with Bankruptcy Rule 3018(a), temporarily allows such Disputed Claim for the limited purpose of voting to accept or reject the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before fourteen (14) days prior to the Voting Deadline.  A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.      General Procedures for Solicitation and Voting

Pursuant to Bankruptcy Rule 3017(d) and as directed in the Procedures Order, GLH will transmit the Solicitation Packages to all parties entitled to receive it.

### 1.    *Procedures for Non-Voting Classes*

Under the Plan, holders of Claims in Classes 2 and certain holders of Claim in Class 3 are either Disputed and/or are receiving nothing from GLH under the Plan (the "**Non-Voting Parties**").   Under Bankruptcy Code § 1126(f) and (g), the Non-Voting Parities are deemed to have accepted or rejected the Plan, and solicitation of votes from such Classes is not required.   Under the Plan, Class 2 and Disputed Claims in Class 3 are deemed to reject the Plan.   Accordingly, solicitation of votes with respect to these Classes of Claims is not required and holders of Claims in these Classes need not receive Ballots.   GLH will still provide Solicitation Packages to Non-Voting Parties but will not provide a Ballot.

### 2.    *Procedure for Electing Treatment as Class 1 Convenience Claim*

Holders of Allowed Unsecured Claims of $5,000 or less are automatically classified as Class 1 Convenience Claims and are entitled to vote in Class 1.  Holders of Allowed Unsecured Claims in Class 4 greater than $5,000 may elect on their Ballot to reduce their Claim to $5,000 and be treated as a Class 1 Convenience Claim under the Plan. Making this election will constitute a vote in Class 1 in favor of the Plan.

### 3.    *Procedures for Vote Tabulation*

Pursuant to Bankruptcy Rule 3017(c), and as set forth above, Ballots for accepting or rejecting the Plan must be received by GLH by the Voting Deadline in order to be counted. The following general voting procedures and standard assumptions shall be used in tabulating Ballots:

- If a Claim is deemed allowed under the Plan, an order of the Court or a stipulated agreement between the parties, such claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth therein;

- if the holder of a Class 4 Unsecured Claim makes the affirmative election to be treated as a Class 1 Convenience Claim, but also casts a vote on account of its Class 4 Unsecured Claim, such Ballot will be construed and accepted as an election to be treated as a Class 1 Convenience Claim and the vote of its Class 4 Claim shall be disregarded;

- any holder of a Claim entitled to vote that has delivered a valid Ballot may withdraw such Ballot solely in accordance with Bankruptcy Rule 3018(a);

- if a holder casts a Ballot that is properly completed, executed, and timely returned to the Voting gent, but does not indicate either an acceptance or rejection of the Plan, the Ballot shall be deemed a vote to accept the Plan;

- if a holder casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and rejection of the Plan, the Ballot shall not be counted.

Neither GLH nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification.  GLH may, except as otherwise set forth herein, waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline, and any such waivers shall be documented in the vote tabulation certification.

**D.     Acceptance Necessary to Confirm the Plan**

For the Plan to be accepted and thereafter confirmed, it must be accepted by at least one (1) class of Claims that is Impaired by the Plan.  Under § 1126 of the Bankruptcy Code, the Impaired class is deemed to have accepted the Plan if with respect to a class of Claims, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have voted in that class have accepted the Plan; *provided, however,* that the vote of any holder of an Allowed Claim whose acceptance or rejection of the Plan was not made in good faith, as determined by the Court, will not be counted.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE ALL CONTENTS OF THE SOLICITATION PACKAGE FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, USE OF FORM BALLOTS.

**VII.     CONFIRMATION**

**A.     Hearing on Confirmation of the Plan**

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of a plan.  Pursuant to the Procedures Order entered by the Bankruptcy Court, a hearing on confirmation of the Plan will be held on **July_____, at_____Central Time**, before the Honorable Selene Dunn Maddox in the Thad Cochran U.S. Courthouse for the United States Bankruptcy Court for the Northern District of Mississippi, 745 Highway 145 North, Aberdeen, Mississippi 39730 (the "**Confirmation Hearing**").  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the name of the objector, the nature and amount of the Claim held or asserted by the objector against GLH, the basis for the objection and the specific grounds therefor.  **The objection, together with proof of service thereof, must be filed with the Clerk of Court by 5:00 p.m. Central Time on July_____, 2026 ("Objection Deadline"), and served on the following persons by the Objection Deadline**: Counsel for GLH, Douglas C. Noble, dnoble@mmqnlaw.com.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.     Requirements for Confirmation of the Plan**

1.     *Acceptance*

Holders of Claims in Classes 1 and 4 are Impaired and entitled to vote on the Plan, as are holders of fully liquidated Tort Claims in Class 3.  Each class must accept the Plan in order for it to be confirmed without application of the "fair and equitable test" described below to such Class.  As stated above, a Class of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under § 1126(e) of the Bankruptcy Code) that cast votes on the Plan.

2.      *Confirmation without Unanimous Acceptance; Cram Down*

Section 1129(b) of the Bankruptcy Code provides that the Plan may be confirmed by the Court despite not being accepted by every Impaired class if (i) at least one Impaired class of Claims, excluding the claims of insiders, has accepted the Plan; and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable to the rejected classes.  Among other things, such a finding would require a determination by the Court that the Plan provides that no holder of an Allowed Claim junior to the rejecting class will receive or retain property or payment under the Plan until or unless such rejecting class is paid in full.

GLH reserves the right pursuant to Bankruptcy Code § 1129(b) to request the Court to confirm the Plan if all of the applicable requirements of Bankruptcy Code § 1129(a) have been met.  In addition, GLH reserves the right pursuant to Bankruptcy Code § 1126(e) to request the Court to strike any Ballot rejecting the Plan cast by any holder of a Claim which was not cast in good faith.

3.      *Absolute Priority Rule*

The absolute priority rule embodied in § 1129(b)(2) of the Bankruptcy Code provides that the Plan is fair and equitable with respect to a rejecting class if the rejecting class receives (i) payment in full over time with interest or (ii) as long as no class junior to it receives a distribution under the Plan.  GLH believes that the Plan represents the best option available to maximize the return to all creditors.  Furthermore, under the Plan, no inferior class of creditors will receive or retain anything unless the Allowed Claims of all superior classes are paid in full.

4.      *Best Interests of Creditors and Feasibility*

For the reasons explained in Article V, above, the Plan presents the best available option for the interests of creditors as is required under §943(b)(7) of the Bankruptcy Code. Aside from the immeasurable benefits to the community of continuing to provide healthcare to GLH's patient population and preserving hundreds of jobs and the economic benefits that inure to the community, the UMMC Transaction assumes significant liabilities and provides for the ability of GLH to wind down its affairs in the most expeditious manner.  Failure to confirm the Plan or to consummate the UMMC Transaction results in increased liabilities and amounts of Claims asserted against GLH, greater administrative costs and burdens on GLH to liquidate and wind down its affairs, and would likely leave no amounts available for payment of Allowed Claims.

Section 943(b)(7) also requires that the Plan be feasible.  GLH will have available Cash on the Effective Date to satisfy all Administrative Claims and Class 1 Convenience Claims on when Allowed promptly after the Effective Date and to cure all amounts necessary to assume and/or assign all Executory Contracts and Unexpired Leases.  The Post-Closing Budget attached hereto as Exhibit 3 reflects that GLH will collect Cash in the projected amount of $7,000,000, which constitutes sufficient Cash to fund the Post-Closing Expenses necessary to implement the Plan.  Therefore, GLH believes the Plan is feasible and thus confirmable.

5.      *Good Faith*

GLH proposes the Plan and solicits acceptances from holders of Claims in good faith.  The circumstances that have continued to adversely affect GLH have rendered the course of action proposed under the Plan as the best possible outcome for both its creditors and the community interests it exists to serve.  The Board of Commissioners and senior management believe in the exercise of their business judgment that they have formulated and presented the best solution available.

- 20 -

### C.   Effect of Confirmation

Confirmation of the Plan will bind GLH and all holders of Claims, whether or not they accept the Plan.  The distributions provided for in the Plan will be in exchange for and in complete settlement, satisfaction and discharge of all Claims, including any claim arising after the Petition Date.  All holders of Claims shall be precluded from asserting any claim against GLH or its property based upon any transaction or other activity of any kind that occurred prior to the Effective Date.

#### 1.   *General Injunction*

The Plan provides in Section 12.4 for a permanent injunction resulting from confirmation of the Plan against parties holding Claims against GLH which will take effect from and after the Effective Date and states as follows:

**INJUNCTION.  On the Effective Date, All entities or persons that have held, currently hold or may hold any Claim released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against GLH or UMMC any of its respective assets or properties on account of such released Claim: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien, claim or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due UMMC; (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan; and (vi) taking any action to interfere with implementation or consummation of the Plan.**

#### 2.   *Exculpation*

The Plan provides in Section 12.5 for a limited release of claims and causes of action against and exculpation of liability in favor only of GLH for his action while serving in such capacity in these Cases and the Professionals he engaged to fulfill his duties and effect administration of these Cases:

**EXCULPATION.  This Plan does not affect an exculpation or release of any person or entity, save and except the Board of Commissioners, officers and persons employed by GLH during the pendency of these Cases or serving in such capacity as of the Effective Date, GLH, and the Professionals employed by GLH.  Upon the Effective Date, such protected persons shall be released by GLH pursuant to § 1123(b)(3) of the Bankruptcy Code and shall not have or incur any liability to GLH or the estates under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to GLH or the Case, including, but not limited to, (i) formulating, preparing, disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct or gross negligence, and in all respects such protected persons shall be entitled to rely in good faith upon the advice of counsel.**

3.     *Discharge*

GLH shall be entitled to a discharge from all debts upon Confirmation of the Plan.  The Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against GLH, pursuant to §§ 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against GLH at any time, to the extent that such judgment relates to a discharged Claim.  The discharge shall not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by any entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Case.

**D.     Confirmation Order and Plan Control**

To the extent the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, the Plan controls the Disclosure Statement and the Confirmation Order shall control the Plan.

**E.     Immediate Binding Effect and Modification of Plan.**

(a)     Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon GLH and any and all holders of Claims against GLH (regardless of whether such Claims are deemed to have accepted or rejected the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each entity acquiring property under the Plan or the Confirmation Order, and any and all counterparties to Executory Contracts or Unexpired Leases.  All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

(b)     Subject to the limitations contained in the Plan, GLH reserves the right to modify the Plan as to immaterial terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in Bankruptcy Code § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, GLH expressly reserves the right to immaterially alter, amend or modify immaterially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

(c)     Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to Bankruptcy Code § 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**F.     Revocation or Withdrawal**

GLH reserves the right to revoke or withdraw the Plan prior to the Confirmation Date or substantial consummation of the Plan and to file subsequent plans.  If GLH revokes or withdraws the Plan, or if Confirmation or consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of

- 22 -

any Claims; (b) prejudice in any manner the rights of GLH or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by GLH or any other entity.

### G.     Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Mississippi, without giving effect to the principles of conflict of laws thereof.

### VIII.    CONCLUSION AND RECOMMENDATION

GLH believes that the Plan is in the best interests of all holders of Claims and of all other persons who will be affected by the confirmation of the Plan.  GLH urges those holders of Claims allowed to vote hereunder to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be actually received by the Voting Deadline.

THIS the 7th day of June, 2026.

Respectfully submitted,

**GREENWOOD LEFLORE HOSPITAL**

By:   /s/ *Dawne Holmes*

Chief Financial Officer and Interim Chief Executive Officer

Douglas C. Noble, MS Bar No. 10526
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile:  (601) 510-2939
Email:   dnoble@MMQNLaw.com

*Counsel to Greenwood Leflore Hospital*

**Exhibit 1**

Plan of Adjustment

**Exhibit 2**

Procedures Order and Combined Notice

**Exhibit 3**

Post-Closing Budget

[to be provided in Plan Supplement]