**Exhibit 1**

Plan of Adjustment

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| GREENWOOD LEFLORE HOSPITAL | ) | Case No. 26-11337-SDM |
| | ) | Chapter 9 |
| Debtor. | ) | |
| | ) | |

## PLAN OF ADJUSTMENT

This *Plan of Adjustment* (the "**Plan**") dated June 7, 2026, is proposed and submitted by Greenwood Leflore Hospital, a public community hospital (as further defined herein below, "**GLH**").

### INTRODUCTION

GLH proposes this Plan under Chapter 9 of the Bankruptcy Code.  ALL CREDITORS ARE ENCOURAGED TO CONSULT THE ACCOMPANYING DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  NO OTHER SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

### ARTICLE 1.
### Definitions

Unless the context requires otherwise, for purposes of this Plan and any subsequent amendments or modifications hereof, the following words and phrases shall have the meaning set forth below when used in initially-capitalized form, and any term used herein that is defined in the Bankruptcy Code, but not otherwise defined herein, shall have the meaning set forth in the Bankruptcy Code:

1.1.    **"Administrative Claim"** means any indebtedness or obligations incurred or assumed by GLH in connection with administration of this Case or performance of this Plan, any fees and expenses of Professionals payable pursuant to §§ 943(b)(3) and (5) of the Bankruptcy Code, and any other Allowed Claims for actual, necessary costs and expenses asserted under §§ 503(b) and 507(a)(2) that were incurred after the Petition Date in operating the business of GLH.

1.2.    **"Administrative Bar Date"** shall be established in the Confirmation Order as the date that is thirty (30) days after the Effective Date, or such other date as the Court may direct, and such date shall be the deadline by which all request for any unpaid Administrative Claims shall have been asserted.

1

1.3.    **"Allowed Claim"** means a Claim (a) in respect of which a proof of claim has been filed with the Court within the applicable period of limitation fixed by Rule 3003 of the Federal Rules of Bankruptcy Procedure, or filed thereafter with the Court pursuant to a final order, or (b) appears in the books and records of GLH to the extent the same is not listed as disputed, contingent, or unliquidated as to amount, and in either case, as to which no written objection to the allowance thereof has been filed within any applicable period of limitation fixed by Rule 3007 of the Federal Rules of Bankruptcy Procedure, or an order of the Court, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal and as to which no appeal is pending. An Allowed Claim shall not include unmatured or post-petition interest on the principal amount of such Claim, except as specifically provided herein.

1.4.    **"Ballot"** means with respect to any class of Claims that are Impaired and entitled to vote under this Plan, the forms which will be distributed to holders of Claims to be used for showing acceptance or rejection of this Plan.

1.5.    **"Case"** means the above-styled Chapter 9 bankruptcy case of GLH currently pending in the Northern District of Mississippi.

1.6.    **"Cash"** is lawful currency of the United States of America.

1.7.    **"Causes of Action"** means any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, debts, dues, sums of money, accounts, judgments, claims and demands whatsoever of GLH, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, including all Causes of Action and rights to recover money or property under Chapter 5 of the Bankruptcy Code.  Causes of Action shall not include any such rights transferred to or derivative of any rights transferred to UMMC in the UMMC Transaction.

1.8.    **"City"** means the City of Greenwood, Mississippi.

1.9.    **"Claim"** shall have the meaning set forth in Bankruptcy Code § 101(5) with regard to any claim asserted against any of GLH.

1.10.    **"Claimant"** is any holder of a Claim against any of GLH.

1.11.    **"Claim Bar Date"** is the deadline established by the Bankruptcy Court by which a Proof of Claim is required to be filed with the clerk of the Bankruptcy Court by creditors and governmental units.

1.12.    **"Claim Objection Deadline"** is the deadline date by which objections to Claims, including Administrative Claims, shall be filed, said deadline being prior to the date of entry of a Final Decree and the closing of the Case.

1.13.    **"Code"** or **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, and any amendments thereto.

1.14.    **"Confirmation"** shall mean the confirmation and approval of the Plan by the Bankruptcy Court in accordance with § 943 of the Bankruptcy Code after notice and a hearing is held in accordance with Bankruptcy Code § 1128 to consider confirmation of the Plan.

1.15.    **"Confirmation Order"** means the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 9 of the Code, whether or not such order shall have become a Final Order.

1.16.    **"Contribution Agreement"** means the Contribution and Asset Transfer Agreement between and among UMC and GLH, the City and the County that is the principal agreement in the UMMC Transaction.

1.17.    "**Convenience Claim**" is any Claim that is an Unsecured Claim and that is (i) Allowed in an amount of Five Thousand Dollars ($5,000) or less, or (ii) Allowed in an amount greater than Five Thousand Dollars ($5,000) but which is reduced to Five Thousand Dollars ($5,000) by an irrevocable written election of the holder of such Claim made on a properly delivered Ballot.

1.18.    **"County"** means Leflore County, Mississippi.

1.19.    **"Court"** or **"Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of Mississippi in which GLH's Case is pending, and any court having competent jurisdiction to review its orders of or to hear appeals from its decisions.

1.20.    **"Debtor"** shall mean GLH.

1.21.    **"Disallowed"** means any Claim to the extent that it is not yet an Allowed Claim, whether in whole or in part.

1.22.    **"Disclosure Statement"** is the disclosure statement approved by the Court as containing adequate information concerning the Plan, in accordance with Bankruptcy Code § 1125.

1.23.    **"Disputed"** with respect to any Claim is one to which an objection is timely filed, or which is otherwise contested in any manner, until such objection is resolved by Final Order.

1.24.    **"Effective Date"** of the Plan means the date after the entry of the Confirmation Order confirming this Plan that all conditions to the effectiveness of the Plan have been satisfied or waived, or as soon thereafter as is practicable.

1.25.    **"Escrow Account"** means the account into which the Escrow Funds shall be deposited as provided in the Escrow Agreement.

1.26.    **"Escrow Agreement"** means the agreement to be entered into as part of the UMMC Transaction and shall become effective from and after closing.

1.27.    **"Escrow Funds"** means the Cash and other "Liquidation Proceeds" as defined in the Escrow Agreement required to be deposited into the Escrow Account, together with all interest earned thereon.

1.28.    **"Executory Contract"** means any executory contract of any of GLH as such term is used in § 365 of the Bankruptcy Code.

**1.29.    "Final Order"** shall mean an order or judgment of the Court as to which the time to modify, amend, or appeal, petition for certiorari, or seek reargument or rehearing has expired and as to which no modification, amendment, appeal, reargument, certiorari petition, or rehearing is pending, or if such action has been sought, the order of the Court has been affirmed by the highest court to which the

order was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, or the appeal is dismissed or rendered moot, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

1.30.   **"GLH"** shall mean the debtor in this Case, Greenwood Leflore Hospital, a public community hospital formed and existing under § 41-13-10 of the Mississippi Code.  GLH is jointly owned by the City and County and, as a public community hospital, is recognized under Mississippi law as a stand-alone municipal entity separate and apart from its owners.

1.31.   **"Impaired"** means, with regard to any Class of Claims, that the rights of the claimants in such Class are deemed impaired under § 1124 of the Bankruptcy Code.

**1.32.   "Insurance Coverage"** means any insurance coverage under any Insurance Policy which is available for the payment of liability, damages, fees or expenses arising from or related to Tort Claims.

1.33.   **"Pension Plan"** means the GLH Pension Plan instituted October 1, 1974, as thereafter amended and restated.

1.34.   **"Petition Date"** means April 15, 2026, the date GLH filed its petition initiating this Case.

1.35.   **"Plan"** shall mean this Plan, all addenda, exhibits, schedules, releases and other attachments, as may be hereafter amended, modified or altered.

1.36.   **"Post-Confirmation Budget"** means the estimated costs and expenditures that constitute Post-Confirmation Expenses to be formulated and maintained by GLH, as updated and modified, pursuant to which GLH will fund performance of the Plan from and after the Effective Date.  GLH shall provide UMMC with Post-Confirmation Budget for each calendar month and with periodic reconciliations both of which are to be acceptable to UMMC in form, manner of administration and substance.

1.37.   **"Post-Confirmation Expenses"** shall mean all administrative and operational costs incurred by GLH from and after the Effective Date in performing the Plan, administering its remaining affairs, winding down operations and dissolving GLH's corporate existence.  Post-Confirmation Expenses shall be paid from Cash, assets and properties of GLH that constitute "Excluded Assets" as defined in the UMMC Transaction and which shall be reported as provided in the Escrow Agreement. Post-Confirmation Expenses shall be administered and subject to the Post-Confirmation Budget.

1.38.   **"Professional"** means any professional person or organization retained by GLH to provide services in or in connection with this Case.

1.39.   **"*pro rata*"** shall mean in the same proportion that the amount of any Allowed Claim in a class bears to the aggregate amount of all Claims in such class, including in such aggregate amount both the Allowed Claims and any then unresolved Disputed Claims in such class as of the date of any distribution payment pursuant to this Plan.

1.40.   **"Rejection Claim"** is an Unsecured Claim asserted under § 502(g) of the Bankruptcy Code resulting from the rejection of any Executory Contract or Unexpired Lease in accordance with § 365 of the Bankruptcy Code.

1.41.   **"Tort Claim"** is a Claim against any of GLH arising from a private or civil wrong or injury, other than breach of contract.

1.42. **"Tort Claim Reserves"** means the trust fund established and administered by GLH as a self-insured political subdivision under § 11-46-17(3) of the Mississippi Code. Replacement liability insurance coverage provided by any subsequent insurer or insurers that fully assume all of GLH's liabilities upon termination of GLH's self-insured status shall be considered to be Tort Claim Reserves under the Plan.

1.43. **"UMMC"** means the University of Mississippi Medical Center.

1.44. **"UMMC Transaction"** means the transaction between GLH and UMMC as described in Section 6.1, below, to be closed on the Effective Date.

1.45. **"Unexpired Lease"** means any unexpired lease of any of GLH as such term is used in § 365 of the Bankruptcy Code.

1.46. **"Unimpaired"** means, as to any Class of Claims, that the rights of claimants in such Class are not Impaired.

1.47. **"Unsecured Claim"** shall mean any Allowed Claim, other than an Administrative Claim, that arises under any Executory Contract or Unexpired Lease which has been rejected, any deficiency Claim, any Claim of a general trade creditor, and any other obligation, liability or Claim of any kind or nature held against GLH which was incurred on or before the Petition Date.

## ARTICLE 2.
### Plan Summary

The Plan provides for adjustment of GLH's debts by entering into the UMMC Transaction to be closed whereby the hospital operations and facilities will be transferred to UMMC on the Effective Date pursuant to the Contribution Agreement and ancillary agreements, under which only certain expressed assets are transferred to UMMC and certain expressed obligations are assumed by UMMC, in its sole and absolute discretion. Thereafter, GLH will continue the winding down of its affairs, disposing of and collecting remaining assets and properties, funding the Escrow Account as required, resolving all Claims, and ultimately dissolving when all administrative matters are completed.

## ARTICLE 3.
### Administrative Claims

3.1. *Allowance and Payment.*

3.1.1. Unless otherwise agreed, each holder of an Allowed Administrative Claim shall be paid in Cash equal to the amount of the holder's Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date funds become available to pay such Allowed Administrative Claim or (iii) as soon as practicable after such Administrative Claim becomes payable pursuant to (a) any agreement between GLH, as applicable, and the holder of such Administrative Claim or (b) by Final Order. In the event an Allowed Administrative Claim is not paid in full on or before the Effective Date, such Claim shall be deemed included as a Post-Confirmation Expense that GLH shall satisfy as soon as practicable after the Effective Date.

3.1.2. All requests for payment of previously unpaid Administrative Claims shall have been made by the Administrative Bar Date, and the failure to do so shall render such unpaid Administrative Claims shall be waived, discharged and forever barred. All such requests are subject to review and approval by the Bankruptcy Court after notice and a hearing.

3.2.    *Compensation of Professionals*.  All Professionals holding an Administrative Claim for unpaid fees and expenses for services provided to GLH in or in connection with this Case shall have filed, within five (5) days prior to the Confirmation Hearing, a declaration stating all amounts paid or to be paid by GLH.  Unpaid compensation and expenses shall be paid on the Effective Date if GLH determines them to be reasonable, failing in which such declaration shall serve as request for Allowance of an Administrative Claim to which GLH may object and have resolved by the Court.

## ARTICLE 4.
### Classification Of Claims

4.1.    *Unclassified Claims*.  Administrative Claims are not classified pursuant to § 1123(a) of the Bankruptcy Code and are treated separately as provided in § 1129(a) of the Bankruptcy Code.

4.2.    *Classified Claims*.  Claims against in GLH are classified in the following classes:

       4.2.1.   <u>Class 1</u>:          Convenience Claims

       4.2.2.   <u>Class 2</u>:          Pension Claims

       4.2.3.   <u>Class 3</u>:          Tort Claims

       4.2.4.   <u>Class 4</u>:          Unsecured Claims

## ARTICLE 5.
### Treatment and Voting Rights of Classified Claims

5.1.    *Treatment of Claims*

       5.1.1.   Class 1: Convenience Claims

       a.         **Treatment**.  Holders of Allowed Class 1 Convenience Claims will receive Cash equal to (i) Ten Percent (10%) of the Allowed amount of its Claim or, (ii) if the aggregate amount distributable to Class 1 Claims exceeds $50,000, their *pro rata* share of $50,000, on the Effective Date in full satisfaction and release of such Claim.

       b.         **Impairment**.  Class 1 is Impaired and entitled to vote on the Plan.

       5.1.2.   <u>Class 2</u>: Pension Claims

       a.         **Treatment**.  Class 2 consists of all Pension Claims.  Holders of Allowed Class 2 Claims shall be entitled to payment solely from the GLH Pension Plan strictly in accordance with its terms and provisions and only to the extent of benefits available for payment to participants thereunder. The holder of a Class 2 Claim shall have no right to assert any further Claim against GLH or to seek further recovery from GLH or its assets or properties on account of an Allowed Class 2 Claim.

       b.         **Impairment**.  Class 2 is Impaired.  Holders of Class 2 Claims will receive nothing under the Plan outside of amounts available to them under the GLH Pension Plan and are therefore not entitled to vote on the Plan.

5.1.3.   <u>Class 3</u>:  Tort Claims

a.      **Treatment**.  Class 3 consists of all Tort Claims.  Holders of Allowed Class 3 Claims shall be entitled to payment solely from Tort Claim Reserves to the extent of the amount of coverage available thereunder.  From and after the Effective Date, the automatic stay shall be lifted with respect to the prosecution of any Tort Claim, and the holder of a Tort Claim shall have no right to assert any further Claim against GLH or to seek further recovery from GLH or its assets or properties on account of an Allowed Class 3 Claim.

b.      **Impairment**.  Class 3 is Impaired.  Holders of Class 3 Claims that were liquidated prior to the Petition Date are entitled to vote on the Plan.  Holders of Class 3 Tort Claims that remain unliquidated are Disputed and not entitled to vote on the Plan.

5.1.4.   <u>Class 4</u>: Unsecured Claims

a.      **Treatment**.  Each holder of an Allowed Class 4 Unsecured Claim will receive distributions of its *pro rata* share of net Cash realized from the liquidation and collection of GLH properties and assets after the Effective Date. Distributions shall be made as provided in Section 7.4 and as and when otherwise provided for in this Plan and shall constitute payment in full satisfaction of said Allowed Class 4 Claims.

b.      **Impairment**.  Class 4 is Impaired and entitled to vote on the Plan.

5.2.      *Voting Classes*.  There are 3 voting Classes under this Plan.  Holders of Allowed Claims in Classes 1, 3 and 4 are Impaired, and are therefore entitled to vote to accept or reject this Plan.

5.3.      *Voting Rights as to Confirmation of Plan; Necessity of Allowance of Claims*.  If a Claim is a Disputed Claim prior to confirmation of the Plan, such Disputed Claim shall not be entitled to vote on the Plan unless such Claim is estimated, for voting purposes, by Final Order of the Bankruptcy Court.

5.4.      *Acceptance by Impaired Classes*.  An Impaired Class of Claims shall have accepted this Plan if (a) the holders (other than any holder designated under Bankruptcy Code § 1126(e)) of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan, and (b) the holders (other than any holder designated under Bankruptcy Code § 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.

### ARTICLE 6.
### Means for Implementation of Plan

6.1.      *UMMC Transaction*.  Upon the Effective Date, GLH shall close the UMMC Transaction in accordance with the Contribution Agreement in form and substance substantially identical to that attached hereto as **Exhibit "A"** together with Escrow Agreement and various ancillary agreements, exhibits and schedules thereto.  GLH will transfer and transition hospital ownership and operations to UMMC pursuant thereto on the Effective Date.  UMMC shall not be deemed a successor to GLH, the City or the County nor shall it incur any liabilities associated with any of them except those expressly assumed in the Contribution Agreement.  The Contribution Agreement, the Escrow Agreement and other ancillary agreements are incorporated into this Plan solely for purposes of implementing and enforcing the rights, protections, limitations, and conditions in favor of UMMC. Nothing in this Plan shall amend, waive, impair, limit, or modify any right, condition, consent right, termination right, approval right, protection, defense, or remedy of UMMC under the Contribution Agreement or the Escrow Agreement unless expressly agreed to in writing by UMMC.

6.2.    *Post-Confirmation Management*

6.2.1.    Continued Corporate Existence.  From and after the Effective Date, GLH shall continue its corporate existence for as long as the Board of Commissioners deems necessary or appropriate to carry out the terms of this Plan and to wind down the affairs of GLH.

6.2.2.    Board of Commissioners Remain in Place.  The Board of Commissioners of GLH shall remain in place and shall continue to oversee the affairs of GLH.

6.2.3.    Key Management and Personnel.  GLH will employ such persons as are deemed necessary, from time to time and on such terms as it deems appropriate, to perform the Plan and carry out its business from and after the Effective Date. These personnel are expected to include certain senior management and other administrative employees needed to permit GLH to carry out the tasks set forth in Section 6.3 and otherwise perform the Plan. At such point in time that GLH has fully wound-down its affairs, it may designate or contract with a third-party to administer it remaining non-operational obligations under the Plan.

6.3.    *Post-Confirmation Operations and Administration*

After occurrence of the Effective Date and closing of the UMMC Transaction, GLH presently anticipates that its post-confirmation obligations will include the following:

6.3.1.    Disposition of Assets.  All properties and assets of GLH that are not transferred to UMMC in the UMMC Transaction (defined in the Contribution Agreement as "Excluded Assets") will be liquidated or otherwise disposed of as necessary to furtherance of administration.  This will include the "Excluded Real Property" as defined in the UMMC Transaction.

6.3.2.    Collection of Accounts Receivable and Assertion of Causes of Action.  Subject to the Contribution Agreement, GLH will continue to manage all billing and collection of accounts receivable and shall be empowered to file and prosecute its rights to recover the same in adversary proceedings in the Bankruptcy Court or other litigation in any other appropriate forum.  Except to the extent expressly waived under the Plan, as of the Effective Date, pursuant to Bankruptcy Code § 1123(b)(3), any and all Causes of Action shall remain property of GLH. GLH shall retain the power and authority to litigate, abandon, sell, settle or compromise any Cause of Action.

6.3.3.    Termination of Pension Plan and related benefit plans.  GLH's Pension Plan will terminate pursuant to its terms, specifically Sections 10.05 and 10.06 of the Pension Plan.  GLH will follow all required procedures in the Pension Plan regarding the termination, and holders of Pension Claims shall receive distributions in such amounts and at such times as provided in the Pension Plan. GLH will also terminate an employee profit-sharing plan and transition employee accounts as directed by the employees. GLH will also be required to terminate its employee health benefit plan.

6.3.4.    Management of Tort Claims and Related Claims.  It is the intention as part of implementation of the Plan that GLH will terminate its self-insured plan and transition its liabilities for Tort Claims to one or more insurance companies to provide coverage for such liabilities substantively equal to that provided under the Tort Claim Reserves. Until such time, which may happen prior to or after the Effective Date of the Plan, it will continue to administer Tort Claims.  GLH will continue to administer workers compensation claims and unemployment claims until all such claims are resolved.

6.3.5.    Financial and Corporate Records.  GLH will be required to comply with statutory audit requirements and regulatory filings (*e.g.*, Medicare and Medicaid cost reports) and to otherwise attend

8

to all of its financial and administrative affairs and to finalize and close all books and records at such time as the Plan has been performed.  As and when appropriate, GLH will take necessary and appropriate actions to dissolve its corporate existence.

6.3.6.    <u>Management and Termination of Employees</u>.  As and when no longer necessary or beneficial to GLH's implementation of the Plan, employees will be terminated.  GLH will continue to oversee all matters relating to legal, regulatory and administrative requirements relating to employment matters.

**ARTICLE 7.**
**Plan Implementation and Execution**

7.1.    *Consent under § 904 of the Bankruptcy Code*.  Pursuant to and for purposes of Bankruptcy Code § 904, GLH consents to entry of the Confirmation Order on the terms and conditions set forth herein and to entry of any further orders as necessary or required to implement the provisions of the Plan or any related transactions, *provided, however*, that, other than as set forth specifically herein, the terms and provisions of this Plan are without prejudice to the rights of GLH pursuant to § 904 of the Bankruptcy Code, and, other than as specifically set forth herein, shall not be deemed to constitute GLH's consent to the Bankruptcy Court's interference with (i) any of the governmental powers of GLH; (ii) any of the property or revenues of GLH; or (iii) GLH's use or enjoyment of any income-producing property.

7.2.    *Authority to Implement Plan*.  GLH shall be empowered and authorized to take any and all steps it deems necessary or appropriate to manage its affairs, administer its assets and properties, and to otherwise implement the Plan.  GLH shall neither be required nor obligated to seek approval from the Bankruptcy Court in the performance of its duties, but may do so, if it determines in its discretion to do so, to the extent of the Bankruptcy Court's retained jurisdiction under the Plan.

7.3.    *Post-Confirmation Budget and Funding of Escrow Account*. GLH will perform its obligations under the Plan in accordance with the Post-Confirmation Budget. The Post-Confirmation Budget identifies and quantifies the Post-Confirmation Expenses associated with administering the matters discussed above and all expected matters required of GLH to wind-down its affairs.  Consistent with the Escrow Agreement, GLH and UMMC will mutually agree to procedures for management of the Post-Confirmation Budget and the flow of funds relating to payment of Post-Confirmation Expenses. Notwithstanding anything in this Plan or the Post-Confirmation Budget to the contrary, no Post-Confirmation Expense, reserve, budget item, distribution, or other use of Cash or proceeds shall prime, reduce, delay, impair, or otherwise limit the funding, replenishment, maintenance, use, or disbursement of the Escrow Account or Escrow Funds for UMMC's benefit, except for directly related liquidation costs expressly permitted by the Escrow Agreement. All "Liquidation Proceeds" as defined in the Escrow Agreement shall be handled, deposited, applied, and disbursed in accordance with the Escrow Agreement and the Contribution Agreement.

7.4.    *Distributions to Class 4 Claims*

7.4.1.    <u>Excluded Real Estate Proceeds</u>.  Distributions to Holders of Allowed Class 4 Unsecured Claims shall be made first from the net Cash realized from the sale of "Excluded Real Estate" as defined in the UMMC Transaction documents.  GLH shall cause the Excluded Real Estate to be sold and distributions made to holders of Allowed Class 4 Unsecured Claims on a *pro rata* basis as and when it deems appropriate but as soon as is practicable and in the best interest of such Holders but after payment or reservation for Administrative Claims and Post-Confirmation Expenses.

9

7.4.2. Residual Escrow Account Proceeds. If and to the extent available upon termination of the Escrow Account, as provided under the terms of the Escrow Agreement, holders of Allowed Class 4 Claims shall receive *pro rata* distributions from Escrow Funds. No holder of a Class 4 Claim shall have any direct right to the Escrow Account or the Escrow Funds except to the extent such residual funds are released from escrow in accordance with the Escrow Agreement.

## ARTICLE 8.
## Administration of Claims

8.1. *Objection to Claims*. From and after the Effective Date, GLH shall have the exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims. GLH may withdraw, abandon, settle or compromise any Claim and may, but shall not be required, to seek entry of an order from the Bankruptcy Court approving of such action.

8.2. *Objection Deadline.* Objections to Claims shall be filed with the Bankruptcy Court, served upon the holders of each Claim to which objection is made, and resolved or withdrawn prior to entry of the Final Decree in these Cases.

8.3. *Allowance of Claims.* Except as to Claims Allowed by the Plan, or as otherwise expressly provided herein or in any order by the Bankruptcy Court prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed in accordance with the Plan.

8.4. *Treatment of Disputed Claims.* Cash shall be distributed to a holder of any type of Disputed Claim when, and only to the extent that, such Disputed Claim becomes an Allowed Claim as provided in the Plan.

8.5. *Disallowed Claims.* All holders of Claims against whom GLH has or has asserted a Cause of Action that arises under Chapter 5 of the Bankruptcy Code shall be deemed disallowed pursuant to § 502(d) of the Bankruptcy Code, and holders of such Claims may not vote to accept or reject the Plan until the Cause of Action against the holder of such Claim has been settled or a Final Order entered and all sums due on account thereof have been paid in full.

8.6. *Estimation of Claims.* GLH may for any purpose, including for purposes of making distributions hereunder, request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to § 502(c) of the Bankruptcy Code without regard to whether such Claim has been subject to a previous objection or whether such objection has been ruled upon or is subject to continued proceedings, including appeal.

8.7. *Distributions Pending Allowance*. Notwithstanding any other provision of the Plan, if any Claim or any portion of a Claim is Disputed, no payment or distribution provided in the Plan shall be made on account of such Claim unless and until the Disputed Claim is resolved and becomes Allowed. GLH on Agent may estimate an amount to which a Disputed Claim may be Allowed, and may reserve from any distribution such amounts as GLH deems necessary and appropriate.

8.8. *Means of Payment*. Payments made pursuant to this Plan shall be made in Cash and paid by check drawn or by wire transfer initiated from a domestic bank as determined by GLH.

8.9. *Delivery of Distributions*. For purposes of all distributions under the Plan, GLH shall be entitled to rely on the name and address of the holder of each Allowed Claim or Interest as shown any timely filed proof of Claim and, if no such proof of Claim is filed, as shown on the Schedules, except to the

10

extent that GLH receives adequate written notice of a transfer or change of address, properly executed by the holder or its authorized agent.  If a distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until GLH is notified, in writing, of such holder's then current address, at which time distributions shall be made to such holder without interest.  Any amounts deemed by GLH to be unclaimed funds after delivery hereunder has failed shall be deemed to escheat to the City and County in equal proportion.

8.10.   *Right of Offset*.  Pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, GLH may set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Claim (before any Distribution is made on account of such Claim), the claims, equity interests, rights, and causes of action of any nature that GLH may hold against the holder of such Allowed Claim; *provided, however*, that neither the failure to effect such a setoff nor the Allowance of any Claim hereunder shall constitute a waiver or release by GLH of any such claims, rights, and causes of action that GLH may possess except as specifically provided herein.  No entity shall retain the right of offset, set off, recoupment, or any other right, against GLH under Bankruptcy Code § 553 or otherwise unless such entity is the Holder of a Claim that has been timely filed under Bankruptcy Code § 502 and such Claim is an Allowed Claim.

### ARTICLE 9.
### Executory Contracts and Unexpired Leases

9.1.   *Assumption.*

9.1.1.   <u>Assumption and Assignment</u>.  On the Effective Date, the Executory Contracts and Unexpired Leases identified in Schedule 9.1 attached hereto shall either be assumed by GLH or assumed and assigned to UMMC as part of the UMMC Transaction, respectively and as separately indicated in Schedule 9.1. At that time, GLH or UMMC, as applicable, shall, except as to defaults described in § 365(b)(2) of the Bankruptcy Code, (i) cure, or provide adequate assurance that they will promptly cure, any existing default in the Executory Contract or Unexpired Lease, (ii) compensate, or provide adequate assurance that they will promptly compensate, another party to the Executory Contract or Unexpired Lease for any actual pecuniary loss to such other party resulting from such default, and (iii) provide adequate assurance of future performance under such Executory Contract or Unexpired Lease.  GLH and UMMC reserve the right to amend or supplement Schedule 9.1.

9.1.2.   <u>Cure Amounts</u>.  GLH and UMMC, as applicable, shall promptly satisfy on the Effective Date, if not paid before then, the cure amounts stated in Schedule 9.1, or such other amount or upon such repayment terms and conditions as may be otherwise mutually agreed, to the respective counterparties to the Executory Contracts and Unexpired Leases identified therein. Failure of any counterparty to object to the amount stated in Schedule 9.1 in connection with the confirmation of this Plan shall result in said amounts being fully and finally determined to be the cure amount required to assume and assign the Executory Contracts and Unexpired Leases stated therein.

9.1.3.   <u>Approval of Assumption</u>.  Entry of the Confirmation Order shall constitute the approval, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment of the Executory Contracts and Unexpired Leases assumed pursuant to Section 9.1 hereof.

9.2.   *Rejection*

9.2.1.   <u>Blanket Rejection</u>.  Except for those Executory Contracts and Unexpired Leases previously assumed or rejected during the pendency of this Case or otherwise specifically addressed elsewhere in this Plan, all Executory Contracts and Unexpired Leases that existed as of the Petition Date to

11

which GLH was a party and which has not expired by its terms shall be rejected.  Subject to the occurrence of the Effective Date, the rejection of any Executory Contract or Unexpired Lease pursuant to this Article shall be effective upon the earliest of (i) the date that GLH provides notice to the counterparty of the effectiveness of such rejection and (ii) the date specified as the effective date of rejection in any order of the Court.

       9.2.2.   <u>Approval of Rejection</u>.  Entry of the Confirmation Order shall constitute the approval, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of all Executory Contracts and Leases not otherwise assumed under the Plan.

       9.2.3.   <u>Bar Date for Asserting Rejection Claims</u>.  Rejection Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan must be filed with the Court within thirty (30) days after the Effective Date.  The Confirmation Order shall provide that notice of the Effective Date be provided to all counterparties to any rejected Executory Contract or Unexpired Lease. Any Rejection Claim arising from rejection of a previously rejected Executory Contract or Lease during the pendency of the Cases shall have been filed by the date set by the Court in the order approving such rejection.  Any Rejection Claims not filed within such times are/will be forever barred from assertion against GLH and its property.  If any Rejection Claim becomes an Allowed Claim, it shall be treated as an Unsecured Claim under Class 4.

## ARTICLE 10.
### Cramdown and Plan Modification

10.1.   *Confirmation by "Cram Down"*.  If any Impaired Class does not vote to accept the Plan as provided in § 1126 of the Bankruptcy Code, GLH will request confirmation of the Plan pursuant to § 1129(b) of the Code with respect to any Impaired Class in the applicable voting estate.  GLH reserves the right to amend the Plan pursuant to this Article 10.

10.2.   *Right to Modify*.  GLH reserves the right to amend or modify the Plan before the Effective Date.  After the Effective Date, GLH may remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

10.3.   *Deemed Acceptance or Rejection*.  A Holder of a Claim that has accepted or rejected the Plan will be deemed to have either accepted or rejected, as the case may be, the Plan as modified or amended, even if the modifications or amendments are made after the solicitation of votes of acceptance or rejection of the Plan, unless the Bankruptcy Court orders that such Claimant may change its previous vote within a time established by the Bankruptcy Court for such change to be made.

## ARTICLE 11.
### Conditions to Confirmation and Effective Date of Plan

11.1.   *Conditions to Confirmation*.  The Plan shall not be confirmed unless the Confirmation Order and the Plan, as confirmed pursuant to the Confirmation Order, shall be in a form and substance satisfactory to GLH and UMMC and in compliance with the requirements thereof under the UMMC Transaction.

11.2.   *Conditions to Occurrence of the Effective Date*.  The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied, waived or extended, as the case may be, in writing by GLH:

11.2.1.  The Confirmation Order shall have been entered, unstayed and become a Final Order.

11.2.2.  The UMMC Transaction shall have closed and all actions to be taken incident thereto have occurred or been waived or extended; and

11.2.3.  All consents, regulatory approvals and other authorizations required for implementation of the Plan have been granted and effective.

11.3.   *Revocation or Withdrawal of the Plan.*

11.3.1.  GLH may revoke or withdraw the Plan prior to the Confirmation Date.

11.3.2.  If the Plan is revoked or withdrawn prior to the Confirmation Date in accordance with Section 11.3.1 hereof, or the Effective Date does not occur because the conditions precedent thereto have not been satisfied, then at the election of GLH the Plan may be deemed null and void.  In such event, (i) GLH and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the filing of the Plan, and (ii) all GLH's obligations with respect to the Claims shall remain unchanged, all of GLH's rights against all parties shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed an admission or statement against interest or to constitute a waiver or release of any claims by or against GLH or any other party or to prejudice in any manner the rights of GLH or any party in any further proceedings.

11.4.   *Notice of Effective Date.*  The Confirmation Order shall provide that, promptly after the occurrence of the Effective Date, GLH shall cause to be served on all creditors a notice that informs such creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption and assignment and or the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for filing of Rejection Damage Claims; (iv) the deadline established under the Plan for the assertion of Administrative Claims; and (v) such other matters as GLH finds appropriate or the Court may direct.

**ARTICLE 12.**
**General Provisions**

12.1.   *Effect of Confirmation.*  The provisions of § 944 of the Bankruptcy Code shall apply in full to the Plan and the actions contemplated here on and after the Effective Date.

12.2.   *Discharge.*  Except as expressly provided otherwise in this Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against GLH, pursuant to §§ 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against GLH at any time, to the extent that such judgment relates to a discharged Claim; provided that such discharge will not apply to (i) Claims specifically exempted from discharge under the Plan; and (ii) Claims held by any entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Case.

12.3.   *Automatic Stay.*  Unless otherwise modified by order of the Bankruptcy Court during the Case, the automatic stay of § 362 of the Bankruptcy Code shall continue in effect until the Effective Date.

**12.4.   *INJUNCTION.*  On the Effective Date, All entities or persons that have held, currently hold or may hold any Claim released or exculpated pursuant to the Plan will be permanently enjoined from taking any of the following actions against GLH or UMMC any of its respective assets or**

**properties on account of such released Claim: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien, claim or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due UMMC; (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan; and (vi) taking any action to interfere with implementation or consummation of the Plan. For the avoidance of doubt, from and after the Effective Date, no holder of any Claim or other person may assert against UMMC, the Transferred Assets, or any affiliate or designee of UMMC any Excluded Liability or any claim based on successor liability, transferee liability, continuation, de facto merger, alter ego, substantial continuity, or similar theory arising from GLH's or any other Transferor's acts, omissions, circumstances, or liabilities occurring on or before the Effective Date.**

12.5.   *EXCULPATION.*  **This Plan does not affect an exculpation or release of any person or entity, save and except the Board of Commissioners, officers and persons employed by GLH during the pendency of these Cases or serving in such capacity as of the Effective Date, GLH, and the Professionals employed by GLH.  Upon the Effective Date, such protected persons shall be released by GLH pursuant to § 1123(b)(3) of the Bankruptcy Code and shall not have or incur any liability to GLH or the estates under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to GLH or the Case, including, but not limited to, (i) formulating, preparing, disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct or gross  negligence, and in all respects such protected persons shall be entitled to rely in good faith upon the advice of counsel.**

12.6.   *Effect of Injunction and Exculpation*

12.6.1.  Other than as limited by the foregoing injunction (Section 12.4) and exculpation (Section 12.5) provisions of this Plan, or any other provision of the Plan, neither the Plan, the Confirmation Order nor any documents executed or filed in connection with the Plan, the Confirmation Order or the Case shall release, impair or affect any claims or causes of action possessed by the holder of a Claim against any non-debtor person who may be liable with GLH on account of such Claim; provided, however, that nothing in this Plan preserves or permits any claim against UMMC, the Transferred Assets, or any affiliate or designee of UMMC to the extent barred by the Contribution Agreement, the Escrow Agreement, this Plan, or the Confirmation Order.

12.7.   *Default*.  In the event that GLH fails to make any payment required under this Plan when due, or that GLH fails to perform any obligation required to be performed under this Plan timely, the aggrieved party may notify GLH of such default by providing written notification as required under the Plan of such failure to perform or failure to pay and thirty (30) business days to cure the default.  Upon default, such aggrieved party may exercise any remedy to which it may be entitled under this Plan, the Bankruptcy Code, or non-bankruptcy law to recover its Allowed Claim without further action required by the Bankruptcy Court, except to the extent prohibited by Section 13.3, supra.

12.8.   *Binding Effect.*  On the Effective Date, according to § 944 of the Bankruptcy Code, the provisions of this Plan will bind GLH, GLH and any holder of a Claim or Interest, whether or not the Claim is Impaired under the Plan and whether or not the holder of the Claim has accepted the Plan.

14

12.9.    *Notices.*  Except as otherwise specified, all notices and requests will be given by any written means, including but not limited to, telex, telecopy, telegram, first class mail, express mail or similar overnight delivery service and hand delivered letters, and any such notice or request will be deemed to have been given when received.  Notices will be delivered as follows:

*If to GLH*

Greenwood Leflore Hospital
ATTN:  Dawne Holmes
2001 Garrard Ave
Greenwood, Mississippi 38930
Email:  dholmes@glh.org

*with a copy to*

Douglas C. Noble
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile:  (601) 510-2939
Email:   dnoble@MMQNLaw.com

12.10.   *Headings.*  The headings used in the Plan are inserted for convenience only and constitute part neither of the Plan nor in any manner affect the provisions or interpretations of the Plan.

12.11.   *Enforceability.*  Should any provision of the Plan be determined to be unenforceable for any reason, such determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

12.12.   *Closing of Case*.  At such time as GLH determines that the Plan has been fully performed and the Case fully administered, it will close the case as provided in § 946 of the Bankruptcy Code.

## ARTICLE 13.
### Retention of Jurisdiction

The Bankruptcy Court will retain jurisdiction of all matters arising out of or related to the Case and the Plan as long as necessary for the purposes of §§ 105(a) and 945 of the Bankruptcy Code as may be necessary for implementation of this Plan.

*[remainder of page intentionally left blank]*

THIS the 7th day of June, 2026.

Respectfully submitted,

**GREENWOOD LEFLORE HOSPITAL**

By:   /s/ *Dawne Holmes*

Chief Financial Officer and Interim Chief Executive Officer

Douglas C. Noble, MS Bar No. 10526
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile:  (601) 510-2939
Email:   dnoble@MMQNLaw.com

*Counsel to Greenwood Leflore Hospital*

16

# EXHIBIT
# A

*Execution Copy*

# CONTRIBUTION AND ASSET TRANSFER AGREEMENT

**By and Among**

**GREENWOOD LEFLORE HOSPITAL**

**GREENWOOD, MISSISSIPPI**

**LEFLORE COUNTY, MISSISSIPPI**

**AND**

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

**JUNE ___, 2026**

**TABLE OF CONTENTS**

ARTICLE 1 DEFINITIONS..............................................................................................2

    1.1    Definitions ........................................................................................................2

ARTICLE 2 CONTRIBUTION, TRANSFER, AND LIMITED ASSUMPTION ......................7

    2.1    Contribution and Transfer of Transferred Assets ...........................................7
    2.2    Excluded Assets................................................................................................8
    2.3    Limited Assumption of Assumed Liabilities ...................................................9
    2.4    Excluded Liability; No Successor Liability....................................................10
    2.5    Transfer Free and Clear .................................................................................10
    2.6    Real Property Contributions ...........................................................................11
    2.7    Permitted Liens ..............................................................................................11
    2.8    Real Property Exclusions; Temporary Use of Certain Real Property. ...........11
    2.9    Non-assignable Assets ....................................................................................11
    2.10   Withholding Rights.........................................................................................12
    2.11   Retained Liabilities ........................................................................................12
    2.12   Return of Transferred Real Property Upon Hospital Closure.........................12

ARTICLE 3 CLOSING ...................................................................................................12

    3.1    Closing............................................................................................................12

ARTICLE 4 TRANSFERRED PROVIDER AGREEMENTS; REGULATORY MATTERS ... 13

    4.1    Intended Continuation and Assignment of Existing Medicare and Medicaid
          Participation ...................................................................................................13
    4.2    UMMC Acknowledgment of Potential Associated Liability; Allocation as
          Between the Parties.........................................................................................13
    4.3    Regulatory Cooperation..................................................................................14
    4.4    Excluded Liabilities Escrow ...........................................................................14
    4.5    Delay or Denial of Assignment or Continuation ...........................................15
    4.6    No Representation of Regulatory Outcome by UMMC ...................................15

ARTICLE 5 ASSUMED CONTRACTS AND ASSUMED LEASES .......................................15

    5.1    Designation Rights..........................................................................................15
    5.2    Assumption and Assignment Process ............................................................15
    5.3    Cure Costs and Defaults .................................................................................15
    5.4    Failure of Assignment....................................................................................15

ARTICLE 6 EMPLOYEES; BENEFIT PLANS; LABOR MATTERS....................................16

    6.1    No Obligation to Hire .....................................................................................16
    6.2    Offers of Employment in Sole Discretion ......................................................16
    6.3    Employee Liabilities Excluded.......................................................................16

6.4      Benefit Plans ................................................................................................ 16

ARTICLE 7 RECORDS; ACCESS; HIPAA; PATIENT INFORMATION ............................... 16

7.1      Transfer of Books and Records ..................................................................... 16
7.2      Pre-Closing Access to GLH's EMR and Data ............................................... 16
7.3      Retention of Records; Post-Closing Access .................................................. 17
7.4      Legacy Systems Access and Records ............................................................ 17
7.5      Privacy, Security and Patient Information ..................................................... 17
7.6      No Expansion of Assumed Liabilities ........................................................... 18

ARTICLE 8 BANKRUPTCY CASE; PLAN REQUIREMENTS; COURT ORDERS .............. 18

8.1      Bankruptcy Milestones ................................................................................. 18
8.2      Form of Plan and Orders ............................................................................... 18
8.3      Required Findings and Protections ................................................................ 18
8.4      Appeals; Stays .............................................................................................. 19

ARTICLE 9 REPRESENTATIONS AND WARRANTIES OF TRANSFEROR ....................... 19

9.1      Existence; Authority ..................................................................................... 19
9.2      Authorization ................................................................................................ 20
9.3      Enforceability ............................................................................................... 20
9.4      No Conflict ................................................................................................... 20
9.5      GLH Subsidiaries .......................................................................................... 20
9.6      Absence of Undisclosed Liabilities ............................................................... 20
9.7      Ownership; Title ........................................................................................... 20
9.8      Contracts ...................................................................................................... 20
9.9      Inventory ...................................................................................................... 20
9.10     Financial Information; Liabilities .................................................................. 21
9.11     Litigation; Investigations .............................................................................. 21
9.12     Compliance With Law ................................................................................... 21
9.13     Licenses; Permits .......................................................................................... 21
9.14     Hospital Payment Programs........................................................................... 21
9.15     Accreditation; Third-Party Payor Claims ...................................................... 22
9.16     Real Property ................................................................................................ 23
9.17     Employees and Labor Matters ....................................................................... 24
9.18     Environmental Matters. ................................................................................. 24
9.19     Insurance ...................................................................................................... 25
9.20     Medical Staff and Employed Physician Matters............................................. 25
9.21     IT Assets. ...................................................................................................... 25
9.22     No Brokers .................................................................................................... 26
9.23     Sufficiency of Information............................................................................. 26

ARTICLE 10 COVENANTS OF TRANSFEROR ................................................................... 26

10.1     Operation Pending Closing............................................................................ 26
10.2     Schedules ...................................................................................................... 26

10.3  Real Property Inspections; Permitted Liens..................................................26
10.4  Escrow Account..................................................................................27
10.5  Billing & Collections............................................................................28
10.6  Consents and Approvals ......................................................................28
10.7  Misdirected Payments .........................................................................29
10.8  Payment of Cure Amounts and Closing Costs...........................................29
10.9  Post-Closing Liability of City and County ................................................29
10.10  Reporting; Deposit Verification; Audit Rights ...........................................29

ARTICLE 11 CONDITIONS TO UMMC'S OBLIGATIONS..........................................29

11.1  Bankruptcy Orders .............................................................................30
11.2  No Closure; No Voluntary Termination ...................................................30
11.3  Accuracy of Representations and Warranties ............................................30
11.4  Performance ....................................................................................30
11.5  No Material Adverse Change .................................................................30
11.6  Governmental Approvals .....................................................................30
11.7  Assumed Contracts & Assumed Leases; Cure Amounts...............................30
11.8  Provider Protections...........................................................................30
11.9  Billing & Collections Support Arrangements.............................................30
11.10  Controlled Substances Authorization .....................................................31
11.11  Delivery Items..................................................................................31
11.12  Due Diligence Satisfaction ..................................................................31
11.13  No Injunction or Litigation ..................................................................31
11.14  Closing Deliverables ..........................................................................31

ARTICLE 12 CLOSING DELIVERABLES.................................................................31

12.1  Transferor Deliverables ......................................................................31
12.2  UMMC Deliverables...........................................................................32

ARTICLE 13 LIMITIATION OF LIABILITY; INDEMNIFICATION ...................................33

13.1  Limitation of City and County Liability ...................................................33
13.2  Survival...........................................................................................33
13.3  No Indemnification by UMMC ...............................................................33

ARTICLE 14 TERMINATION...............................................................................33

14.1  Termination by UMMC ........................................................................33
14.2  Other Termination Rights ....................................................................33
14.3  Effect of Termination..........................................................................33
14.4  Transferor's Limited Remedy................................................................33

ARTICLE 15 MISCELLANEOUS ..........................................................................34

15.1  Entire Agreement...............................................................................34
15.2  Amendment; Waiver...........................................................................34

15.3    Assignment by UMMC ............................................................................... 34
15.4    Specific Performance ................................................................................ 34
15.5    Notices ...................................................................................................... 34
15.6    Governing Law .......................................................................................... 35
15.7    Venue; Jurisdiction ................................................................................... 35
15.8    Severability ............................................................................................... 35
15.9    No Third-Party Beneficiaries .................................................................... 35
15.10   Counterparts; Electronic Signatures ........................................................ 35
15.11   Construction .............................................................................................. 35
15.12   Public Announcements ............................................................................. 35
15.13   Further Assurances .................................................................................. 36

Exhibit A – List of Clinics
Exhibit B – Form of Transition Services Agreement
Exhibit C – Form of Escrow Agreement
Exhibit D – Form of Bill of Sale
Exhibit E – Form of Assignment and Assumption
Exhibit F – Form of Limited Power of Attorney
Disclosure Schedules

## CONTRIBUTION AND ASSET TRANSFER AGREEMENT

This CONTRIBUTION AND ASSET TRANSFER AGREEMENT (this "**Agreement**") is made and entered into as of June ___, 2026 (the "**Effective Date**"), by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL**, a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees ("**GLH**"), and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting as a department of The University of Mississippi and political body of the State of Mississippi, or such affiliated or designated acquiring entity as UMMC may identify in writing prior to Closing (collectively, "**UMMC**"). The City, County, GLH, and UMMC are each a "**Party**" and collectively the "**Parties**."

## RECITALS

WHEREAS, pursuant to Miss. Code Ann. Section 41-13-10 et. seq., City and County are joint statutory owners of Greenwood Leflore Hospital, which is a 25-bed acute care hospital located at 1401 River Road, Greenwood, MS 38930-4030, together with certain clinics and other ancillary operations all as described on **Exhibit A** (as used herein "**GLH**" shall include any and all such clinics and ancillary operations);

WHEREAS, pursuant to Miss. Code Ann. §41-13-15(3), as amended, Transferor has determined that it is in the best interest of the persons living in its communities served by GLH to contribute, convey, assign, transfer, and deliver to UMMC, and UMMC desires to accept from Transferor, the Transferred Assets, all on the terms and subject to the conditions set forth in this Agreement.

WHEREAS, prior to the execution and delivery of this Agreement, GLH filed a petition for relief under Chapter 9 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Mississippi, Case No. 26-11337 (the "**Bankruptcy Case**"), and the Bankruptcy Case remains pending as of the Effective Date. The Parties acknowledge that consummation of the transactions contemplated by this Agreement shall occur only pursuant to the Confirmation Order.

WHEREAS, the Parties intend that UMMC shall assume only the Assumed Liabilities, and that no other Liabilities, obligations, debts, claims, commitments, or responsibilities of any kind whatsoever of Transferor, including GLH's operations, shall be assumed by UMMC, whether known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted, or arising before, on, or after the Closing from facts, events, acts, omissions, or circumstances occurring on or before the Closing.

WHEREAS, the Parties intend that the transactions contemplated by this Agreement be structured and implemented so that, to the maximum extent permitted by applicable law and the orders entered in the Bankruptcy Case, UMMC acquires the Transferred Assets free and clear of all Liabilities (except for the Assumed Liabilities), is not deemed a successor to GLH or other Transferor, and is not responsible for any Excluded Liability.

WHEREAS, Transferor acknowledges that UMMC is entering into this Agreement solely in reliance upon the protections, limitations, and conditions expressly stated herein, including UMMC's sole discretion to designate Transferred Assets, Assumed Contracts, Assumed Leases, Transferred Provider Agreements, and Assumed Liabilities, and UMMC's unilateral termination rights.

NOW, THEREFORE, in consideration of Transferor's contribution of the Transferred Assets to UMMC, UMMC's assumption of the Assumed Liabilities set forth herein, the Parties' mutual covenants, agreements, representations, and warranties contained herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    <u>Definitions</u>.  As used herein, the capitalized terms below shall have the following meanings:

"**Assumed Contracts**" is defined in Section 2.1(b).

"**Assumed Leases**" is defined in Section 2.1(c).

"**Assumed Liabilities**" is defined in Section 2.3.

"**Bankruptcy Case**" is defined in the recitals.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Mississippi, or any other court of competent jurisdiction presiding over the Bankruptcy Case.

"**Chapter 9 Plan**" means the plan for the adjustment of debts filed or to be filed in the Bankruptcy Case pursuant to Chapter 9 of the Bankruptcy Code, as the same may be amended, modified, supplemented, or confirmed from time to time.

"**Closing**" means the consummation of the transactions contemplated by this Agreement.

"**Closing Date**" means the date and time the Closing is effective between the Parties, which shall be 11:59:59 PM Central Time, as of the date of Closing.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Chapter 9 Plan, in form and substance acceptable to UMMC in its sole and absolute discretion

"**DSH Payments**" means any payments, adjustments, settlements, supplemental payments, or other reimbursement amounts payable under any Medicare or Medicaid disproportionate share hospital payment program.

"**Escrow Account**" is defined in Section 10.4.

**"Escrow Agreement"** is defined in Section 10.4.

**"Excluded Assets"** is defined in Section 2.2.

**"Excluded Liabilities"** means all Liabilities of Transferor, the Bankruptcy Case, or arising from Transferor's ownership, leasing, use, occupancy, or operation of the Transferred Assets or GLH's operations, other than expressly identified in Section 2.3 as an Assumed Liability, as of the Closing Date, including all of the following arising before, on, or after the Closing Date and whether known or unknown, all indebtedness for borrowed money, bonds, notes, guarantees, letters of credit, and financing obligations:

(a)     all trade payables, accounts payable, accrued expenses, and unpaid invoices incurred and accrued prior to the Closing Date;

(b)     all Liabilities relating to services rendered, supplies furnished, or care provided before the Closing Date;

(c)     all tort Liabilities, malpractice Liabilities, professional liability claims, medical staff claims, general liability claims, workers' compensation claims, product liability claims, and premises liability claims arising from GLH's operations prior to the Closing Date;

(d)     all Liabilities arising out of any actual or alleged violation of law before Closing;

(e)     to the extent not assigned and transferred to UMMC as a Transferred Provider Agreement or otherwise listed as a Transferred Asset, all Liabilities related to provider agreements and similar programs under Medicare, Medicaid, TRICARE, CHAMPVA, Hospital Payment Programs, commercial payors, managed care organizations, governmental reimbursement programs, cost reports, audits, overpayments, underpayments, reconciliations, recoupments, offsets, penalties, extrapolations, repayments, false claims, program integrity matters, civil monetary penalties, self-disclosures, and settlement obligations;

(f)     all employee-related Liabilities, including wages, payroll taxes, withholding, benefits, PTO, vacation, sick leave, severance, retention, bonuses, WARN Act Liabilities, COBRA, unemployment, labor grievances, pension Liabilities, multiemployer plan Liabilities, and ERISA Liabilities;

(g)     all taxes of GLH of any kind, including income, MHAP assessments, franchise, sales, use, property, payroll, employment, excise, gross receipts, transfer, documentary, stamp, and withholding taxes, and all related interest and penalties;

(h)     all environmental Liabilities, including remediation, monitoring, reporting, corrective action, or natural resource damages related to pre-Closing conditions;

(i)     all Liabilities arising out of any Excluded Asset;

3

(j)      all Liabilities under all contracts or leases that are not Assumed Contracts or Assumed Leases;

(k)      all cure amounts and all obligations required to assume and assign any Assumed Contract or Assumed Lease;

(l)      all Liabilities arising from ownership or operation of GLH or another Transferor before Closing;

(m)      all claims asserted in, arising under, or related to the Bankruptcy Case, including administrative expenses, plan obligations, and creditor claims;

(n)      all Liabilities arising from any affiliate, predecessor, joint venture, or related entity of any Transferor; and

(o)      all Liabilities not expressly assumed by UMMC in strict accordance with Section 2.3.

"**Excluded Real Property**" is defined in Section 2.8(a).

"**Excluded Receivables**" is defined in Section 2.2(b).

"**GLH's Knowledge**" means the actual knowledge, after reasonable inquiry, of GLH's executive officers and such other appropriate personnel of GLH as would reasonably be expected to have responsibility for or knowledge of the matter in question.

"**Governmental Authority**" means any federal, state, county, municipal, local, tribal, or foreign governmental, regulatory, judicial, administrative, or quasi-governmental body, agency, authority, department, board, bureau, court, commission, officer, or instrumentality.

"**Government Program**" means any Medicare, Medicaid, TRICARE, CHAMPVA or other governmental health care program, plan, or arrangement that pays for, reimburses, subsidizes, insures, or arranges for health care items or services.

"**Hazardous Material**" means any substance, material, chemical, constituent, waste, pollutant or contaminant that is listed, regulated or defined under any environmental law, including medical waste, bio-hazardous materials, polychlorinated biphenyls, toxic mold, asbestos or petroleum or petroleum products (including crude oil or any fraction thereof), and any "hazardous substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("**CERCLA**").

"**Health Care Law**" means any applicable law, statute, ordinance, rule, regulation, code, order, judgment, decree, injunction, permit, license, franchise, accreditation standard, directive, guidance having the force of law, or other requirement of any Governmental Authority relating to or governing the ownership, operation, licensure, certification, accreditation, management, reimbursement, billing, documentation, coding, recordkeeping, reporting, privacy, security, quality, or provision of health care items or services, or participation in or payment under any Government Program or other third-party payor program, including laws relating to fraud and

4

abuse, referrals, kickbacks, self-referrals, false claims, overpayments, exclusions, civil monetary penalties, fee-splitting, the corporate practice of medicine, provider-based status, pharmacy, controlled substances, medical necessity, and the use of certified electronic health record technology, and the rules and regulations promulgated thereunder.

"**Hospital Payment Programs**" means DSH Payments, UPL, MHAP, and any other Medicare or Medicaid hospital payment program or payment arrangement, including any supplemental payment, enhanced payment, directed payment, add-on payment, adjustment, settlement, reimbursement, incentive payment, uncompensated care payment, or similar payment or funding mechanism, in each case arising under or payable pursuant to applicable Health Care Law, any CMS-approved state plan, waiver, demonstration, directed payment arrangement, methodology, or other payment authority, including any amendment, renewal, replacement, restructuring, renaming, successor, or substitute program or arrangement.

"**Improvements**" means all buildings, improvements and structures of every kind and description owned or leased by Transferor and located on the Real Property, together with all right, title and interest of each Transferor in and to utility conduits and infrastructure located on, about or under the Real Property (including water and sewer conduits and pipelines, electrical conduits and wiring and telecommunication conduits and wiring).

"**Inventory**" means all usable inventory and supplies owned by GLH or otherwise used or held for use in the operation of GLH as of the Closing Date, including pharmacy inventory, drugs, biologicals, medical and surgical supplies, linens, food, office supplies, maintenance supplies, and other consumable supplies, but excluding expired, obsolete, damaged, or unusable items.

"**IT Assets**" means all information technology assets, computers, including software, hardware, databases, firmware, middleware and platforms, interfaces, systems, networks, equipment, facilities, websites, infrastructure, workstations, routers, hubs, switches, data communications lines, associated documentation and all other information technology equipment used or held for use in, or otherwise relating to, GLH's operations.

"**Leased Real Property**" is defined in Section 9.16(b).

"**Liabilities**" means any and all claims, demands, liabilities, liens, encumbrances, interests, charges, mortgages, deeds of trust, security interests, options, rights of first refusal, rights of use or occupancy, restrictions, easements, licenses, covenants, successor liability theories, taxes, assessments, judgments, orders, obligations, penalties, causes of action, and other rights or interests of any kind, whether legal or equitable, choate or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, known or unknown.

"**Liens**" means, with respect to any property or asset, any lien, claim, encumbrance, pledge, mortgage, security interest, transfer restriction, right of first refusal, easement, charge or other similar encumbrances.

"**MHAP**" means payments from or owed to the Mississippi Division of Medicaid under the Mississippi Hospital Access Program and any amendments, renewals, replacements, component payments, restructured, renamed, or successor supplemental hospital payment program thereunder.

"**Non-assignable Asset**" is defined in Section 2.9.

"**Owned Real Property**" is defined in Section 9.16(a).

"**Party**" is defined in the introductory paragraph.

"**Parties**" is defined in the introductory paragraph.

"**Permitted Liens**" is defined in Section 2.7.

"**Real Property**" is defined in Section 9.16(b).

"**Straddle Patient**" is defined in Section 10.5.

"**Transferor**" means collectively City, County, and GLH.

"**Transferred Assets**" is defined in Section 2.1.

"**Transferred Cost Report Settlement Rights**" means all rights, claims, causes of action, appeal rights, settlement rights, reimbursement rights, refunds, underpayments, retroactive adjustments, supplemental payments, cost report settlement amounts, and other amounts payable to, or recoverable by, GLH or any Transferor in respect of Medicare, Medicaid or other Government Program cost reports, audits, reopenings, appeals, reconciliations, settlements or similar reimbursement proceedings for any periods ending on or before the Closing Date, including the short period from May 1, 2026 through the Closing Date; provided, however, that Transferred Cost Report Settlement Rights shall not include any patient-specific accounts receivable constituting Excluded Receivables or any Liabilities, repayments, recoupments, offsets, penalties, overpayments or other amounts payable by GLH or any Transferor, all of which shall remain Excluded Liabilities.

"**Transferred Personal Property**" is defined in Section 2.1(g).

"**Transferred Provider Agreements**" means the existing Medicare and Mississippi Medicaid participation of GLH and any related provider agreements, provider numbers, CMS certifications, CMS Certification Numbers, Medicaid enrollments, billing numbers, and related participation rights expressly described on **Schedule 2.1(e)** that the Parties intend to transfer, continue, assign, or otherwise recognize in favor of UMMC, together with any additional participation rights that UMMC may designate in writing before Closing, in each case to the extent permitted by applicable law and approved or recognized by the applicable Governmental Authority. As between the Parties, inclusion on **Schedule 2.1(e)** or other designation by UMMC shall not shift responsibility to UMMC for any Excluded Liability.

"**Transferred Real Property**" is defined in Section 2.1(a).

"**UPL**" means payment from the Mississippi Upper Payment Limit Program.

6

**ARTICLE 2**
**CONTRIBUTION, TRANSFER, AND LIMITED ASSUMPTION**

2.1     <u>Contribution and Transfer of Transferred Assets</u>.  As of the Closing Date, subject to the terms and conditions of this Agreement and Confirmation Order, Transferor shall contribute, donate, assign, transfer, convey, and deliver to UMMC, and UMMC shall accept, all of Transferor's right, title, and interest in and to the following assets, which are necessary to continue and maintain the operations of GLH after the Closing Date, in UMMC's sole and absolute discretion (the "**Transferred Assets**"):

(a)     fee-owned land, parcels, tracts, air rights, easements, rights-of-way, access rights, parking rights, appurtenances, strips and gores, and all other real property interests, together with all Improvements and fixtures located thereon or used in connection therewith, in each case as described on **Schedule 2.1(a)** (the "**Transferred Real Property**");

(b)     those executory contracts of Transferor described on **Schedule 2.1(b)** (the "**Assumed Contracts**") as contracts to be assumed by and assigned to UMMC as of the Closing Date;

(c)     leasehold, subleasehold, license, occupancy, and other possessory interests in real property, together with all rights of possession, renewal, extension, expansion, parking, and other appurtenant rights arising thereunder, as described on **Schedule 2.1(c)** (the **"Assumed Leases"**);

(d)     all amounts payable under any Hospital Payment Program, patient-specific insurance, patient self-pay or other third-party reimbursement with respect to periods after the Closing Date;

(e)     to the extent assignable or transferable, such Transferred Provider Agreements, including to the extent assignable or transferable, any National Provider Identifiers assigned to GLH described on **Schedule 2.1(e)**;

(f)     all Inventory;

(g)     all machinery, furniture, furnishings, vehicles, equipment and any other tangible or intangible personal property described on **Schedule 2.1(g)** (the "**Transferred Personal Property**");

(h)     the IT Assets described on **Schedule 2.1(h)**, solely to the extent transferable;

(i)     all claims, causes of action, avoidance actions, rights of setoff, defenses, counterclaims, chooses in action, and proceeds related to the Transferred Assets (including warranties, indemnities, rebates and guarantees), contractual or otherwise, arising before or after the Closing Date;

7

(j)      the Transferred Cost Report Settlement Rights. Notwithstanding anything to the contrary in this Agreement, including Section 2.2(b), Section 2.2(d), Article 4, Section 7.6, Section 10.5, Section 10.7, Section 10.10 or any other provision of this Agreement, the Transferred Cost Report Settlement Rights shall be Transferred Assets, shall not be Excluded Assets, Excluded Receivables or proceeds of Excluded Assets, and shall be owned solely by UMMC from and after Closing. Any proceeds of the Transferred Cost Report Settlement Rights received by any Transferor shall be held in trust for UMMC and remitted to UMMC within ten (10) business days after receipt, without offset, deduction, setoff or deposit into the Escrow Account.

(k)      any insurance proceeds arising in connection with damage to the Transferred Assets occurring prior to the Closing Date but only to the extent not expended on the repair or restoration of the Transferred Assets prior to the Closing Date;

(l)      books and records described on **Schedule 2.1(l)**, subject to applicable law;

(m)      intellectual property, domain names, telephone numbers, and related goodwill described on **Schedule 2.1(m)** (the **"Transferred IP"**);

(n)      permits, licenses, certificates, accreditations, and approvals described on **Schedule 2.1(n)**, solely to the extent transferable or reissuable;

(o)      rights under the Assumed Contracts or Assumed Leases; and

(p)      rights under warranties, guaranties, indemnities, credits, claims for rebates prepaid items, and such other assets expressly described on **Schedule 2.1(p)**.

UMMC, in its discretion, shall have the right to amend, delete or otherwise modify the list of Transferred Assets set forth in this Section 2.1 and related schedules to be acquired by UMMC, by revisions to the schedules by UMMC in its sole and absolute discretion at any time prior to the entry of the Confirmation Order. No asset, including any real property interests, shall be deemed a Transferred Asset unless expressly listed in this Section 2.1 and related schedules as finally designated by UMMC.

2.2      Excluded Assets. Any of GLH's assets that are not expressly identified by UMMC as Transferred Assets under Section 2.1 and are not intended by UMMC to be part of the transaction contemplated by this Agreement, including all of the following assets (the **"Excluded Assets"**):

(a)      all cash, cash equivalents, bank accounts, deposit accounts, lockboxes, and securities;

(b)      all accounts receivable, accrued and unbilled receivables, rights to payment, reimbursement rights, settlements, credits, refunds, recoupment recoveries, and other amounts payable with respect to services rendered or items furnished by or on behalf of GLH prior to the Closing Date (collectively, the **"Excluded Receivables"**);  provided, however, that Excluded Receivables shall not include any Transferred Cost Report Settlement Rights, any amounts payable to UMMC under Section 2.1(d), or any other asset

8

expressly identified as a Transferred Asset; and provided further that all collections and proceeds of Excluded Receivables shall be subject to funding the Escrow Account as set forth in Section 10.4;

(c)   to the extent not assigned and transferred to UMMC as a Transferred Provider Agreement, such provider agreements, provider numbers, Medicare certifications, Medicaid enrollments, and third-party payor agreements;

(d)   all claims, causes of action, avoidance actions, rights of setoff, defenses, counterclaims, choses in action, and proceeds related to the Excluded Assets;

(e)   all tax refunds and tax attributes;

(f)   all rights under this Agreement and the ancillary documents, except as expressly assigned at Closing;

(g)   all assets of any employee benefit plan;

(h)   all assets not transferable by law without consent, unless and until such consent is obtained and UMMC elects in writing to acquire the same;

(i)   all assets necessary to administer the Bankruptcy Case or retained under the Chapter 9 Plan;

(j)   all minute books, governance records, seals, and organizational records of any Transferor;

(k)   all deposits, prepaid expenses, and reserves that are otherwise not a Transferred Asset;

(l)   all other assets, rights, properties, and interests of Transferor not expressly included as Transferred Assets; and

(m)   the Excluded Real Property, subject only to UMMC's temporary use rights in the Temporary Real Property under Section 2.8(b).

UMMC, in its sole and absolute discretion, shall have the right to amend, delete or otherwise modify the list of Excluded Assets set forth in this Section 2.2 and related schedules at any time prior to the entry of the Confirmation Order.

2.3   Limited Assumption of Assumed Liabilities.  As of the Closing Date, UMMC shall assume only the following Liabilities ("**Assumed Liabilities**"):

(a)   those Liabilities related to the Transferred Provider Agreements that are imposed on UMMC by operation of law or negotiated between UMMC and the Mississippi Division of Medicaid in the Office of the Governor or CMS as a result of the transfer under applicable Medicare or Medicaid laws and regulations, subject to the Confirmation Order and Sections 10.4 and 10.5 of this Agreement;

(b)      the obligations first arising as of and after the Closing Date under the Assumed Contracts or Assumed Leases, but expressly excluding from such Assumed Liabilities the following:

(i)      any default, breach, delinquency, or violation occurring on or before Closing;

(ii)     any cure amount;

(iii)    any obligation to pay for goods delivered or services rendered before Closing;

(iv)    any obligation, claim or Liabilities arising out of facts or circumstances occurring on or before Closing;

(v)     any obligation arising from a contract or lease that is not validly assumed and assigned in accordance with applicable law and this Agreement; and

(vi)    any other Liabilities, if any, expressly described on **Schedule 2.3**.

UMMC, in its sole and absolute discretion, may revise by deletion from or addition to the Assumed Liabilities set forth in this Section 2.3 and related schedules at any time prior to the entry of the Confirmation Order.  No Liability shall be deemed an Assumed Liability unless expressly set forth above or described in a schedule under this Section 2.3 as finally designated by UMMC.

2.4      Excluded Liability; No Successor Liability.  Notwithstanding anything to the contrary in any contract, law, equity, or common-law doctrine, UMMC shall not be deemed to:

(a)      be a successor to GLH or other Transferor;

(b)      have agreed to pay, perform, discharge, or otherwise be liable for any Excluded Liability;

(c)      be a mere continuation of GLH;

(d)      have entered into a de facto merger or affiliation with GLH or other Transferor; or

(e)      have any liability based on transferee liability, successor liability, veil piercing, alter ego, product line, continuity of enterprise, substantial continuity, or any analogous theory.

2.5      Transfer Free and Clear.  Transferor shall cause the Chapter 9 Plan, Confirmation Order, and all ancillary transfer documents to provide that, to the maximum extent permitted by applicable law, the Transferred Assets shall vest in UMMC at Closing free and clear of all Liabilities other than Permitted Liens and the Assumed Liabilities.

2.6     <u>Real Property Contributions</u>.  To the extent any fee-owned real property is included in the Transferred Assets, Transferor shall contribute and convey such real property to UMMC at Closing by general warranty deed or such other deed in form acceptable to UMMC, in its sole discretion and subject to the Bankruptcy Case, together with all easements, appurtenances, access rights, parking rights, strips and gores, and other rights appurtenant thereto, free and clear of all Liabilities other than Permitted Liens.

2.7     <u>Permitted Liens</u>.  UMMC shall not be required to accept any title exception, easement, restrictive covenant, occupancy right, lease, license, lien, or other encumbrance affecting any real property included in the Transferred Assets unless expressly identified on **Schedule 2.7** and approved by UMMC in writing (the **"Permitted Liens"**).

2.8     <u>Real Property Exclusions; Temporary Use of Certain Real Property</u>.

(a)     **Schedule 2.8(a)** lists the Real Property that will be an Excluded Asset (the **"Excluded Real Property"**) and not otherwise conveyed and transferred to UMMC as part of the transactions contemplated hereby.  For the avoidance of doubt, Excluded Real Property shall constitute an Excluded Asset and shall not constitute Transferred Real Property or any other Transferred Asset.

(b)     Despite being an Excluded Real Property, UMMC will have one (1) year of complete right to occupy and use quietly without interference the Real Property set forth on **Schedule 2.8(b)** (the "**Temporary Real Property**") to assist in the transition of certain GLH services and practices from their current location, subject to any such existing lease agreement or arrangement by UMMC, as tenant, and GLH, as landlord.  To the extent there is no existing lease on any of the Temporary Real Property, the following shall apply:

(i)     Usage and access shall be rent-free;

(ii)     UMMC may terminate such arrangement and vacate any Temporary Real Property for any reason without costs, upon at least thirty (30) days prior notice in writing;

(iii)     UMMC will be responsible for reasonable routine maintenance during its usage, subject to UMMC's sole and absolute discretion;

(iv)     UMMC will be responsible for actual cost of utilities at such Temporary Real Property during its days of usage.

2.9     <u>Non-assignable Assets</u>.  Notwithstanding anything to the contrary herein, nothing in this Agreement, nor the consummation of the transactions contemplated hereby, shall be construed as an attempt or agreement to assign or transfer any Transferred Asset which by its terms or by law is not assignable or transferable without the consent of a third party or is cancelable by a third party in the event of an assignment or transfer (in each case, a "**Non-assignable Asset**"), unless and until such consent shall have been obtained. Each of the Parties shall use its commercially reasonable efforts (including the dedication of resources thereto, but without any obligation to commence litigation) to obtain expeditiously any such consent to the assignment or transfer, as applicable, of a Non-assignable Asset. Unless and until any such consent is obtained,

11

the Parties will establish an arrangement reasonably satisfactory to UMMC under which UMMC would obtain the claims, rights and benefits under such Non-assignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Transferor would enforce for the benefit of UMMC any and all claims, rights and benefits of GLH against a third party thereto.

2.10    Withholding Rights.   Without limiting any other provision of this Agreement, UMMC shall be entitled to deduct and withhold from any consideration otherwise payable to any third party pursuant to this Agreement or any other transaction document such amounts as it is required to deduct and withhold with respect to the making of such payment under provisions of applicable laws. To the extent that such amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable person in respect to which such deduction and withholding was made.

2.11    Retained Liabilities.   Subject to Section 10.9, Transferor shall remain solely responsible for all Excluded Liabilities and shall provide for the treatment, payment, discharge, defense, settlement, reservation, or other resolution of all Excluded Liabilities through the Chapter 9 Plan, applicable court orders, and any reserves or funding mechanisms required by this Agreement. No Excluded Liability shall be the responsibility of UMMC, and no third party shall have recourse against UMMC or the Transferred Assets on account of any Excluded Liability except to the extent expressly set forth in this Agreement as an Assumed Liability.

2.12    Return of Transferred Real Property Upon Hospital Closure. If, at any time after the Closing Date, UMMC or any affiliate, designee, or other transferee of UMMC that owns or operates the Transferred Real Property (a) other than as a result of casualty, force majeure, or temporary suspension for repair, renovation, or reconstruction, ceases operation of the Hospital at the Transferred Real Property for a continuous period of six (6) months, and (b) voluntarily terminates, or permits to be terminated, revoked, surrendered, or lapse without reinstatement or replacement, the Medicare and Medicaid provider agreements, provider numbers, or other material Government Program participation necessary to operate the Hospital as an acute care hospital, then UMMC shall, within ninety (90) days after the occurrence of both clauses (a) and (b), contribute, convey, and transfer to City and County, without additional consideration, all of UMMC's right, title, and interest in and to the Transferred Real Property, by special warranty deed or other customary conveyance instrument, in the same respective ownership interests held by City and County immediately prior to the Closing, or as City and County may otherwise jointly direct in writing.

## ARTICLE 3
## CLOSING

3.1    Closing.   Subject to the entry of the Confirmation Order by the Bankruptcy Court and UMMC's termination rights, Closing shall take place on the later of (i) the last business day of the month in which all conditions precedents set forth in Article 11 have been satisfied or waived or (ii) such other date as the Parties may mutually agree. The Closing shall take place remotely via electronic exchange of documents or at a location agreed upon by the Parties. The Closing with respect to the Parties shall be deemed to have occurred and be effective as of the Closing Date.

## ARTICLE 4
## TRANSFERRED PROVIDER AGREEMENTS; REGULATORY MATTERS

4.1     Intended Continuation and Assignment of Existing Medicare and Medicaid Participation.  Transferor and UMMC intend that the existing Medicare and Mississippi Medicaid participation of GLH, including the Transferred Provider Agreements, be transferred, assigned, continued, or otherwise recognized in favor of UMMC at or after the Closing Date to the maximum extent permitted by applicable law and as directed by UMMC. Transferor shall take, and shall cause GLH to take, at its sole cost and expense, all actions requested by UMMC in connection with such transfer, assignment, continuation, change-of-ownership notice, revalidation, re-enrollment, survey, licensure, or recognition. Transferor agrees not to cease operations, terminate existing Medicare or Medicaid provider agreements or take any other action that would cause GLH to relinquish its authority to operate as a hospital, pursuant to 42 U.S.C. § 1395x(e), or any Medicare or Medicaid laws or regulations prior to Closing without the prior approval of UMMC. GLH may not close a particular service line, without the prior written consent of UMMC.

4.2     Transfer Provider Agreement Liability Allocation as Between the Parties.  The Parties agree as follows:

(a)     all Liabilities attributable to periods, services, cost report years, reports, filings, acts, omissions, facts, circumstances, or payment periods occurring on or before Closing shall remain Excluded Liabilities;

(b)     Transferor shall remain solely responsible for all such Excluded Liabilities and shall provide for the payment, satisfaction, discharge, defense, settlement, reservation, or other treatment of all such Liabilities for the benefit of UMMC through the Chapter 9 Plan, the Confirmation Order, and other applicable orders or arrangements consistent with Mississippi law; provided, however, the obligations of the City and County post-Closing shall be subject to the limitations set forth in Section 10.9;

(c)     no acknowledgment by UMMC in this Agreement shall constitute an agreement by UMMC to assume any Excluded Liability;

(d)     Notwithstanding anything to the contrary in this Agreement, all proceeds and collections of the Excluded Assets, other than the Excluded Real Property,  shall be subject to funding the Escrow Agreement pursuant to Section 10.4;

(e)     All payments, reimbursements, settlements, supplemental payments, enhanced payments, adjustments, and other amounts payable under any Hospital Payment Program, patient-specific insurance, patient self-pay or other third-party reimbursement, attributable to periods after the Closing Date, including Transferred Cost Report Settlement Rights, shall constitute Transferred Assets pursuant to Section 2.1(d) and shall not be subject to Section 10.5. If any Transferor receives any such amount, Transferor shall remit such amount to UMMC within ten (10) business days after receipt.

(f)     Notwithstanding anything in this Agreement to the contrary, UMMC and GLH shall allocate any assessment, overpayment, reconciliation, adjustment, recoupment, or other Liability related to any Hospital Payment Program, any Transferred Provider

13

Agreement, patient-specific insurance, patient self-pay, or any other insurance or third-party reimbursement ("Adjustments") as follows:

(i) any patient-specific Adjustment relating to a Straddle Patient (as defined below), shall be allocated in accordance with Section 10.5;

(ii) any Adjustment attributable to periods ending prior to or on the Closing Date shall be an Excluded Liability and paid by GLH;

(iii) any Adjustment attributable to periods beginning after the Closing Date shall be an Assumed Liability and paid by UMMC;

(iv) any Adjustment attributable to a period that straddles the Closing Date shall be allocated between GLH and UMMC on a per diem basis according to the number of days in such period falling on or before the Closing Date and the number of days in such period falling after the Closing Date; and

(v) if either Party receives notice of any amount allocable to the other Party under this Section 4.2(e), that Party shall forward such notice to the other Party within ten (10) Business Days after receipt.

For the avoidance of doubt, Transferor's responsibility for preparing, filing, amending, prosecuting, defending and resolving such cost reports and related reimbursement matters shall not affect UMMC's ownership of the Transferred Cost Report Settlement Rights, and all positive recoveries, refunds, underpayments, settlements and retroactive adjustments constituting Transferred Cost Report Settlement Rights in accordance with Section 2.1(j).

(g)     For the avoidance of doubt, Transferor shall be solely responsible, at its sole cost and expense, for all cost reports and related reimbursement matters for the fiscal years ended April 30, 2025 and April 30, 2026, and for the short period from May 1, 2026 through the Closing Date, and all liabilities arising therefrom shall be Excluded Liabilities.

4.3     Regulatory Cooperation.  Transferor shall, at its sole cost and expense, cooperate fully with UMMC in connection with all notices, change-of-ownership filings, applications, tie-in notices, submissions, surveys, licensure actions, enrollment actions, revalidation actions, correspondence, payor contacts, and other steps that UMMC determines are necessary or advisable in connection with any Transferred Provider Agreement, Hospital Payment Program or approval from any Governmental Authority.  Without limiting the foregoing, Transferor shall take all actions reasonably requested by UMMC to cause any Hospital Payment Program payments, notices, correspondence, reconciliations, and related remittances to be directed to UMMC, and shall promptly deliver to UMMC any such items received by Transferor.

4.4     Excluded Liabilities Escrow.  Transferor acknowledges and agrees that all such Liabilities attributable to periods, services, reports, filings, acts, omissions, facts, circumstances, or payment periods occurring on or before Closing are Excluded Liabilities as between the Parties and shall be secured and reimbursed to UMMC through the Escrow Account established and maintained pursuant to Section 10.4, and with respect to the obligations of the City and County,

14

are subject to Section 10.9.  For the avoidance of doubt, Transferor's obligation to remit to UMMC directly any Hospital Payment Program payment or other amount that belongs to UMMC under this Agreement is separate from, and in addition to, funding the Escrow Account with proceeds from Excluded Assets, other than Excluded Real Property. Notwithstanding the foregoing, neither the Transferred Cost Report Settlement Rights nor any proceeds thereof shall constitute Excluded Assets or Excluded Receivables or be required to be deposited into the Escrow Account, and neither the exclusion of Excluded Real Property proceeds from the Escrow Account nor the transfer of the Transferred Cost Report Settlement Rights to UMMC shall limit Transferor's responsibility for Excluded Liabilities.

4.5     Delay or Denial of Assignment or Continuation.  If any Transferred Provider Agreement cannot be validly transferred, assigned, continued, or recognized as of Closing on terms satisfactory to UMMC in its sole and absolute discretion, UMMC may elect, in its sole and absolute discretion, to: (1) delay Closing; (2) close and pursue post-Closing recognition, continuation, or assignment; (3) require new enrollment or certification while receiving transition support from Transferor; (4) remove the affected Transferred Provider Agreement from the transaction; or (5) terminate this Agreement.

4.6     No Representation of Regulatory Outcome by UMMC.  UMMC makes no representation, warranty, or covenant that any provider agreement, provider number, license, permit, survey, accreditation, enrollment, certification, or payor contract will be transferred, assigned, reissued, recognized, or approved.

## ARTICLE 5
## ASSUMED CONTRACTS AND ASSUMED LEASES

5.1     Designation Rights.  UMMC may add, delete, or modify the list of Assumed Contracts and Assumed Leases in its sole and absolute discretion at any time before the entry of the Confirmation Order.

5.2     Assumption and Assignment Process.  Transferor shall, at its sole cost and expense, take all actions necessary to assign to UMMC each Assumed Contract and Assumed Lease in accordance with applicable law and any order of the Bankruptcy Court.

5.3     Cure Costs and Defaults.  Subject to the Confirmation Order, Transferor shall be solely responsible for, and shall timely pay in full, all cure amounts and all Liabilities, defaults, arrearages, penalties, or other amounts required to assume and assign any Assumed Contract and Assumed Lease. UMMC shall not be obligated to pay any cure amount unless UMMC expressly agrees in writing to do so with respect to an Assumed Contract and Assumed Lease.

5.4     Failure of Assignment.  No failed contract or lease assignment shall impose any liability on UMMC. If any contract or lease cannot be validly assumed and assigned on terms satisfactory to UMMC in its sole and absolute discretion, then UMMC may elect, in its sole and absolute discretion, to:

(a)     waive such defect and proceed;

15

(b)     remove such contract or lease from the list of Assumed Contracts and Assumed Leases;

(c)     delay Closing; or

(d)     terminate this Agreement.

## ARTICLE 6
## EMPLOYEES; BENEFIT PLANS; LABOR MATTERS

6.1     No Obligation to Hire.  UMMC shall have no obligation to interview, employ, retain, recognize, or continue the employment of any employee, independent contractor, medical staff member, volunteer, leased employee, or other service provider of GLH or other Transferor.

6.2     Offers of Employment in Sole Discretion.  UMMC may, in its sole and absolute discretion, offer employment to any person associated with GLH, on such terms as UMMC may determine in its sole and absolute discretion. No person shall become an employee of UMMC unless and until such person accepts a written offer from UMMC and commences employment with UMMC.

6.3     Employee Liabilities Excluded.  All Liabilities relating to employees and former employees of GLH or other Transferor shall be Excluded Liabilities, including payroll, wages, bonuses, PTO, vacation, severance, WARN, COBRA, retirement, pension, unemployment, workers' compensation, and labor Liabilities.

6.4     Benefit Plans.  UMMC shall not assume any employee benefit plan, pension plan, welfare plan, deferred compensation arrangement, or fringe benefit plan sponsored, maintained, or contributed to by GLH or other Transferor.

## ARTICLE 7
## RECORDS; ACCESS; HIPAA; PATIENT INFORMATION

7.1     Transfer of Books and Records.  At Closing, Transferor shall deliver to UMMC the books and records expressly designated as Transferred Assets under this Agreement, including the books and records described on **Schedule 2.1(l).** in such form and format as UMMC may reasonably request, whether by originals, copies, imaged records, electronic export, hosted access, or other means reasonably acceptable to UMMC and permitted by applicable law. To the extent Transferor is required by applicable law, the Bankruptcy Case, record retention requirements, or legitimate defense, compliance, or administrative needs to retain originals or copies of any such books and records, Transferor may retain such originals or copies, provided that such retention shall not limit UMMC's rights in or access to the Transferred Assets or transferred books and records under this Agreement.

7.2     Pre-Closing Access to GLH's EMR and Data.  From and after the Effective Date through the Closing Date, GLH shall provide UMMC and its authorized representatives with reasonable and secure access to GLH's electronic medical record system and related clinical, operational, billing, and other data and information maintained in or generated from such system solely to the extent reasonably necessary for due diligence, transition planning, regulatory

16

preparation, operational readiness, continuity of patient care planning, billing and revenue cycle transition, data mapping, data migration, testing, validation, training, cutover preparation, and other purposes expressly contemplated by this Agreement and the ancillary agreements. Such access shall be provided in a manner that preserves confidentiality, protects patient information, and does not unreasonably interfere with GLH's operations.

7.3     Retention of Records; Post-Closing Access.   Transferor, at its sole costs and expense, shall retain copies of all books and records necessary to administer the Bankruptcy Case, defend claims, comply with legal obligations, and satisfy record retention requirements. From and after the Closing Date and for so long as reasonably necessary to satisfy the purposes described in this Section 7.3 or as otherwise required by law, Transferor shall provide UMMC, at no additional cost, with prompt and reasonable access to such retained books and records, and to the information contained therein, to the extent reasonably requested by UMMC for reimbursement, compliance, audits, patient care, or operations related to the Transferred Assets.  For the avoidance of doubt, the books and records to be maintained under this retention and access obligation includes claim files, billing files, medical records to the extent permitted by law, remittance advices, explanations of benefits, correspondence, cost reports, settlement notices, reimbursement notices, appeals files, collection files, work papers, and other documentation relating to the origination, billing, adjudication, collection, appeal, settlement, or payment of any accounts receivables, including all records related to any Hospital Payment Program.  Transferor's obligation under this Section 7.3 shall continue for at least the longer of (a) the retention period required by applicable law for the particular record at issue, measured as required by such law, including Mississippi hospital record retention requirements, (b) ten (10) years after the Closing Date, or (c) any longer period required by any Government Program, third-party payor requirement, litigation hold, audit, investigation, subpoena, cost report, appeal, reimbursement matter, or pending proceeding.

7.4     Legacy Systems Access and Records.   To the extent reasonably necessary for UMMC to access retained books and records or information covered by Section 7.3, Transferor shall provide, or cause to be provided, reasonable post-Closing access to the applicable legacy systems, archives, document repositories, and related platforms in or through which such books and records are stored, maintained, indexed, retrieved, or produced, together with reasonable cooperation and support for chart retrieval, report production, export, imaging, indexing, and similar records-access functions. Such post-Closing access and related support will be provided pursuant to a transition services agreement between Transferor and UMMC, in form and substance as set forth in **Exhibit B** UMMC (the **"Transition Services Agreement"**), but no such agreement shall limit UMMC's rights under this Agreement. The Parties acknowledge that the operational maintenance of legacy revenue cycle systems and billing and collections support for Excluded Receivables shall be governed by Section 10.5, except to the extent otherwise expressly provided in any such Transition Services Agreement.

7.5     Privacy, Security and Patient Information.   Each Party shall comply with applicable law in connection with any access to, use of, disclosure of, retention of, transfer of, storage of, or other handling of patient information, medical records, protected health information, and other confidential or regulated information under this Agreement. Transferor shall implement and maintain reasonable administrative, technical, and physical safeguards with respect to all books and records, systems, and information remaining in its possession, custody, or control after Closing.  All Liabilities arising from any breach or alleged breach of HIPAA, HITECH, privacy

17

law, security law, confidentiality obligation, or medical records law occurring on or before Closing shall be Excluded Liabilities. Without limiting the foregoing, Transferor shall cooperate with UMMC in the investigation, response, mitigation, defense, and resolution of any such matter, including by providing reasonable access to records, audit logs, system information, relevant personnel, and other information reasonably requested by UMMC.

7.6     No Expansion of Assumed Liabilities.  Nothing in this Article 7 shall expand the Assumed Liabilities of UMMC, reduce any Excluded Liability of Transferor, alter the ownership of any Excluded Receivable, or shift to UMMC any Liability, obligation, or responsibility that is not expressly assumed by UMMC under this Agreement. All costs and expenses incurred by Transferor in performing its obligations under this Article 7 shall be borne solely by Transferor unless expressly stated otherwise in this Agreement.

## ARTICLE 8
## BANKRUPTCY CASE; PLAN REQUIREMENTS; COURT ORDERS

8.1     Bankruptcy Milestones.  Transferor shall comply with the following milestones, unless waived in writing by UMMC:

(a)     the Bankruptcy Case shall remain pending and shall not be dismissed, converted, or administered in a manner unacceptable to UMMC at any time from the Effective Date through the Closing Date;

(b)     the Chapter 9 Plan is filed on or before June 8, 2026;

(c)     the entry of the Confirmation Order on or before July 15, 2026; and

(d)     the Closing shall occur on or before August 1, 2026.

8.2     Form of Plan and Orders.  The Chapter 9 Plan, disclosure materials, Confirmation Order, and all other orders, pleadings, notices, and related documents affecting UMMC, the Transferred Assets, the Assumed Contracts and Assumed Leases, the Assumed Liabilities, or the Transferred Provider Agreements shall be in form and substance acceptable to UMMC in its sole and absolute discretion.

8.3     Required Findings and Protections.  Without limiting UMMC's discretion, Transferor shall obtain a Confirmation Order and such other orders as UMMC requests, containing findings and rulings satisfactory to UMMC, including that:

(a)     the Bankruptcy Court has jurisdiction over the transactions contemplated by this Agreement;

(b)     Transferor is authorized to enter into and perform this Agreement and consummate the transactions contemplated hereby;

(c)     all notices required in connection with the transactions contemplated by this Agreement have been given;

18

(d)    the Chapter 9 Plan satisfies all applicable confirmation requirements, and the Confirmation Order confirms the Chapter 9 Plan; any regulatory or electoral approval necessary to carry out the Chapter 9 Plan has been obtained or is expressly conditioned as required by law;

(e)    the Transferred Assets shall vest in UMMC at Closing free and clear of all Liabilities other than Permitted Liens and Assumed Liabilities;

(f)    all Excluded Liabilities remain Liabilities of Transferor and are not Liabilities of UMMC;

(g)    UMMC is not and shall not be deemed a successor to GLH or other Transferor;

(h)    no holder of any Liabilities, obligations, debts, claims, commitments, or responsibilities of any kind whatsoever shall have any right against UMMC or the Transferred Assets on account of any Excluded Liability or any act, omission, or circumstance occurring on or before Closing;

(i)    all persons and third parties of any nature whatsoever are forever barred, estopped, and enjoined from asserting against UMMC any Excluded Liability or successor liability theory;

(j)    Transferor shall pay all cure amounts required for assumption and assignment of Assumed Contracts and Assumed Leases;

(k)    directing  the Mississippi Division of Medicaid as to interim payments and reconciliations payments in a manner satisfactory to UMMC in its sole discretion; and

(l)    the protections of this Agreement in favor of UMMC are approved and enforceable.

8.4    Appeals; Stays.  UMMC shall have no obligation to Close unless the Confirmation Order and all other required orders are final and nonappealable, or, if appealable, are not stayed and are otherwise acceptable to UMMC in its sole and absolute discretion.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES OF TRANSFEROR

To induce UMMC to enter into this Agreement and to consummate the transaction contemplated herein, GLH represents and warrants to UMMC (and the City and County represents and warrants to UMMC with respect to Sections 9.1, 9.2, 9.3, 9.4, 9.6, 9.22 and 9.23) as of the Effective Date and through the Closing Date as follows, except as expressly disclosed on the Schedules:

9.1    Existence; Authority.  City and County are each a political subdivision of the State of Mississippi and GLH is a community hospital organized and operated under Miss. Code Ann.

§§41-13-10, et. seq., as amended.  Each Transferor has the requisite power to enter into this Agreement and perform its obligations hereunder.

9.2     Authorization.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been, or by Closing will have been, duly authorized by all necessary action of each Transferor, including all board approvals.

9.3     Enforceability.  This Agreement constitutes, and each ancillary document when executed and delivered will constitute, the valid and binding obligation of each Transferor, enforceable against such Transferor in accordance with its terms, subject only to the entry of required orders in the Bankruptcy Case.

9.4     No Conflict.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not violate any law, order, organizational document, resolution, contract, lease, permit, bond covenant, reimbursement agreement, or other obligation binding on any Transferor or GLH, except as set forth on **Schedule 9.4**.

9.5     GLH Subsidiaries.  Except as set forth on **Schedule 9.5**, GLH does not directly or indirectly own any equity, membership, ownership, partnership or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity, membership, ownership, partnership or similar interest in any other corporation, partnership, joint venture, or other business association or entity, foreign or domestic. GLH is not a member of, nor does it exercise control over, any nonprofit corporation.

9.6     Absence of Undisclosed Liabilities.  Other than items expressly set forth in **Schedule 9.6**, except for (a) Liabilities reflected on or reserved against GLH's balance sheet, and (b) Liabilities or obligations incurred by GLH in the ordinary course of business that are not individually or in the aggregate material to the business or operation of GLH, Transferor has no Liabilities or obligations of any nature with respect to GLH (whether known or unknown and whether absolute, accrued, contingent, or otherwise and whether or not due).

9.7     Ownership; Title.  Transferor has, or at Closing will have, good and marketable title to, or a valid leasehold or contractual right in, the Transferred Assets, free and clear of all Liabilities except as disclosed on **Schedule 9.7** and those that will be released, satisfied, cured, or otherwise removed on or before Closing.

9.8     Contracts & Leases.  **Schedule 9.8** contains a true, correct, and complete list of all contracts, leases, agreements, and commitments that could reasonably relate to the Transferred Assets or the operations of GLH, including vendor agreements, equipment leases, physician agreements, management agreements, software agreements, maintenance agreements, and payor agreements.  **Schedule 9.8** also identifies each such contract, lease, agreement, and commitment with respect to which GLH is in material breach or has received written notice of any material default that remains uncured.

9.9     Inventory.  GLH will manage Inventory as efficiently as possible under the circumstances; provided, however, Inventory levels may fluctuate and as of the Closing, may not

20

be of sufficient quantity to conduct normal operations light of cash management, vendor availability, and actions taken in connection with the Bankruptcy Case.

9.10    Financial Information; Liabilities.  **Schedule 9.10** contains complete and accurate copies of all available financial statements, internal financial reports, aged accounts payable and receivable reports, debt Schedules, bond and note documents, reimbursement summaries, cost reports, reserve reports, and other material financial information concerning GLH and the Transferred Assets. Except as set forth on **Schedule 9.10**, there are no Liabilities related to the Transferred Assets or GLH operations other than Liabilities incurred in the ordinary course and Liabilities fully disclosed to UMMC in writing.

9.11    Litigation; Investigations.    **Schedule 9.11** lists all pending or, to GLH's Knowledge, threatened litigation, arbitration, administrative proceedings, audits, investigations, subpoenas, settlements, consent decrees, claims, demands, reimbursement reviews, program integrity reviews, and enforcement matters relating to GLH, the Transferred Assets, or the operation of GLH.

9.12    Compliance With Law.  GLH and each Transferor are and have complied in all material respects with all applicable laws, permits, licenses, Medicare and Medicaid requirements, fraud and abuse laws, privacy laws, licensure laws, accreditation standards, billing rules, and reimbursement requirements, except as disclosed on **Schedule 9.12**.

9.13    Licenses; Permits.    **Schedule 9.13** lists all material licenses, accreditations, certificates, registrations, permits, provider numbers, certifications, and approvals issued by any Governmental Authority or pursuant to any law and used in GLH's operations, and all deficiencies, plans of correction, limitations, or threatened adverse actions related thereto.

9.14    Hospital Payment Programs.    **Schedule 9.14** contains complete and accurate information relating to the Hospital Payment Programs as follows:

(a)    all Medicare and Medicaid provider numbers and enrollment records;

(b)    all third-party payor contracts and participation agreements;

(c)    all cost reports, desk reviews, audits, appeals, reopenings, and settlements for the past five (5) years;

(d)    all identified or alleged overpayments, underpayments, recoupments, offsets, extrapolations, penalties, self-disclosures, and repayment obligations;

(e)    all notices from CMS, the Mississippi Division of Medicaid, any Medicare administrative contractor, any fiscal intermediary, any managed care organization, or any other payor;

(f)    all pending or threatened program integrity, fraud, abuse, or false claims matters; and

(g)    all outstanding or contingent reimbursement Liabilities.

21

9.15    Accreditation; Third-Party Payor Claims.  Except as set forth on **Schedule 9.15**,

(a)    GLH (i) is currently participating in the Government Programs and is not subject to any suspension, revocation proceeding, or other limitation on such participation status; (ii) has a current and valid provider agreement or provider contract, as applicable, with such Government Programs; (iii) is in compliance in all material respects with the conditions of participation in such Government Programs; (iv) is duly accredited, without contingencies, and a copy of the most recent accreditation letter pertaining to each facility has been made available to UMMC; and (v) makes claims for provider-based reimbursement only if eligible to do so and in compliance in all material respects with all Health Care Laws.

(b)    The billing practices of GLH with respect to all direct or third-party payors, including the Government Programs and private insurance companies (including companies operating managed care plans), are currently, and have, to GLH's Knowledge, been in material compliance with all applicable Health Care Laws. GLH has not billed, received, or retained any overpayment or reimbursement other than in compliance in all material respects with applicable Health Care Laws.

(c)    GLH has no outstanding Liabilities (i) to any third-party contractor administering claims for the Government Programs, (ii) directly to the Government Programs, (iii) to any private insurance company (including companies operating managed care plans), or (iv) to any third-party contractor administering claims for private health insurance or managed care plans, in each case for the recoupment of any material amounts previously paid to GLH by any such third-party contractor, Government Program, or private health insurance company; nor, to GLH's Knowledge, is there any basis for any such recoupment, except as recorded as a contingent or actual liability on the books of GLH.

(d)    GLH has duly filed all required Medicare and Medicaid cost reports and all cost reports required to be filed in connection with any private insurance plans, including managed care plans, through and including the cost report year ended April 30, 2025. All such cost reports accurately reflect, in all material respects, the information required to be included therein. GLH has identified those cost reports that have not been audited and finally settled and has described all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any other material unresolved claims or disputes relating to such cost reports. GLH has established reserves, consistent with generally accepted accounting principles in the United States, except as otherwise disclosed in writing, and consistent with GLH's past practices, to cover potential reimbursement obligations of GLH relating to such cost reports, and such reserves are reflected in GLH's financial statements. Further, to GLH's Knowledge, there is no event that has occurred that, with notice or the passage of time or both, would result in, or provide a basis for, (a) termination of any Medicare or Medicaid provider agreement of GLH; or (b) termination for cause of any participating provider agreement, contract, or similar arrangement between GLH and any private insurance company or managed care organization.

22

9.16    Real Property.

(a)     Transferor owns good and marketable fee simple title to its real property that is necessary to or used in the operation of GLH as set forth on **Schedule 9.16(a)**, together with all Improvements located thereon and all appurtenances and rights thereto (the "**Owned Real Property**"), free and clear of any and all Liens except for Permitted Liens.

(b)     Transferor holds good and valid leasehold title to its real property that is necessary to or used in the operation of GLH as set forth on **Schedule 9.16(b)**, together with all Improvements located thereon and all appurtenances and rights thereto (the "**Leased Real Property**" and, together with the Owned Real Property, the "**Real Property**"), free and clear of any and all Liens except for Permitted Liens. **Schedule 9.16(b)** also sets forth the title, date and parties to each ground lease, lease, sublease, license or other occupancy agreement and any amendments or modifications thereto pursuant to which Transferor has the right to occupy the Leased Real Property.  True and complete copies of Leased Real Property agreements have been delivered to UMMC. The Real Property constitutes all real property used in the operation of GLH by Transferor.

(c)     With respect to Real Property:

(i)     Except as set forth on **Schedule 9.16(c)(i)**, to GLH's Knowledge, Transferor has not received written notice from any Governmental Authority of a violation of any applicable law with respect to the Real Property, which violation has not been corrected to the satisfaction of the applicable Governmental Authority;

(ii)     Except as set forth in **Schedule 9.16(c)(ii)**, to GLH's Knowledge, the Real Property and its operation are in material compliance with all applicable zoning ordinances (or is considered legally nonconforming or "grandfathered" thereunder);

(iii)     Transferor has not created any Liens, easements, restrictions or other encumbrances which materially restrict or impair the use of the Owned Real Property for its current use;

(iv)     There are no tenants or other persons or entities occupying any space in the Real Property, other than pursuant to tenant leases described in **Schedule 9.16(c)(iv)**, and no tenants have paid rent in advance for more than one (1) month and no improvement credit or other tenant allowance of any nature is owed to any tenant, nor is any landlord improvement work required, except as disclosed in **Schedule 9.16(c)(iv)**;

(v)     Attached to **Schedule 9.16(c)(v)** is a "rent roll" which sets forth for those leases used in and necessary to the operation of GLH where Transferor is landlord:  (i) the names of then current tenants; (ii) the rental payments for the then current month under each of the leases; (iii) a list of all then delinquent rental payments; (iv) a list of all tenant deposits and a description of any application

23

thereof, and (v) a list of all uncured material defaults under the leases known to Transferor; and

(vi)     Except as set forth on **Schedule 9.16(c)(vi)**, to GLH's Knowledge, since August 1, 2019, no Transferor has received any written notice from any Government Authority of any existing, proposed or contemplated plans to modify or realign any street or highway, or any existing, proposed or contemplated eminent domain proceeding that would result in the taking of all or any part of the Owned Real Property or that would materially and adversely affect the current use of any part of the Owned Real Property.

9.17     Employees and Labor Matters.  **Schedule 9.17** contains a complete and accurate list of all employees, contractors, compensation arrangements, benefit plans, medical staff arrangements, union matters, grievances, leave claims, PTO balances, severance arrangements, retention arrangements, and labor disputes affecting GLH.

9.18     Environmental Matters.

(a)     Except as provided in **Schedule 9.18(a)**, Transferor has complied with all environmental laws in all material respects.

(b)     Except as provided in **Schedule 9.18(b)**, Transferor has timely applied for, and currently maintains all environmental permits material for GLH's operation as currently operated and the Real Property, and no action is pending or, to GLH's Knowledge, threatened, to revoke, modify, suspend or terminate any such environmental permit.  A true and complete list of all such environmental permits, all of which are in full force and effect, is set forth on **Schedule 9.18(b)**.

(c)     Except as provided in **Schedule 9.18(c)**, Transferor has not received any written notice solely or primarily applicable to GLH if it remains outstanding or unresolved, and there are no pending or, to GLH's Knowledge, threatened actions solely or primarily applicable to GLH alleging, asserting or pertaining to a violation of any environmental law or liability under environmental laws or with respect to Hazardous Materials.

(d)     Except as provided in **Schedule 9.18(d)**, there has been no release at, on, under or from the Real Property and no Transferor has arranged by contract, agreement or otherwise, for the transportation, disposal or treatment of Hazardous Materials at any location, in any case, such that Transferor has incurred or would reasonably be expected to incur material liability under environmental laws or with respect to Hazardous Materials.

(e)     Except as provided in **Schedule 9.18(e)**, to GLH's Knowledge, none of the following are present at the Real Property in violation of or that would reasonably be expected to result in liability under environmental law: (a) any underground storage tanks that contain or previously contained Hazardous Materials; (b) dumps, landfills, waste disposal pits or other units for the treatment or disposal of Hazardous Materials; (c) filled in wetlands; (d) polychlorinated biphenyls; (e) toxic mold; (f) lead-based paint; or (g) asbestos or asbestos-containing material.

(f)      Transferor has made available to UMMC copies of all material environmental assessments, reports and audits in their possession or under their control that solely or primarily relate to Transferor's compliance with or liability under environmental law.

9.19     Insurance.  **Schedule 9.19** is a listing of the true, correct and complete copies of the insurance policies or self-insurance funds currently maintained by or on behalf of GLH (covering the ownership and operations of GLH (the "**Insurance Policies**"), indicating the type of insurance, policy numbers, identity of insurers and insureds, amounts, and coverage. The Insurance Policies are in full force and effect with no premium arrearage. GLH has given in a timely manner to insurers all notices required to be given under the Insurance Policies with respect to all of the claims and actions to be covered by such insurance. Transferor has not received any notice or other communication from any such insurance company canceling or materially amending any of the Insurance Policies, and no such cancellation or amendment is pending or, to GLH's Knowledge, threatened.

9.20     Medical Staff and Employed Physician Matters.  GLH has provided UMMC true, correct, and complete copies of the rules and regulations of the medical staff and other facilities operated by GLH, as well as a list of all current members of such medical staff. Except as set forth on **Schedule 9.20** no medical staff members have resigned or had their privileges revoked or suspended.

9.21     IT Assets.

(a)      **Schedule 9.21(a)** lists all material IT Assets and other intellectual property currently owned or licensed and used in GLH's operations. No proceedings have been instituted, are pending, or, to GLH's Knowledge, (i) are threatened, that challenge the validity of the ownership or license of IT Assets or any other intellectual property and (ii) there is no basis therefor. Except as set forth on **Schedule 9.21(a)**, to GLH's Knowledge, there otherwise has been no material use of or infringement of any such IT Assets or other intellectual property by any other person. GLH owns (or possesses adequate and enforceable licenses or other rights to use) all material IT Assets and other intellectual property used in the conduct of its business, of which all such copies have been delivered by GLH to UMMC.

(b)      All IT Assets (and all parts thereof) (i) operate and perform in accordance with their documentation and functional specifications as required for GLH operation in all material respects, (ii) have not materially malfunctioned or failed in the past three (3) years, and (iii) are free of (A) any critical defects, including any critical error or critical omission in the processing of any transactions and (B) to GLH's Knowledge, any virus, worm, Trojan horse, spyware, malware, harmful scripts or other code or routine intended to disrupt, damage, gain unauthorized access to or permit unauthorized control over any systems or data. Except as set forth on **Schedule 9.21(b)**, to GLH's Knowledge, during the three (3) year period prior to the date of this Agreement, there has not been any material unauthorized breach, disclosure, or loss of data stored or contained in the IT Assets.

9.22   <u>No Brokers</u>.  No Transferor has incurred any liability for brokerage fees, finder's fees, investment banking fees, or similar compensation in connection with this Agreement or the transactions contemplated hereby, except as disclosed on **Schedule 9.22**, all of which shall be paid by Transferor.

9.23   <u>Sufficiency of Information</u>.   No representation, warranty, Schedule, exhibit, certificate, document, or written statement furnished by or on behalf of Transferor to UMMC contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading.

**ARTICLE 10**
**COVENANTS OF TRANSFEROR**

10.1   <u>Operation Pending Closing</u>.   Until the earlier of Closing or termination of this Agreement, Transferor shall:

(a)   preserve the Transferred Assets in substantially their present condition, ordinary wear and tear excepted;

(b)   not sell, transfer, lease, pledge, encumber, abandon, or dispose of any Transferred Asset without UMMC's prior written consent;

(c)   not enter into, amend, renew, or terminate any contract or lease that could affect the Transferred Assets or prospective operations without UMMC's prior written consent;

(d)   maintain all insurance, licenses, certifications, and permits relating to the Transferred Assets and GLH operations to the extent reasonably practicable;

(e)   promptly notify UMMC of any material adverse change, casualty, litigation, claim, notice, audit, reimbursement issue, or regulatory action;

(f)   give UMMC and its representatives full access to the Transferred Assets, books, records, personnel, payor correspondence, contracts, and other information reasonably requested by UMMC; and

(g)   comply with all instructions reasonably requested by UMMC in connection with the Chapter 9 Plan, regulatory filings, and transition matters.

10.2   <u>Schedules</u>.  As of the Effective Date, the Parties shall cooperate in the completion of the Disclosure Schedules to be attached hereto, but each shall be responsible solely for the accuracy and completion of their respective schedules. The Parties acknowledge that the Disclosure Schedules will not be deemed final until entry of the Confirmation Order, subject to updates due to circumstances and discovery of new information thereafter.  No Schedule update shall cure any breach or limit any right of UMMC unless UMMC expressly agrees in writing.

10.3   <u>Real Property Inspections; Permitted Liens</u>.  Prior to the Closing, UMMC may obtain, at its expense, a current owner's title insurance commitment from Old Republic Title

26

Insurance Company or other title company reasonably acceptable to UMMC (hereinafter called the "**Title Commitment**") for the issuance of an ALTA 2021 owner's policy of title insurance relating to the Real Property at normal rates together with an ALTA/NSPS survey of the Real Property (the "**Survey**") certified by a Mississippi licensed surveyor or engineer (the "**Surveyor**"). UMMC shall obtain with the Title Commitment copies of all available documents constituting exceptions to Transferor's title as reflected in the Title Commitment and a copy of the vesting deed(s) into Transferor (the "**Title Documents**").   If UMMC has any objections to the Title Commitment or Survey, UMMC shall deliver to Transferor in writing such objections within forty-five (45) days after the Effective Date. Any such title or survey objection shall only constitute a defect in title or Survey (a "**Defect**") if it could reasonably be expected to have a material adverse effect upon UMMC's use of the Real Property after Closing for the Real Property's current use. Any items to which UMMC does not object within such time period shall be deemed to be Permitted Liens. Prior to Closing, UMMC may update the Title Commitment and Survey to determine if there are any other exceptions on the Real Property that were not shown on the initial Title Commitment or Survey. If UMMC delivers an objection notice within the time period set forth herein, Transferor will have fifteen (15) days after receipt of such objection notice to notify UMMC that Transferor will either (i) use commercially reasonable efforts to remove or remedy such Defects on or before the Closing or (ii) not cause such Defects to be removed or remedied. If Transferor fails to deliver timely any such notice as to a particular Defect, then Transferor will be deemed to have made the election in clause (ii) as to such Defect. If Transferor elects not to cause such Defects to be removed or remedied, then UMMC shall have ten (10) business days after receipt of such notice to notify Transferor in writing that UMMC will either (A) nevertheless proceed with the Closing in accordance with the terms of this Agreement or (B) terminate this Agreement in its entirety pursuant to Section 14.2, and if (B) is elected the Parties will have no further rights or obligations hereunder.

10.4   Escrow Account.  As of the Closing Date and subject to the Confirmation Order, the Parties shall cause there to be established, funded, maintained, and administered an escrow account for the sole benefit of UMMC (the "**Escrow Account**"), in form and substance as set forth in **Exhibit C** (the "**Escrow Agreement**"), to secure and provide a source of payment and reimbursement for all Excluded Liabilities, including any arising under or relating to any Transferred Provider Agreement, any Government Program participation, any Hospital Payment Program, any cost report, any overpayment, recoupment, offset, repayment, audit, extrapolation, civil monetary penalty, self-disclosure, settlement obligation, or other reimbursement, regulatory, operational, contractual, tort, employment, tax, environmental, or other liability attributable to periods, services, reports, filings, acts, omissions, facts, circumstances, or payment periods occurring on or before the Closing Date. UMMC shall be entitled to payment or reimbursement from the Escrow Account in accordance with the Escrow Agreement for any Excluded Liability asserted against, imposed upon, collected from, incurred by, or otherwise affecting UMMC.

Notwithstanding anything to the contrary in this Agreement, proceeds from any sale, lease, transfer, monetization or other disposition of Excluded Real Property shall not be required to be deposited into the Escrow Account. Such proceeds shall be retained by City, County, GLH or the applicable Transferor, as applicable, and shall be used solely to pay Bankruptcy Court-approved administrative costs, professional fees and other administrative expenses of the Bankruptcy Case and other Excluded Liabilities of GLH, in each case in accordance with the Chapter 9 Plan, the Confirmation Order and applicable law. No use or application of proceeds of Excluded Real

27

Property shall create, expand or otherwise result in any Liability of UMMC, reduce any Excluded Liability, impair UMMC's rights to the Transferred Assets, or modify the limitations on UMMC's Assumed Liabilities set forth in this Agreement.

10.5   Billing & Collections.  From and after the Closing, Transferor shall, at its sole cost and expense, and not UMMC, use its best efforts and be solely responsible for (a) billing, collecting, reconciling, appealing, administering, and otherwise servicing all Excluded Receivables, whether directly or through one or more qualified third-party contractors selected by Transferor, (b) maintaining, continuing, or causing to be maintained or continued the legacy revenue cycle systems, software, records access, data hosting, reporting capabilities, and related operational support necessary or appropriate to bill and collect the Excluded Receivables and to provide information, data, reports, remittance information, claim histories, backup materials, and supporting documentation requested by UMMC from time to time in connection with audits, reviews, recoupments, repayments, cost reports, reimbursement matters, governmental inquiries, litigation, compliance matters, or other purposes relating to periods on or before the Closing Date or to any Transferred Provider Agreement, and (c) applying, or causing to be applied, collections of Excluded Receivables and such other funds or sources as may be required by this Agreement, the Chapter 9 Plan, or the Confirmation Order to fund, replenish, and support the Escrow Account. Transferor may satisfy the foregoing obligations through one or more third-party contractors, acceptable to UMMC in its sole and absolute discretion, but no such arrangement shall relieve Transferor of its obligations hereunder. All such arrangements, services, systems, and costs shall be solely the responsibility of Transferor, shall not be the responsibility of UMMC, and shall constitute Excluded Liabilities.

With respect to any patient admitted to GLH on or before the Closing Date who remains a patient after the Closing Date (a "**Straddle Patient**"), Transferor shall separately bill and collect for services provided on or before the Closing Date, and UMMC shall separately bill and collect for services provided after the Closing Date, in each case to the extent permitted by applicable Health Care Law, payor contract, and billing requirements. If billing rules require one Party to submit the claim for both periods, that Party shall do so, and the Parties shall cooperate in good faith to allocate the payment consistent with the services provided before and after Closing. Any amount received by one Party that belongs to the other Party shall be remitted promptly after receipt. Transferor shall provide, and shall cause its contractors and legacy system vendors to provide, the records, claim detail, coding support, and other cooperation reasonably requested by UMMC in connection with Straddle Patient billing, rebilling, adjustments, appeals, audits, or collections. Any amount attributable to GLH under this paragraph shall be deposited into the Escrow Account in accordance with the Escrow Agreement.

For the avoidance of doubt, this Section 10.5 governs only patient-specific billing and collection, including for Straddle Patients and any related patient-specific denials, refunds, overpayments, adjustments, and recoupments, and does not alter UMMC's rights to any Hospital Payment Program payment or other non-patient-specific amount under Sections 2.1(d) and 4.2(d).

10.6   Consents and Approvals.  Transferor shall obtain, at its sole cost and expense, all consents, notices, waivers, approvals, tie-in notices, and other actions necessary or advisable to consummate the transactions contemplated by this Agreement, including those described on **Schedule 10.6**.

10.7    Misdirected Payments.  In the event that after the Closing Date, either Transferor or UMMC receives a payment that was intended for the other Party, regardless of whether such payment relates to amounts due prior to or subsequent to the Closing, the receiving Party shall remit such payment to the other Party, as soon as reasonably practicable but in no event more than ten (10) business days following receipt thereof; provided, however, that any payments attributed to GLH shall be promptly deposited into the Escrow Account in accordance with the terms of the Escrow Agreement; provided, however, that (i) any payment attributable to Excluded Receivables or other Excluded Assets, other than Excluded Real Property proceeds, shall be deposited into the Escrow Account to the extent required by Section 10.4, and (ii) any payment constituting a Transferred Cost Report Settlement Right or other Transferred Asset shall be remitted directly to UMMC in accordance with this Agreement and shall not be deposited into the Escrow Account.

10.8    Payment of Cure Amounts and Closing Costs.  Transferor shall pay all cure amounts, all transferor-side transaction costs, all costs of the Bankruptcy Case, all fees of its professionals, and all costs necessary to deliver the Transferred Assets and Assumed Contracts and Assumed Leases.

10.9    Post-Closing Liability of City and County.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, the post-closing obligations and liabilities of City and County to UMMC shall be limited to the depositing of the net proceeds (as defined and set forth in the Escrow Agreement) from the sale, collection, monetization, or otherwise liquidation of the Excluded Assets, other than the Excluded Real Property, into the Escrow Account, as provided for in Section 10.4.  No discharge, modification, or treatment in the Bankruptcy Case shall impair, release, or diminish any liability of any Transferor to UMMC under this Agreement absent UMMC's prior written consent.

10.10    Reporting; Deposit Verification; Audit Rights. Transferor shall maintain complete and accurate books, records, and supporting documentation sufficient to verify (a) the billing, collection, adjustment, appeal, and administration of the Excluded Receivables and (b) the receipt, deposit, and application of all amounts required to be deposited into the Escrow Account.  Upon receipt, Transferor shall promptly provide UMMC with copies of any documents, statements, correspondence or any other information that relates to the Excluded Assets, Excluded Liabilities or any of Transferor's post-Closing obligations, including funding of Escrow Account. UMMC and its representatives may, on reasonable notice, review and audit the books, records, systems, and supporting materials relating to the Excluded Assets, Excluded Receivables and the Escrow Account. If any review or audit shows that amounts required to be deposited into the Escrow Account were not timely deposited, Transferor shall deposit those amounts within two (2) business days after notice from UMMC. Transferor shall require any billing, collection, revenue cycle, or other contractor engaged after Closing to provide the same reporting, access, and audit cooperation required by this Section 10.10.

## ARTICLE 11
## CONDITIONS TO UMMC'S OBLIGATIONS

All conditions in this Article are for the sole benefit of UMMC and may be waived only by UMMC in writing. UMMC shall have no obligation to consummate the Closing unless each of the following conditions has been satisfied or waived by UMMC in writing:

29

11.1    Bankruptcy Orders.  The Bankruptcy Court shall have entered the Confirmation Order and such other orders as UMMC requires, each in form and substance acceptable to UMMC in its sole and absolute discretion, and such orders shall be final and unstayed or otherwise acceptable to UMMC.

11.2    No Closure; No Voluntary Termination. GLH shall not, prior to the Closing Date: (a) cease operations, close GLH, or effect a close of business or (b) deliver or file any notice of voluntary termination of GLH's Medicare provider agreement or other material Government Program participation, in each case within the meaning of applicable CMS rules, regulations, manuals, or guidance, without UMMC's prior written consent.

11.3    Accuracy of Representations and Warranties.  All representations and warranties of Transferor shall be true, correct, and complete in all respects as of the Closing Date as though made on the Closing Date.

11.4    Performance.  Transferor shall have fully and timely performed all obligations required to be performed by Transferor on or before Closing.

11.5    No Material Adverse Change.  Since the Effective Date, there shall have occurred no event, change, development, condition, or circumstance that UMMC determines, in its sole and absolute discretion, is materially adverse to the Transferred Assets, the proposed operations, regulatory status, reimbursement profile, or feasibility of transferring GLH's operations to UMMC.

11.6    Governmental Approvals.  All approvals of a Governmental Authority required by UMMC, including any approval of the Board of Trustees of State Institutions of Higher Learning, licensure actions, Mississippi State Department of Health, Certificate(s) of Need, Medicare and Mississippi Division of Medicaid change-of-ownership notices or acknowledgments, provider enrollment or revalidation actions, reimbursement notices, and third-party approvals that UMMC deems necessary or advisable, shall have been obtained or satisfied on terms acceptable to UMMC in its sole and absolute discretion.  UMMC will have submitted or filed all material notices, applications for change of ownership and other material applications set forth on **Schedule 11.6**.

11.7    Assumed Contracts & Assumed Leases; Cure Amounts.  Each Assumed Contract and Assumed Lease shall be capable of valid assumption and assignment to UMMC on terms acceptable to UMMC, and all cure amounts and related defaults shall have been paid, otherwise satisfied or addressed in the Bankruptcy Court's plan of adjustment in a manner acceptable to UMMC.

11.8    Provider Protections.  If any Transferred Provider Agreement is included in the transaction, all protections described in Article 4 shall have been fully established and become effective on terms acceptable to UMMC.

11.9    Billing & Collections Support Arrangements.  Transferor shall have delivered to UMMC evidence satisfactory to UMMC that Transferor has established, or caused to be established, effective post-Closing arrangements, at Transferor's sole cost and expense, for the billing and collection of the Excluded Receivables and for the continued availability of the

30

applicable revenue cycle systems, data, and reporting capabilities necessary to support Transferor's obligations under this Agreement, including providing UMMC access upon request.

11.10    Controlled Substances Authorization.  GLH shall have provided on or prior to the Closing the Power of Attorney, duly executed by the appropriate persons, authorizing UMMC to utilize federal and state controlled substances permits and pharmacy licenses used by GLH in its operations

11.11    Delivery Items.   Transferor shall have delivered all documents, instruments, Schedules, approvals, certificates, resolutions, deeds, bills of sale, assignments, endorsements, estoppels, title documents, and other items required by UMMC.

11.12    Due Diligence Satisfaction.  UMMC shall be satisfied, in its sole and absolute discretion, with the results of its legal, operational, financial, regulatory, reimbursement, environmental, title, tax, labor, and other due diligence review.

11.13    No Injunction or Litigation.  No action, proceeding, appeal, objection, injunction, or stay shall be pending or threatened that could, in UMMC's judgment, adversely affect the transactions contemplated hereby or expose UMMC to liability.

11.14    Closing Deliverables.  On or before the Closing Date, Transferor shall deliver or cause to be delivered to UMMC those items provided in Article 12 to the satisfaction of UMMC, in its sole and absolute discretion.

## ARTICLE 12
## CLOSING DELIVERABLES

12.1    Transferor Deliverables.  At Closing, Transferor shall execute and deliver to UMMC, all in form and substance satisfactory to UMMC:

(a)      a bill of sale covering the Transferred Assets other than real property in the form attached hereto as **Exhibit D** (the "Bill of Sale");

(b)      one or more general warranty deeds, assignments of leasehold interests, assignments of easements, and other real estate conveyance instruments for the Transferred Assets, each in recordable form and acceptable to UMMC and the title insurer;

(c)      an assignment and assumption agreement, limited solely to the Assumed Liabilities, in the form attached hereto as **Exhibit E (** the "Assignment and Assumption");

(d)      the limited power of attorney duly executed by the appropriate persons, authorizing UMMC to utilize federal and state controlled substances permits and pharmacy licenses used by GLH in its operations in the form attached hereto as **Exhibit F** (the **"**Power of Attorney**"**)

(e)      provider enrollment, change-of-ownership, and regulatory transfer documents for the Transferred Provider Agreements;

31

(f)      the Transition Services Agreement;

(g)      the Escrow Agreement;

(h)      all applications, notices, transfer documents, cooperation undertakings, and other materials reasonably requested by UMMC in connection with the transition, replacement, reissuance, or continued use, to the extent permitted by applicable law, of pharmacy licenses, controlled substances registrations, and related permits used in GLH's operations;

(i)      certified copies of all resolutions, approvals, and authorizations of each Transferor;

(j)      officer or authorized representative certificates of each Transferor;

(k)      title commitments or pro forma policies, surveys, legal descriptions, lien releases, owner affidavits, gap undertakings, estoppels, non-disturbance agreements, possession affidavits, notices to tenants or occupants, and such other title company or real estate closing deliverables as UMMC may require;

(l)      FIRPTA and tax forms, to the extent applicable;

(m)      possession and control of the Transferred Assets;

(n)      access credentials, passwords, keys, badges, codes, and lock combinations related to the Transferred Assets;

(o)      originals or copies of all leases, occupancy agreements, service contracts, warranties, permits, plans, surveys, environmental reports, and other books and records relating to the Transferred Assets; and

(p)      any other documents, certificates or agreements as UMMC may reasonably require or as required by the Bankruptcy Court to the satisfaction of UMMC.

12.2    <u>UMMC Deliverables</u>.  At Closing, UMMC shall execute and deliver:

(a)      the Bill of Sale

(b)      the Assignment and Assumption;

(c)      the Power of Attorney;

(d)      the Escrow Agreement;

(e)      the Transition Services Agreement; and

(f)      such other documents as may be required by UMMC, in its discretion, needed to consummate the transactions contemplated under this Agreement.

32

### ARTICLE 13
### LIMITIATION OF LIABILITY; INDEMNIFICATION

13.1     Limitation of City and County Liability.  After the Closing Date and subject to UMMC's approval of the Confirmation Order, the obligations of City and County shall be limited to the funds deposited into the Escrow Account in accordance with Sections 10.4 and 10.9 or otherwise approved in the Confirmation Order.

13.2     Survival. All representations, warranties, covenants, and indemnities of Transferor shall survive Closing, indefinitely, except to the extent limited only by applicable statute of limitations and other laws, and subject in all respects to Section 10.9 and Section 13.1

13.3     No Indemnification by UMMC.  UMMC shall have no indemnification obligation to any Transferor under this Agreement.

### ARTICLE 14
### TERMINATION

14.1     Termination by UMMC.  UMMC may terminate this Agreement at any time before Closing, in its sole and absolute discretion, for any reason or no reason, upon written notice to Transferor.

14.2     Other Termination Rights.  This Agreement may also be terminated:

(a)     by UMMC if Transferor breaches this Agreement;

(b)     by UMMC if any condition to UMMC's obligation to Close, pursuant to Article 11, is not satisfied or waived by UMMC;

(c)     by UMMC if the Bankruptcy Case is dismissed, converted, or administered in a manner unacceptable to UMMC;

(d)     by UMMC if the Confirmation Order or other required order is reversed, modified, stayed, vacated, or not entered on terms satisfactory to UMMC;

(e)     by UMMC if any Governmental Authority or other person seeks to impose on UMMC any liability or condition unacceptable to UMMC; or

(f)     by any Party if Closing has not occurred by August 31, 2026, provided that the Parties may extend this date by written consent.

14.3     Effect of Termination.  Upon termination, this Agreement shall be void and of no further force or effect except for those provisions that expressly survive termination; provided, however, that no termination shall limit or impair any right or remedy of UMMC arising from any breach by Transferor.

14.4     Transferor's Limited Remedy.  Transferor acknowledges and agrees that their sole remedy in connection with any failure of the transactions contemplated hereby to close shall be

33

termination of this Agreement, and in no event shall Transferor be entitled to damages, specific performance, lost profits, reliance damages, or any other recovery against UMMC.

**ARTICLE 15**
**MISCELLANEOUS**

15.1     Entire Agreement. This Agreement, together with the Schedules, exhibits, ancillary documents, and the Bankruptcy Court orders approved in connection herewith, constitutes the entire agreement among the Parties with respect to the subject matter hereof.

15.2     Amendment; Waiver.  No amendment, modification, or waiver of this Agreement shall be effective unless in writing and signed by UMMC and Transferor. No waiver by UMMC of any provision shall be deemed a waiver of any other provision or of any subsequent breach.

15.3     Assignment by UMMC.  UMMC may assign this Agreement or designate any affiliate, division, subsidiary, state-sponsored entity, nonprofit corporation, or other designee to take title to any or all Transferred Assets or to assume any or all Assumed Liabilities, without the consent of Transferor. Transferor may not assign this Agreement or any rights or obligations hereunder without UMMC's prior written consent.

15.4     Specific Performance.  Transferor acknowledges that UMMC would be irreparably harmed by any breach of this Agreement by Transferor and that money damages may not be an adequate remedy. Accordingly, UMMC shall be entitled to specific performance, injunctive relief, and all other equitable remedies in addition to any other rights and remedies available at law or in equity. Transferor shall not be entitled to specific performance against UMMC.  Notwithstanding the foregoing, after Closing, UMMC's rights to specific performance or other equitable relief against City or County shall be limited to enforcement of the obligations expressly applicable to City or County under Section 10.9, Section 10.10, and the Confirmation Order.

15.5     Notices.  All notices under this Agreement shall be in writing and delivered to the addresses set forth below, or to such other address as a Party may designate by notice:

| | |
|---|---|
| If to GLH: | Greenwood Leflore Hospital<br>ATTN: Dawne Holmes<br>2001 Garrard Ave.<br>Greenwood, Mississippi 38930<br>Email:  dholmes@glh.org |
| If to County: | Leflore County<br>ATTN:  President of Board of Supervisors<br>306 W. Market St.<br>Greenwood, MS 38930<br>[EMAIL] |
| If to City: | City of Greenwood, Mississippi<br>ATTN:  Mayor<br>101 W Church St. |

<table>
<tr><td></td><td>Greenwood, MS 38930<br>[EMAIL]</td></tr>
<tr><td>If to UMMC:</td><td>Alan E. Jones, MD<br>Associate Vice Chancellor for Health Affairs<br>The University of Mississippi Medical Center<br>2500 N. State St.<br>Jackson, Mississippi 39216<br>aejones@umc.edu</td></tr>
<tr><td>With copies to:</td><td>William C. Smith, III<br>General Counsel<br>The University of Mississippi Medical Center<br>2500 N. State St.<br>Jackson, Mississippi<br>wcsmith3@umc.edu</td></tr>
<tr><td>and</td><td></td></tr>
<tr><td>(which shall not constitute notice):</td><td>Butler Snow LLP<br>Attn: John J. Healy III<br>1020 Highland Colony Parkway, 14th Floor<br>Ridgeland, Mississippi 39157<br>johnny.healy@butlersnow.com</td></tr>
</table>

15.6   <u>Governing Law</u>.  Except to the extent governed by federal bankruptcy law, this Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi, without regard to conflicts-of-law principles.

15.7   <u>Venue; Jurisdiction</u>.  Until the Closing or earlier termination of this Agreement, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or related to this Agreement and the transactions contemplated hereby. After Closing or termination, venue for any action not within the exclusive jurisdiction of the Bankruptcy Court shall lie exclusively in the federal and the state courts located in Hinds, County, Mississippi, and each Transferor irrevocably submits to such jurisdiction.

15.8   <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable, the remaining provisions shall remain in full force and effect, and the invalid or unenforceable provision shall be reformed to the maximum extent permitted to carry out the Parties' intent.

15.9   <u>No Third-Party Beneficiaries</u>.  Nothing in this Agreement is intended to confer any rights or remedies on any third party other than the Parties hereto.

15.10  <u>Counterparts; Electronic Signatures</u>.   This Agreement may be executed in counterparts and by electronic or PDF signatures, each of which shall be deemed an original and all of which together shall constitute one instrument.

35

15.11 <u>Construction</u>.   This Agreement shall be construed without regard to any presumption or rule requiring construction against the party drafting an instrument. The word "including" means "including without limitation."

15.12 <u>Public Announcements</u>.   Transferor shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without UMMC's prior written consent, except as required by law, court order, or public records requirements, in which case Transferor shall provide UMMC advance notice and a reasonable opportunity to review and comment.

15.13 <u>Further Assurances</u>.   After Closing, Transferor shall execute and deliver such further instruments and take such further actions as UMMC may reasonably request to vest, perfect, confirm, or evidence UMMC's rights in the Transferred Assets and the limited assumption of Assumed Liabilities.

**[Signature Pages to Follow]**

IN WITNESS WHEREOF, this Contribution and Asset Transfer Agreement has been executed and delivered by duly authorized persons of the Parties as of the Effective Date.

**TRANSFEROR:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____


**LEFLORE COUNTY, MISSISSIPPI**

By: _____

Name: _____

Title: _____


**CITY OF GREENWOOD, MISSISSIPPI**

By: _____

Name: _____

Title: _____


**[Signature Pages Continued on Next Page]**


*Signature Page to the Contribution and Asset Transfer Agreement*

**UMMC:**

**THE UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER**

By: _____

Name: _____

Title: _____

*Signature Page to the Contribution and Asset Transfer Agreement*

**EXHIBIT A**

**Description of Clinics and Ancillary Operations**

1. Orthopedic

2. General Surgery

3. Vascular Surgery

4. Gastroenterology

5. Neurology

6. Itta Bena

7. Cancer Center at GLH

*Exhibit A to the Contribution and Asset Transfer Agreement*

**EXHIBIT B**

**Form of Transition Services Agreement**

*Exhibit B to the Contribution and Asset Transfer Agreement*

**TRANSITION SERVICES AGREEMENT**

THIS TRANSITION SERVICES AGREEMENT (this "**TSA**") is made this ___ day of _____, 2026, by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"); **GREENWOOD LEFLORE HOSPITAL**, a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees ("**GLH**", together with City and County, "**Transferor**"); and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning ("**UMMC**").

The City, County, GLH, and UMMC are each a "**Party**" and collectively the "**Parties**". Capitalized terms used in this TSA not otherwise defined herein shall have the meanings ascribed in the Contribution Agreement.

**RECITALS:**

A.       **WHEREAS**, pursuant to the Contribution Agreement, Transferor has contributed, conveyed, assigned, transferred, and delivered to UMMC, and UMMC has accepted from Transferor, the Transferred Assets; and

B.       **WHEREAS**, pursuant to the Contribution Agreement, UMMC has assumed only the Assumed Liabilities, and no other liabilities, obligations, debts, claims, commitments, or responsibilities of any kind whatsoever of Transferor; and

C.       **WHEREAS**, pursuant to the Contribution Agreement, Transferor shall provide UMMC and its authorized representatives with reasonable and secure access to GLH's electronic medical record system and related clinical, operational, billing, and other data and information on such terms and for such purposes as provided therein; and

D.       **WHEREAS**, GLH is a licensee to certain software systems which contain certain patient data and serves as the repository of certain of GLH's legal, health, billing, and accounting records (the "**Legacy Systems**") necessary for UMMC's operations following the Closing; and

E.       **WHEREAS**, UMMC and its authorized representatives  require post-Closing access to certain of GLH's Legacy Systems, including such Legacy Systems' archives, document repositories, and related records stored, maintained, indexed, retrieved, or produced, together with reasonable cooperation and support for chart retrieval, report production, export, imaging, indexing, and similar records-access functions (the "**Extraction Work**"); and

F.       **WHEREAS**, Transferor acknowledges and agrees that completion of the Extraction Work requires that GLH, at its sole expense, remain a licensee to certain of the Legacy Systems for the purposes and periods as more fully detailed herein; and

G.      **WHEREAS,** pursuant to the Contribution Agreement, from and after the Closing, Transferor shall, at its sole cost and expense, and not UMMC, be solely responsible for billing, collecting, reconciling, appealing, administering, and otherwise servicing all Excluded Receivables in accordance with the terms therein; and

H.      **WHEREAS**, the Parties desire to enter into this TSA to assist in the orderly transition of the management and operation of the Business to UMMC immediately following the Closing and to more effectively carry out the terms of the Contribution Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual covenants and conditions contained in this Agreement, the Parties agree as follows:

1.      Legacy Systems Transition Services.  Subject to the terms and conditions in this TSA, UMMC and its authorized representatives shall retrieve, copy, migrate, export, image, and index, among other similar records-access functions, certain GLH data and records for ingestion into UMMC's or UMMC's third-party contractors' technology systems in furtherance of UMMC's operations following the Closing.

1.1      Extraction Work. UMMC will cooperate with its third-party consultant (the "**Extraction Contractor**") to complete the Extraction Work in accordance with the scope as set forth below. UMMC shall have sole responsibility for defining the scope of the Extraction Work (including defining the data to be copied and format for UMMC to separately ingest into UMMC's own systems and/or for UMMC to access archived information via Extraction Contractor systems) and shall be solely responsible for working with Extraction Contractor to oversee and validate all such Extraction Work.

1.2      Scope of Extraction Work.  UMMC shall work with Extraction Contractor to perform the Extraction Work with the following Legacy Systems vendors and in accordance with the following terms:

A.      Vendor: Oracle Health/Cerner

(i)      Scope: GLH patient encounter data and records for hospital visits, including but not limited to, patient chart information, laboratory results, imaging reports, radiological oncology images and reports, and pharmaceutical history for a historical period of ten (10) years prior to Closing. Licenses and competencies of certain staff.

(ii)     Deliverables: Completion of Extraction Work from Oracle Health/Cerner's Sorian Document Management system.

(iii)    Confirmation: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

2

(iv)  Access Period: UMMC and Extraction Contractor shall require access to the Sorian Document Management system for a minimum period of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

B.  Vendor: NextGen

(i)  Scope: GLH patient encounter data and records for clinic visits, including but not limited to, patient chart information, laboratory results, imaging reports, and pharmaceutical history for a historical period of ten (10) years prior to Closing. GLH patient billing and accounting data and records for clinic visits.

(ii)  Deliverables: Completion of Extraction Work from Waystar's NextGen system.

(iii)  Confirmation: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

(iv)  Access Period: UMMC and Extraction Contractor shall require access to the NextGen system for a minimum period of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

C.  Vendor: Oracle Health/Cerner

(i)  Scope: GLH patient billing and accounting data and records for hospital visits.

(ii)  Deliverables: Completion of Extraction Work from Oracle Health's Invision system for a historical period of six (6) years prior to Closing.

(iii)  Confirmation: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

(iv)  Access Period: UMMC and Extraction Contractor shall require access to the Invision system for a minimum period of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

D.  Vendor: Siemens Medical Solutions USA

3

(i)     <u>Scope</u>: Patient radiological data and records for a period of three (3) years.

(ii)    <u>Deliverables</u>: Completion of Extraction Work from PACS Syngo system.

(iii)   <u>Confirmation</u>: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

(iv)   <u>Access Period</u>: UMMC and Extraction Contractor shall require access to the Syngo system for a minimum period of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

E.    Vendor: APTEAN

(i)     <u>Scope</u>: Audit and cost report data and records.

(ii)    <u>Deliverables</u>: Completion of Extraction Work from Ross Financials system for a historical period of six (6) years prior to Closing.

(iii)   <u>Confirmation</u>: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

(iv)   <u>Access Period</u>: UMMC and Extraction Contractor shall require access to the Ross Financials system for a minimum period of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

F.    Vendor: DBTech

(i)     <u>Scope</u>: Audit and cost report data and records.

(ii)    <u>Deliverables</u>: Completion of Extraction Work from RASi system for a historical period of six (6) years prior to Closing.

(iii)   <u>Confirmation</u>: UMMC to ensure accuracy, validation, and success of Extraction Work in its sole and absolute discretion.

(iv)   <u>Access Period</u>: UMMC and Extraction Contractor shall require access to the RASi system for a minimum period

4

of six (6) months and a maximum period of twelve (12) months for completion of the Extraction Work.

1.3 <u>Performance of Extraction Work</u>. UMMC acknowledges that: (i) UMMC will be performing the Extraction Work with such Extraction Contractor; and (ii) Transferor will not be performing any services in relation to the Extraction Work or subsequent migration or ingestion into UMMC systems. UMMC shall be responsible for scheduling all such Extraction Work with Extraction Contractor. Extraction Contractor will be performing under this TSA on behalf of UMMC and shall be treated for purposes of this TSA as UMMC's authorized representative. UMMC shall and shall cause the Extraction Contractor to: (i) exercise commercially reasonable care in performing the Extraction Work; and (ii) perform the Extraction Work in a professional manner and in compliance with all applicable laws.

1.4 <u>Payment for Extraction Work</u>. Transferor acknowledges and agrees that it shall bear any and all financial obligations and costs associated as the licensee to the Legacy Systems and related to the Extraction Work until the completion of the Extraction Work pursuant to Section 1.5 of this TSA. Such financial obligations and costs related to this TSA shall be paid through the Escrow Account established and maintained pursuant to Section 10.4 of the Contribution Agreement or by other of Transferors' funds. Transferor further acknowledges and agrees that any activity, work, or act by Transferor made in connection with this TSA will not impose any obligation upon UMMC to compensate Transferor or convey any sort of interest to Transferor.

1.5 <u>Completion of Extraction Work</u>. Upon completion of the Extraction Work by Extraction Contractor, UMMC shall confirm to Transferor that all information or data requested to be extracted by Extraction Contractor has been received by UMMC.

2. <u>Billing & Collections</u>. From and after the Closing, Transferor shall, at its sole cost and expense, and not UMMC, be solely responsible for (a) billing, collecting, reconciling, appealing, administering, and otherwise servicing all Excluded Receivables, whether directly or through one or more qualified third-party contractors selected by Transferor, (b) maintaining, continuing, or causing to be maintained or continued the legacy revenue cycle systems, software, records access, data hosting, reporting capabilities, and related operational support necessary or appropriate to bill and collect the Excluded Receivables and to provide information, data, reports, remittance information, claim histories, backup materials, and supporting documentation requested by UMMC from time to time in connection with audits, reviews, recoupments, repayments, cost reports, reimbursement matters, governmental inquiries, litigation, compliance matters, or other purposes relating to periods on or before the Closing Date or to any Transferred Provider Agreement, and (c) applying, or causing to be applied, collections of Excluded Receivables and such other funds or sources as may be required by the Contribution Agreement, the Chapter 9 Plan, or the Confirmation Order to fund, replenish, and support the Escrow Account. Transferor may satisfy the foregoing obligations through one or more third-party contractors, acceptable to UMMC in its sole and absolute discretion, but no such arrangement shall relieve Transferor of its obligations hereunder. All such arrangements, services, systems,

5

and costs shall be solely the responsibility of Transferor, shall not be the responsibility of UMMC, and shall constitute Excluded Liabilities.

3.     <u>Term; Termination</u>. This TSA shall be in effect from the execution hereof and shall terminate only upon UMMC's written confirmation that all Extraction Work has been completed to UMMC's satisfaction in its sole discretion, or upon written agreement executed by UMMC.

4.     <u>Notices</u>. Any notice, demand, waiver, consent or other communication required or permitted hereunder shall be in writing and shall be deemed received on the date delivered (a) by hand delivery (to the person or department if one is specified below), (b) by U.S. mail, certified or registered, with return receipt requested, or (c) by FedEx, Airborne, UPS or other national overnight courier service, and in each case addressed as follows:

| | |
|---|---|
| If to GLH: | [NAME/TITLE]<br>[ADDRESS]<br>[EMAIL] |
| If to County: | [NAME/TITLE]<br>[ADDRESS]<br>[EMAIL] |
| If to City: | [NAME/TITLE]<br>[ADDRESS]<br>[EMAIL] |
| If to UMMC: | Alan E. Jones, MD<br>Associate Vice Chancellor for Health Affairs<br>2500 N. State St.<br>Jackson, MS 39216<br>aejones@umc.edu |
| With copies to: | William C. Smith, III<br>General Counsel<br>The University of Mississippi Medical Center<br>2500 N. State St.<br>Jackson, MS 39216<br>wcsmith3@umc.edu |
| and | |
| (which shall not constitute notice): | Butler Snow LLP<br>Attn: John J. Healy III<br>1020 Highland Colony Parkway, 14th Floor<br>Ridgeland, Mississippi 39157<br>Johnny.Healy@butlersnow.com |

or to such other address as any Party may provide to the other Parties in writing from time to time.

5.      Severability. If any provision of this TSA, or portion thereof, is declared invalid, the remaining provisions will remain in full force and effect.

6.      Remedies. The rights and remedies conferred upon the Parties hereto shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies.  The waiver of any right or remedy hereunder shall not preclude the subsequent exercise of such right or remedy.

7.      Assignment. Except as expressly herein provided, no Transferor party may assign its rights or obligations under this TSA without UMMC's prior written consent. UMMC may assign this TSA to any affiliated or designated acquiring entity upon written notice to the other Parties.

8.      Amendments. This TSA may only be amended by a written agreement executed by all of the Parties hereto.

9.      Governing Law; Venue.  This TSA is made and entered into and will be construed and interpreted in accordance with the laws of the State of Mississippi without regard to its conflict of laws provisions.  Venue for any action related to this TSA that is not within the exclusive jurisdiction of the Bankruptcy Court shall lie exclusively in the federal and state courts located in Hinds County, Mississippi and each Transferor irrevocably submits to such jurisdiction.

10.     Binding Effect. This TSA shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

11.     Execution in Counterparts; Electronic Signatures. This TSA may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement. A signed copy of this TSA delivered by facsimile, email, portable document format (.pdf), or other electronic means shall be deemed to have the same legal effect as delivery of an original signed copy of this TSA. The Parties agree that electronic signatures shall be valid and binding and shall have the same force and effect as original manual signatures

12.     Entire Agreement. This TSA, along with the Contribution Agreement to which UMMC and Transferor are Parties, constitutes the entire agreement among the Parties with respect to the subject matter hereof and shall not be rescinded, amended or modified in any manner except by a document in writing executed by all Parties hereto.

**[Signatures on following pages]**

7

IN WITNESS WHEREOF, the Parties hereto have executed this TSA as of the day and year first written above.

**TRANSFEROR:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

**LEFLORE COUNTY, MISSISSIPPI**

By: _____

Name: _____

Title: _____

**CITY OF GREENWOOD, MISSISSIPPI**

By: _____

Name: _____

Title: _____

**[Signature Pages Continued]**

**UMMC:**

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

By: _____

Name: _____

Title: _____

**EXHIBIT C**

**Form of Escrow Agreement**

*Exhibit C to the Contribution and Asset Transfer Agreement*

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Escrow Agreement**") is made this ___ day of _____, 2026, by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL**, a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees ("**GLH**", together with City and County, "**Transferor**"), **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning ("**UMMC**") and **[ESCROW AGENT], _____** ("**Escrow Agent**").

City, County, GLH, UMMC, and Escrow Agent are each a "**Party**" and collectively the "**Parties**"; provided, however, that Escrow Agent shall have only the rights, duties, and obligations expressly set forth herein.  Capitalized terms not otherwise defined herein shall have the meaning set forth in Contribution and Asset Transfer Agreement dated as of June __, 2026 among Transferor and UMMC (the "**Contribution Agreement**").

### W I T N E S S E T H:

WHEREAS, pursuant to the Contribution Agreement as approved by the Confirmation Order, Transferor has contributed, conveyed, assigned, transferred, and delivered to UMMC, and UMMC has accepted from Transferor, the Transferred Assets and Transferor has retained the Excluded Assets; and

WHEREAS, pursuant to the Contribution Agreement, UMMC has assumed only the Assumed Liabilities, and no other liabilities, obligations, debts, claims, commitments, or responsibilities of any kind whatsoever of Transferor;

WHEREAS, pursuant to the Contribution Agreement, Transferor acknowledged and agreed that all Excluded Liabilities, as between the Parties, shall be secured through the Escrow Account and paid, reimbursed, or otherwise disbursed therefrom by Escrow Agent in accordance with UMMC's written instructions and the terms of this Escrow Agreement; and

WHEREAS, the Parties acknowledge and agree that the Escrow Account (as defined herein) shall be funded and replenished, after payment of Bankruptcy Court-approved administrative costs, professional fees and the fees of Escrow Agent as set forth in Section 1.4 (collectively, the "**Administrative Costs**") from proceeds of the Excluded Assets, other than Excluded Real Property, but including GLH's cash on hand, collections of Excluded Receivables, and the sale, collection, monetization, or otherwise liquidation of the any other Excluded Assets, net of directly related liquidation costs approved in writing in advance by UMMC (collectively, the "**Liquidation Proceeds**").

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto do agree as follows:

1.      <u>CREATION OF THE EXCLUDED LIABILITIES ESCROW ACCOUNT</u>

1.1     <u>Appointment of Escrow Agent</u>. The Parties hereby appoint Escrow Agent as the escrow agent for the Escrow Account and the Escrow Funds (as defined herein) under this Escrow Agreement, and Escrow Agent hereby accepts such appointment, upon the terms and subject to the conditions set forth herein. The Escrow Agent shall act solely in a ministerial capacity and shall hold, administer, and disburse the Escrow Funds only in accordance with written instructions from and directions by UMMC, in its sole and absolute discretion.

1.2     <u>Escrow Account</u>. As of the Closing Date and subject to the Confirmation Order, the Parties shall cause Escrow Agent to establish and maintain a segregated escrow account  for the sole use and benefit of UMMC (the **"Escrow Account"**) to secure and provide a source of payment and reimbursement for all Excluded Liabilities asserted against, imposed upon, collected from, incurred by, or otherwise affecting UMMC, including any arising under or relating to any Transferred Provider Agreement, Government Program participation, Hospital Payment Program, cost report, overpayment, recoupment, offset, repayment, audit, extrapolation, civil monetary penalty, self-disclosure, settlement obligation, or other reimbursement, regulatory, operational, contractual, tort, employment, tax, environmental, or other liability attributable to periods, services, reports, filings, acts, omissions, facts, circumstances, or payment periods occurring on or before the Closing Date other than Assumed Liabilities under the Contribution Agreement. The Escrow Account shall be opened and maintained by Escrow Agent as an FDIC-insured interest-bearing deposit account until disbursement of all funds held in the Escrow Account. Interest earned on the funds deposited in the Escrow Account shall be credited to the Escrow Account and shall constitute part of the Escrow Funds.

1.3     <u>Deposit of Moneys</u>. Transferor shall cause the Escrow Account held by the Escrow Agent to be funded and replenished by the Liquidation Proceeds.  Transferor, whether directly or indirectly through a third party collection agent, shall have a continuing obligation, at its sole cost and expense, to fund, replenish, and maintain all new funds collected after the date hereof in and to the Escrow Account in such amounts as are necessary to satisfy all Excluded Liabilities, without limitation as to amount (such amounts, together with all interest earned thereon, the "**Escrow Funds**").   After retaining, withholding or paying pursuant to the Confirmation Order or the Plan of Adjustments, the Administrative Costs, not to exceed $100,000 or as otherwise approved by UMMC, Escrow Funds shall be deposited promptly, but at least within three (3) business days of receipt, by Transferor or its qualified third-party contractors.  Transferor shall have the right to deduct from the Liquidation Proceeds any directly related costs for such liquidations as approved in writing in advance by UMMC.  No amount may be withheld or deducted from the Liquidation Proceeds other than (i) the Administrative Costs permitted by this Section 1.3 up to the aggregate set forth above and/or (ii) directly related liquidation costs approved in writing in advance by UMMC.  For the avoidance of doubt, Transferor shall not withhold or deduct from Liquidation Proceeds any amount or funds, except for Administrative Costs or pre-approved costs directly related to collections without UMMC's advance approval in writing which may be delivered electronic mail.

1.4     <u>Escrow Agent Fees & Expenses</u>. Transferor shall pay the fees and charges of the Escrow Agent in the amounts and in the manner set forth on **Exhibit A** attached hereto and

incorporated herein by this reference. The Escrow Agent shall have no right to deduct any fee or expense from the Escrow Funds unless expressly authorized and directed by UMMC in writing.

1.5     Records.  On a monthly basis, Escrow Agent shall deliver to UMMC and Transferor copies of escrow statements, bank statements, deposit records, and wire confirmations.

2.     DISBURSEMENT OF ESCROW FUNDS.

2.1     UMMC Direction. UMMC shall be entitled to payment or reimbursement from the Escrow Account for any Excluded Liability asserted against, imposed upon, collected from, incurred by, or otherwise affecting UMMC, and for any fees, costs, and expenses recoverable under Section 2.6. Escrow Agent shall disburse all or a portion of the Escrow Funds solely upon written instruction from UMMC.  UMMC shall have the sole and absolute discretion to direct Escrow Agent to disburse Escrow Funds to satisfy, reimburse, reserve against, pay, or otherwise cover any Excluded Liability, alleged Excluded Liability, or any costs, expenses, losses, damages, claims, obligations, repayments, offsets, recoupments, settlements, penalties, or liabilities that UMMC determines are related in any way to any Excluded Liability. Escrow Agent shall make such disbursement to UMMC, or its designated payee, promptly, but at least within one (1) business day, after receipt of UMMC's written instruction.

2.2     Binding Determination. UMMC's determination to direct disbursement of Escrow Funds under this Section shall be final, conclusive, and binding on Transferor and Escrow Agent, absent manifest clerical error.

2.3     Authorization by Transferor. Transferor, and each component of Transferor that is a party hereto, hereby irrevocably acknowledges, consents, and agrees that Escrow Agent is authorized and directed to rely upon and comply with any written instruction from UMMC delivered in accordance with this Escrow Agreement, without further consent, approval, notice to, or confirmation from Transferor or any other Person.

2.4     No Duty to Investigate. Escrow Agent shall have no duty to investigate, verify, contest, monitor, or determine whether any disbursement requested by UMMC is proper, payable, due, owing, or correctly characterized as an Excluded Liability, and Escrow Agent may rely conclusively on UMMC's written instructions.

2.5     Insufficiency of Escrow Funds. No insufficiency, delay in funding, depletion, or failure of the Escrow Account shall impose any Excluded Liability upon UMMC. Other than the Escrow Agent's fees which are to be paid in accordance with Section 1.4, all other costs and expenses of establishing, funding, maintaining, administering, and replenishing the Escrow Account shall be borne solely by Transferor and shall constitute Excluded Liabilities to be funded under the Plan of Adjustment and Confirmation Order.

2.6     Transferor irrevocably waives and agrees not to assert, commence, support, or participate in any claim, objection, motion, defense, counterclaim, offset, or other action seeking to restrain, impair, invalidate, delay, reduce, recover, or otherwise challenge the creation, funding, maintenance, replenishment, administration, use, disbursement, or enforcement of the Escrow Account or the Escrow Funds, including any disbursement made or directed in accordance with this Escrow Agreement. If City, County, GLH, or any of their respective affiliates, successors,

3

assigns, representatives, or any person acting by, through, or on behalf of any of them initiates, supports, or participates in any such challenge, UMMC shall be entitled to recover from the Escrow Funds, in addition to any other rights and remedies, all costs and expenses incurred by UMMC in connection therewith, including reasonable attorneys' fees and expenses, and Escrow Agent is hereby authorized and directed to disburse such amounts to UMMC upon UMMC's written instruction.

3.      DUTIES OF ESCROW AGENT

3.1      Limited Duties. Escrow Agent shall have only those duties, responsibilities, and obligations expressly set forth in this Escrow Agreement, and no other duties, implied duties or obligations shall be construed or interpreted into this Escrow Agreement against Escrow Agent. Escrow Agent shall not be required to expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder. Escrow Agent shall not incur any liability in acting in good faith reliance on advice of legal counsel with respect to any matter arising under this Escrow Agreement.

3.2      Reliance.

3.2.1   Escrow Agent shall be entitled to rely conclusively upon any order, judgment, certification, demand, notice, instruction, instrument, or other writing delivered to it hereunder and reasonably believed by it to be genuine and authorized, including any written instruction from UMMC, without being required to determine the authenticity, correctness, validity, or effect thereof.

3.2.2   If at any time Escrow Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Escrow Funds (including but not limited to orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of the Escrow Funds), Escrow Agent is authorized to comply therewith and if Escrow Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, Escrow Agent shall not be liable to Transferor or to any other person or entity even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

3.3      Force Majeure. Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of Escrow Agent (including, but not limited to, any act or provision of any present or future law or regulation or governmental authority, any act of God, war or terrorism, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility), excluding Escrow Agent's gross negligence or willful misconduct.

4.      RELEASE AND EXCULPATION OF ESCROW AGENT

4.1      Release. Each Transferor and UMMC hereby releases and discharges Escrow Agent and its directors, officers, employees, agents, and representatives from any and all claims, causes of action, liabilities, losses, damages, costs, and expenses arising out of or relating to any action taken or omitted to be taken by Escrow Agent in accordance with any written instruction

4

from UMMC delivered pursuant to this Escrow Agreement, except in the case of Escrow Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

4.2     Exculpation. Without limiting the foregoing, Escrow Agent shall not be liable to any Party for acting or refraining from acting in reliance on any written instruction from UMMC, and no Party shall assert any claim against Escrow Agent based on Escrow Agent's compliance with such instruction, except in the case of gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

4.3     No Indemnity by Governmental Parties. Notwithstanding anything herein to the contrary, nothing in this Escrow Agreement shall be construed to require UMMC, GLH, City, or the County to indemnify, defend, or hold harmless Escrow Agent or any private party.

5.     TERMINATION, ASSIGNMENTS AND AMENDMENTS

5.1     Termination.  This Escrow Agreement shall terminate only upon (a) UMMC's written confirmation that all Excluded Liabilities have been paid, reimbursed, resolved, barred, or otherwise fully provided for to UMMC's satisfaction in its sole discretion, (b) written agreement executed by UMMC and Escrow Agent, or (c) the ten-year anniversary of the Closing Date, whichever is earlier. In the event that Escrow Funds remain in the Escrow Account following termination of the Escrow Agreement under this Section 5.1, the Escrow Agent shall release those Escrow Funds to Transferor to be paid out in accordance with the Plan of Adjustment.

5.2     Assignment. Except as expressly herein provided, no Transferor party may assign its rights or obligations under this Escrow Agreement without UMMC's prior written consent. UMMC may assign this Escrow Agreement to any affiliated or designated acquiring entity upon written notice to the other Parties. Escrow Agent may resign and be replaced by a successor escrow agent acceptable to UMMC upon written notice to the other Parties.

5.3     Amendments. This Escrow Agreement may only be amended by a written agreement executed by all of the Parties hereto.  For avoidance of doubt, Transferor shall not alter, modify or revoke the authority of UMMC to direct in its sole and absolute discretion the disbursement, use and payment of Escrow Funds to satisfy any Excluded Liability.

6.     MISCELLANEOUS

6.1     Notices.  Any notice, demand, waiver, consent or other communication required or permitted hereunder shall be in writing and shall be deemed received on the date delivered (a) by hand delivery (to the person or department if one is specified below), (b) by U.S. mail, certified or registered, with return receipt requested, or (c) by FedEx, Airborne, UPS or other national overnight courier service, and in each case addressed as follows:

If to GLH:                    Greenwood Leflore Hospital
                              ATTN: Dawne Holmes
                              2001 Garrard Ave.
                              Greenwood, Mississippi 38930
                              Email:  dholmes@glh.org

5

If to County:                    Leflore County
                                 ATTN:  President of Board of Supervisors
                                 306 W. Market St.
                                 Greenwood, MS 38930
                                 [EMAIL]

If to City:                      City of Greenwood, Mississippi
                                 ATTN:  Mayor
                                 101 W Church St.
                                 Greenwood, MS 38930
                                 [EMAIL]

If to UMMC:                      Alan E. Jones, MD
                                 Associate Vice Chancellor for Health Affairs
                                 2500 N. State St.
                                 Jackson, Mississippi 39216
                                 aejones@umc.edu

With copies to:                  William C. Smith, III
                                 General Counsel
                                 The University of Mississippi Medical Center
                                 2500 N. State St.
                                 Jackson, Mississippi
                                 wcsmith3@umc.edu

and

(which shall not                 Butler Snow LLP
constitute notice):              Attn: John J. Healy III
                                 1020 Highland Colony Parkway, 14th Floor
                                 Ridgeland, Mississippi 39157
                                 johnny.healy@butlersnow.com

or to such other address as any Party may provide to the other Parties in writing from time to time.

6.2     Severability. If any provision of this Escrow Agreement, or portion thereof, is declared invalid, the remaining provisions will remain in full force and effect.

6.3     Remedies. The rights and remedies conferred upon the Parties hereto shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies.  The waiver of any right or remedy hereunder shall not preclude the subsequent exercise of such right or remedy.

6.4     Governing Law; Venue.  This Escrow Agreement is made and entered into and will be construed and interpreted in accordance with the laws of the State of Mississippi without regard to its conflict of laws provisions.  Venue for any action related to this Escrow Agreement that is not within the exclusive jurisdiction of the Bankruptcy Court shall lie exclusively in the federal

and the state courts located in Hinds County, Mississippi and each Transferor irrevocably submits to such jurisdiction.

6.5     <u>Binding Effect</u>. This Escrow Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

6.6     <u>Execution in Counterparts; Electronic Signatures</u>. This Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement. A signed copy of this Escrow Agreement delivered by facsimile, email, portable document format (.pdf), or other electronic means shall be deemed to have the same legal effect as delivery of an original signed copy of this Escrow Agreement. The Parties agree that electronic signatures shall be valid and binding and shall have the same force and effect as original manual signatures

6.7     <u>Entire Agreement</u>. This Escrow Agreement, along with the Contribution Agreement to which UMMC and Transferor are Parties, constitutes the entire agreement among the Parties with respect to the subject matter hereof and shall not be rescinded, amended or modified in any manner except by a document in writing executed by all Parties hereto.

**[Signatures on following pages]**

7

IN WITNESS WHEREOF, the Parties hereto have executed this Escrow Agreement as of the day and year first written above.

**TRANSFEROR:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____


**LEFLORE COUNTY, MISSISSIPPI**

By: _____

Name: _____

Title: _____


**CITY OF GREENWOOD, MISSISSIPPI**

By: _____

Name: _____

Title: _____


**[Signature Pages Continued]**

8

**UMMC:**

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

By: _____

Name: _____

Title: _____

9

**ESCROW AGENT:**

**[NAME]**

By: _____

Name: _____

Title: _____

**EXHIBIT A**

Escrow Agent Fee Schedule

## EXHIBIT D

## Form of Bill of Sale

*Exhibit D to the Contribution and Asset Transfer Agreement*

## BILL OF SALE

This **BILL OF SALE** (this "**Bill of Sale**") is made and entered into as of the _____, **2026** (the "**Effective Date**"), by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL** ("**GLH**"), a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees (the City, County, and GLH are collectively, the "**Transferor**"), and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning, or such affiliated or designated acquiring entity as UMMC may identify in writing prior to Closing (collectively, "**UMMC**").  The City, County, GLH, and UMMC are each a "**Party**" and collectively the "**Parties**."

## RECITALS

A.      Transferor and UMCC are parties to that certain Contribution and Asset Transfer Agreement, dated **June \_\_, 2026** (the "**Contribution Agreement**").  Capitalized terms used but not defined herein have the respective meanings for such terms as defined in the Contribution Agreement.

B.      Pursuant to the Contribution Agreement, Transferor agreed to contribute, convey, assign, transfer, and deliver to UMCC, and UMCC agreed to accept from Transferor, the Transferred Assets, all on the terms and subject to the conditions set forth in the Contribution Agreement.

**NOW THERFORE**, for and in consideration of the above premises, the mutual covenants contained in this Bill of Sale and in the Contribution Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      <u>Contribution and Transfer of Transferred Assets</u>.  As of the Closing Date, Transferor hereby contributes, assigns, transfers, conveys, and delivers to UMMC, and UMMC accepts, all of Transferor's right, title, and interest in and to the Transferred Assets, free and clear of all Liabilities and Liens, other than the Assumed Liabilities and Permitted Liens, to the extent permitted by applicable law and in accordance with the Chapter 9 Plan and Confirmation Order in the Bankruptcy Case.  Notwithstanding anything to the contrary in this Bill of Sale, Transferor shall retain the Excluded Assets and Excluded Liabilities.

2.      <u>Reference to the Contribution Agreement</u>.  The provisions of this Bill of Sale are subject in all respects to the terms of the Contribution Agreement, and all of the representations, warranties, covenants and agreements contained therein shall survive the execution and delivery of this Bill of Sale in accordance with the terms thereof. Nothing contained in this Bill of Sale shall be deemed or construed to alter, modify, add to or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the Contribution Agreement.

3.      <u>Further Actions</u>.  Each Party will, at its own expense, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, assurances and such other action as such other Party.

4.      <u>Governing Law</u>.   This Bill of Sale shall be governed by and construed in accordance with the applicable laws of the State of Mississippi without regard to conflicts-of-law principles.

5.      <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  The facsimile signature of any Party to this Bill of Sale or a PDF copy of the signature of any Party delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

6.      <u>Amendment</u>.  No amendment of any provision of this Bill of Sale shall be valid unless the same shall be in writing and signed by the Parties.

7.      <u>No Third Party Beneficiary</u>.  The terms and provisions of this Bill of Sale are intended solely for the benefit of the Parties hereto and their respective and permitted successors and assigns, and it is not the intention of the Parties to confer, and this Bill of Sale shall not confer, third party beneficiary rights upon any other person or entity.

8.      <u>Binding Agreement</u>.  This Bill of Sale shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and assigns.

9.      <u>Severability; Invalid Provisions</u>.  If any provision of this Bill of Sale is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of Transferor or UMMC under this Bill of Sale will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Bill of Sale will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Bill of Sale will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Bill of Sale a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

10.      <u>Conflicts</u>.  This Bill of Sale is made pursuant to the Contribution Agreement and is subject to the terms and conditions thereof.  If any conflict exists between this Bill of Sale and the Contribution Agreement, the Contribution Agreement shall control.

**[*Signatures pages to follow*]**

2

**IN WITNESS WHEREOF**, this Bill of Sale has been executed and delivered by duly authorized persons of the Parties as of the Effective Date.

**TRANSFEROR:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

[*Signatures Pages Continued*]

*Signature Page to Bill of Sale*

**LEFLORE COUNTY, MISSISSIPPI**

By: _____

Name: _____

Title: _____

**ATTEST**:

_____
[Name/Title]

**[*Signatures Pages Continued*]**

*Signature Page to Bill of Sale*

**CITY OF GREENWOOD, MISSISSIPPI**

By: _____

Name: _____

Title: _____


**ATTEST**:


_____
[Name/Title]


**[*Signatures Pages Continued*]**

*Signature Page to Bill of Sale*

**UMMC**:

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

By: _____

Name: _____

Title: _____

*Signature Page to Bill of Sale*

# EXHIBIT E

## Form of Assignment and Assumption Agreement

*Exhibit E to the Contribution and Asset Transfer Agreement*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "**Agreement**") is made and entered into as of _____, **2026** by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL** ("**GLH**"), a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees (the City, County, and GLH are collectively, "**Assignor**"), and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning, or such affiliated or designated acquiring entity as UMMC may identify in writing prior to Closing (collectively, "**UMMC**" or "**Assignee**").  Each of Assignor and Assignee may be referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      Assignor and Assignee are parties to that certain Contribution and Asset Transfer Agreement, dated **June \_\_, 2026** (the "**Contribution Agreement**").  Capitalized terms used but not defined herein have the respective meanings for such terms as defined in the Contribution Agreement.

B.      Pursuant to the Contribution Agreement, Assignor agreed to contribute, convey, assign, transfer, and deliver all Assignor's rights and interests in the Assumed Contracts and Assumed Leases to Assignee, and Assignee agreed to accept same and to assume the Assumed Liabilities.

**NOW THERFORE**, for and in consideration of the above premises, the mutual covenants contained in this Agreement and in the Contribution Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      <u>Assignment and Assumption</u>.  Effective as of the Effective Date, (a) Assignor hereby transfers, assigns, conveys and delivers to Assignee all of Assignor's right, title, and interest in and to all of the Assumed Contracts and Assumed Leases, and (b) Assignee hereby accepts the Assumed Contracts and Assumed Leases pursuant to and in accordance with the Contribution Agreement. For the avoidance of doubt, <u>Exhibit A</u> sets forth the Assumed Contracts and Assumed Leases.

2.      <u>Reference to the Contribution Agreement</u>.  The provisions of this Agreement are subject in all respects to the terms of the Contribution Agreement pursuant to the Confirmation Order, and all of the representations, warranties, covenants and agreements contained therein shall survive the execution and delivery of this Agreement in accordance with the terms thereof. Nothing contained in this Agreement shall be deemed or construed to alter, modify, add to or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the Contribution Agreement.

3. <u>Further Actions</u>. Each Party will, at its own expense, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, assurances and such other action as such other Party may reasonably request to more effectively consummate the transactions contemplated by this Agreement.

4. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the applicable laws of the State of Mississippi without regard to conflicts-of-law principles.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. The facsimile signature of any Party to this Agreement or a PDF copy of the signature of any Party delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

6. <u>Amendment</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

7. <u>No Third Party Beneficiary</u>. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective and permitted successors and assigns, and it is not the intention of the Parties to confer, and this Agreement shall not confer, third party beneficiary rights upon any other person or entity.

8. <u>Binding Agreement</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and assigns.

9. <u>Severability; Invalid Provisions</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Assignor or Assignee under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

10. <u>Conflicts</u>. This Agreement is made pursuant to the Contribution Agreement and is subject to the terms and conditions thereof. If any conflict exists between this Agreement and the Contribution Agreement, the Contribution Agreement shall control.

**[*Signatures pages to follow*]**

2

     **IN WITNESS WHEREOF**, this Agreement has been executed and delivered by duly authorized persons of the Parties as of the Effective Date.

**TRANSFEROR:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

**[*Signatures Pages Continued*]**

3

**LEFLORE COUNTY, MISSISSIPPI**

By: _____

Name: _____

Title: _____

**ATTEST**:

_____
[Name/Title]

**[*Signatures Pages Continued*]**

**CITY OF GREENWOOD, MISSISSIPPI**

By: _____

Name: _____

Title: _____

**ATTEST**:

_____

[Name/Title]

[*Signatures Pages Continued*]

5

**UMMC**:

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

By: _____

Name: _____

Title: _____

6

## EXHIBIT A

Exhibit A – Assignment and Assumption Agreement

**EXHIBIT F**

**Form of Limited Power of Attorney**

*Exhibit E to the Contribution and Asset Transfer Agreement*

**LIMITED POWER OF ATTORNEY FOR USE OF
DEA AND OTHER REGISTRATION NUMBERS,
AND DEA ORDER FORMS AND ELECTRONIC ORDERS**

Pursuant to that certain Contribution and Asset Transfer Agreement, dated as of **June ___, 2026** (the "**Contribution Agreement**") by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL** ("**GLH**" or "**Registrant**"), a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees (the City, County, and GLH are collectively, the "**Transferor**"), and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning, or such affiliated or designated acquiring entity as UMMC may identify in writing prior to Closing (collectively, "**UMMC**"), Transferor agreed to contribute, convey, assign, transfer, and deliver to UMCC, and UMCC agreed to accept from Transferor, as of the Effective Date, the Transferred Assets as defined under the Contribution Agreement.  Capitalized terms used in this Limited Power of Attorney but not otherwise defined herein shall have the meanings ascribed to such terms in the Contribution Agreement.

In connection with the operation of GLH to the Effective Date, Registrant obtained and has to date maintained licensure with the Mississippi Board of Pharmacy (the "**Board**") and registration with the United States Drug Enforcement Agency (the "**DEA**"), all as set forth in Exhibit A hereto (the "**Pharmacy Registrations**").

In connection with the Contribution Agreement, UMMC will file new applications with the DEA and the Board for registration under the Controlled Substance Act of 1970 and under the Board's regulations, but the applications will not be processed prior to the Effective Date. In order to enable UMMC to continue to make available pharmacy services, including controlled substances, to patients of UMMC and to operate the existing facilities during the interim period between the Effective Date and approval of UMMC's new pharmacy license applications and DEA applications (the "**Applications**"), it is necessary for Registrant to grant to UMMC a Limited Power of Attorney to use the Pharmacy Registrations during the interim period. Registrant desires to grant to UMMC and UMMC desires to accept from Registrant such Limited Power of Attorney upon the terms and conditions described herein.  In consideration of the mutual covenants and agreements herein set forth, UMMC and Registrant do hereby covenant and agree as follows:

1.      <u>Limited Power of Attorney</u>.  In recognition of the need to continue to make available pharmacy services, including controlled substances, for treatment of UMMC's patients and to continue to operate the existing facilities during the period from the Effective Date until approval of the Applications, Registrant hereby makes, constitutes and appoints UMMC as its full and lawful attorney in fact solely and exclusively for the limited purpose of and with power to use the Pharmacy Registrations for purposes of ordering, storing, handling and dispensing drugs and taking all other actions reasonably necessary for operation of the facilities. Registrant further grants this limited power of attorney to UMMC to act, effective as of the Effective Date, as the true and lawful agent and attorney-in-fact of Registrant, and to act in the name, place, and stead of Registrant as Registrant's agent pursuant to DEA registration numbers [●], to execute applications

1

for books of official order forms and to sign such orders for Schedules I, II, III, IV and V controlled substances, whether these orders be on order forms or electronic, but only in accordance with the applicable DEA registration and in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. § 828) and part 1305 of Title 21 of the Code of Federal Regulations, as is necessary for the treatment of UMMC's patients.

2.    Term. The rights, powers and authority granted to UMMC hereunder as attorney in fact for Registrant shall become effective upon the Effective Date and shall continue in effect until the earlier of the following events: (a) UMMC receives all notices of the DEA's and the Board's approvals of its Applications and completes an inventory of all controlled substances then in its possession (the "**Notices**"); or (b) expiration of one hundred eighty (180) days following the Effective Date.  Notwithstanding the foregoing, in the event UMMC's commercially reasonable efforts to obtain new pharmacy licenses and DEA registrations are delayed, Registrant agrees to grant a reasonable extension of the term for a period of time deemed reasonable by Registrant and UMMC which will cover the period until UMMC, using commercially reasonable efforts to obtain such Notices, receives the Notices.

3.    Liability.  In accordance with the requirements of the DEA and the Board, Registrant acknowledges that Registrant remains liable for actions taken by UMMC during the period this Limited Power of Attorney is in effect.

4.    Entire Agreement; Amendment Governing Laws; Headings; Severability.  This Limited Power of Attorney constitutes the entire agreement of the Parties with respect to use of the Pharmacy Registrations.  Any alteration or modification of the provisions of this Limited Power of Attorney shall not be effective unless reduced to writing or executed by the Parties.  This Limited Power of Attorney is governed by and shall be construed under the laws of the State of Mississippi.  Paragraph headings are for convenience of reference only and shall not be used in the interpretation of this Limited Power of Attorney.  The terms and provisions of this Limited Power of Attorney are severable, and should any clause or provision hereof be unenforceable or be declared invalid for any reason whatsoever, this Limited Power of Attorney shall be construed and read as if such invalid or unenforceable clause or provision were omitted.

**[*Signatures pages to follow*]**

2

**IN WITNESS WHEREOF**, Registrant and UMMC have executed this Limited Power of Attorney for use of Pharmacy Registrations in multiple counterparts, each of which shall be considered an original, effective as of the Effective Time.

**UMMC:**

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

By: _____

Name: _____

Title: _____

[*Signatures Pages Continued*]

**REGISTRANT:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

**WITNESS:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

**WITNESS:**

**GREENWOOD LEFLORE HOSPITAL**

By: _____

Name: _____

Title: _____

## **EXHIBIT A**

**DISCLOSURE SCHEDULES**

**TO THE**

**CONTRIBUTION AND ASSET TRANSFER AGREEMENT**

**by and among**

**CITY OF GREENWOOD, MISSISSIPPI**

**LEFLORE COUNTY, MISSISSIPPI**

**GREENWOOD LEFLORE HOSPITAL**

**and**

**THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**

**Dated April \_\_\_, 2026**

The following disclosure Schedules (the "**Disclosure Schedules**") are being delivered pursuant to the Contribution and Asset Transfer Agreement (the "**Contribution Agreement**") entered into as of **[April \_\_\_, 2026]** (the "**Effective Date**"), by and among **CITY OF GREENWOOD, MISSISSIPPI**, a Mississippi municipality acting by and through its Council ("**City**"); **LEFLORE COUNTY, MISSISSIPPI**, acting by and through its Board of Supervisors ("**County**"), **GREENWOOD LEFLORE HOSPITAL**, a community hospital organized and existing under Miss. Code Ann. Section 41-13-10 et. seq. acting by and through its Board of Trustees, and **THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, acting by and through the Board of Trustees of State Institutions of Higher Learning, or such affiliated or designated acquiring entity as UMMC may identify in writing prior to Closing (collectively, "**UMMC**"). The City, County, GLH, and UMMC are each a "**Party**" and collectively the "**Parties**." Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Contribution Agreement.

*Disclosure Schedules to the Contribution and Asset Transfer Agreement*

## **DISCLOSURE SCHEDULES**

Schedule 2.1(a) – Transferred Real Property

Schedule 2.1(b) – Assumed Contracts

Schedule 2.1(c) – Assumed Leases

Schedule 2.1(e) – Transferred Provider Agreements

Schedule 2.1(g) – Transferred Personal Property

Schedule 2.1(h) – IT Assets

Schedule 2.1(l) – Books and Records

Schedule 2.1(m) – Transferred IP

Schedule 2.1(n) - Permits

Schedule 2.1(p) – Transferred Assets Rights

Schedule 2.3 – Assumed Liabilities

Schedule 2.7 – Permitted Liens

Schedule 2.8(a) – Excluded Real Property

Schedule 2.8(b) – Temporary Real Property

Schedule 9.4 – No Conflict

Schedule 9.5 – Subsidiaries

Schedule 9.6 – Absence of Undisclosed Liabilities

Schedule 9.7 – Ownership; Title

Schedule 9.8 – Contracts & Leases

Schedule 9.10 – Financial Information; Liabilities

Schedule 9.11 – Litigation; Investigations

Schedule 9.12 – Compliance with Law

Schedule 9.13 – Licenses & Permits

Schedule 9.14 – Hospital Payment Programs

Schedule 9.15 – Accreditation; Third Party Payor Claims

Schedule 9.16(a) – Owned Real Property

Schedule 9.16(b) – Leased Real Property

Schedule 9.16(c)(i) – Real Property – Notice of Violations

Schedule 9.16(c)(ii) – Real Property - Zoning

Schedule 9.16(c)(iv) – Real Property - Tenants

Schedule 9.16(c)(v) – Real Property – Rent Roll

*Disclosure Schedules to the Contribution and Asset Transfer Agreement*

Schedule 9.16(c)(vi) – Real Property – Eminent Domain

Schedule 9.17 – Employees and Labor Matters

Schedule 9.18(a) – Environmental Matters - Compliance

Schedule 9.18(b) - Environmental Matters - Permits

Schedule 9.18(c) – Environmental Matters – Notice of Hazardous Materials

Schedule 9.18(d) – Environmental Matters – Hazardous Materials Liability

Schedule 9.18(e) – Environmental Matters – Violation of Environmental Laws

Schedule 9.19 – Insurance

Schedule 9.20 – Medical Staff and Employed Physician Matters

Schedule 9.21(a) – IT Assets and Other Intellectual Property – Ownership

Schedule 9.21(b) – IT Assets and Other Intellectual Property – No Breach

Schedule 9.22 – No Brokers

Schedule 10.6 – Consents and Approvals

Schedule 11.6 – Governmental Approvals

*Disclosure Schedules to the Contribution and Asset Transfer Agreement*

| | | CONTRACT PARTY | Leased Item | Unexpired Term | Contract Number | | | CURE AMOUNT | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 345 | MidSouth Copier Systems, Inc | Copiers Rental | | | | Y/2 | $ 10,053.22 | | |
| | | P O Box 8357 | | | | | | | | |
| | | 709 Hwy 82 Bypass | | | | | | | | |
| | | Greenwood, MS 38935 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | 7074 | Toshiba America Business Solutions | Copiers Rental | | TOBBXFG | | Y/2 | $ 4,842.57 | | |
| | | P O Box 402709 | | | | | | | | |
| | | Atlanta, GA 30384-2708 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | 18950 | Oracle Corporation | Cerner_Inv/Soarian/Etc | 12/31/2026 | | | Y | $ 44,083.40 | Contract Number: | Total |
| | | 8779 Hillcrest Road | | | | | | $ - | CRNR-CON0177705-1 | |
| | | Kansas City, MO 64138 | | | | | | $ 1,989.33 | CRNR-CTT0064764-1 | |
| | | | | | | | | $ - | CRNR-CTT0042114-1 | |
| | | | | | | | | $ 38,151.36 | CRNR-CON000010000425-2 | Inv 102433589 and 102433590 |
| | | | | | | | | $ 246.77 | CRNR-CTT0038134-1 | |
| | | | | | | | | $ 2,028.51 | CRNR-CTT0033005-2 | |
| | | | | | | | | $ 1,667.43 | CRNR-CON000010000862-1 | |
| | | | | | | | | | | |
| | 5328 | SSI Group | Claims Scrubber, Director and Analytocs Softwar a | Expires 09/30/2027 | 1000-49881 | | Y | $ 31,654.83 | | |
| | | 4721 Morrison Drive | | | | | | | | |
| | | Mobile, AL 36609 | | | | | | | | |
| | | | | | | | | | | |
| | 20140 | MedAllies | HISP_Network Connectivity Services_EMR Vendor Messaging Services | Auto renews for 1 year unless 60 day notice from Dec | | | Y | $ - | | |
| | | P.O. BOX 637901 | | | | | | | | |
| | | CINCINNATI, OH 45263-7901 | | | | | | | | |
| | | | | | | | | | | |
| | 17998 | GHX, LLC | Enterprise Order Exchange Materials | expires 12/31/27 | C-73792 | | ? | $ 25,750.00 | | |
| | | P O BOX 912199 | | | | | | | | |
| | | DENVER, CO 80291-2199 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | 14304 | SOLVENTUM HEALTH INFORMATION SYSTEMS | APC, Encoder, DRGC, Chart Deficiency Analyzer | | O23406-20 S1-1 | | Y/Limited | $ 28,700.00 | | |
| | | LBX # 844394 | | | | | | | | |
| | | PO BOX 844394 | | | | | | | | |
| | | DALLAS, TX 75284-3398 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | 18525 | Aptean | AP GL Materiala Fixed Assets Software License and Subscription | Expires 05/31/2026 | | | Y | $ - | | |
| | | P O BOX 743722 | | | | | | | | |
| | | Atlanta, GA 30374-3722 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | 12155 | DB Tech | RasMaint Software support | Expires 10/31/2026 | | | Y | $ 43,196.52 | | |
| | | 110 E HOUSTON STREET | | | | | | | | |
| | | 3RD FLOOR | | | | | | | | |
| | | San Antonio, TX 78205 | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 20014 | VIRTUSA CORPORATION | Care Discovery EMeasure and Hybrid Subscription | Expires 06/30/26 | | | Y 1 Q | $ 53,568.00 |
| | 25512 NETWORK PLACE | | | | | | |
| | CHICAGO, IL 60673-1255 | | | | | | |
| | | | | | | | |
| 14257 | NEXTGEN HEALTHCARE, INC | EMR, EPM, Reporting, Waystar, Statements | | | | Y | $ 99,934.30 |
| | P O BOX 809390 | | | | | | |
| | CHICAGO, IL 60680 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 17529 | LUBA WORKERS' COMP | Workers Comp Insurance Premiums | 12/31/2026 | | | Y | $          - |
| | P O Box 98082 | | | | | | |
| | Baton Rouge, LA 70898-9082 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 19543 | CIRCLE J LAWN CARE | Lawn Care | Annual Renewal | | | Y- QUOTE | $          - |
| | P O Box 471 | | | | | | |
| | Eupora,MS 39744 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 20047 | TRAVELERS CL REMITTANCE CENTER | Property Insurance | Expires 06/30/26 | | | Y | |
| | P O Box 660317 | | | | | | |
| | Dallas, TX 75266-0317 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 2345 | EFFICIENCY BILLING SERVICE, INC | Collection Agency | | | | Y | $   7,484.72 |
| | P O Box 2353 | | | | | | |
| | Tupelo, MS 38803 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 3431 | SUNFLOWER SELF-STORAGE, LLC | Mini Storage | Month to Month | | | Y | $   1,502.00 |
| | 704 Tallahatchie St | | | | | | |
| | Greenwood, MS 38930 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 7918 | ADP, INC | Payroll Software License software and processing Service | | 16522 | | Y | $ 32,866.14 |
| | P O Box 830272 | | | | | | |
| | Philadelphia, PA 19182-0272 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 19764 | TRILOGY REVENUE CYCLE SOLUTIONS | REV CYCLE CONSULTING | | | | Y | $ 35,534.41 |
| | P O BOX 679005 | | | | | | |
| | DALLAS, TX 75267-9005 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 19733 | EPO SERVICES, LLC | Mr. Marchand Executive Consulting Services | | | | Y | $          - |
| | 6 ROSALIE DR | | | | | | |
| | LONG BEACH, MS 39560 | | | | | | |
| | | | | | | | |
| 19796 | PILEUM CORPORATION | SOFTWARE LICENSE FOR MALWARE AND ANTIVURUS FOR THE NETWORK | | | | Y | $      168.75 |
| | 190 E CAPITOL ST, SUITE 175 | | | | | | |
| | JACKSON, MS 39201 | | | | | | |
| | | | | | | | |
| | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 18923 | VITAL RECORDS CONTROL OF AR | Microfilming of Medical Records and Medical Records storage | | | | Y | $ 9,212.66 |
| | | DEPT 5874 | | | | | | |
| | | P O BOX 11407 | | | | | | |
| | | BIRMINGHAM, AL 35246-5874 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | 19828 | HFMI, LLC | Subscription Patient Accounts Insurance Eligibility Matching | Monthly | | | Y | $ 1,650.00 |
| | | DBA MAXRTE | | | | | | |
| | | 75 ARDILLA ROAD | | | | | | |
| | | ORINDA, CA 94563 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | 14795 | AT&T | Phone Service | | | | Y-? | $ 7,304.41 |
| | | P O BOX 5019 | | | | | | |
| | | CAROL STREAM, IL 60197-5014 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | 20109 | FSI STRATEGIES, INC | MICROSOFT 365 | | | | Y | $ - |
| | | 1595 SPRING HILL ROAD | | | | | | |
| | | SUITE 550 | | | | | | |
| | | VIENNA, VA 22182 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | Advanced Health Systems (AHS) | | | | | | |
| | | 3545 Lakeland Drive | | | | | | |
| | | Flowood, MS 39232 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | Aetna | | | | | | |
| | | 151 Farmington Avenue | | | | | | |
| | | Hartford, CT 06156 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | BlueCross BlueShield MS | | | | | | |
| | | 3545 Lakeland Drive | | | | | | |
| | | Flowood, MS 39232 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | Cigna<br>Attn: VP of Provider Contracting<br>730 Cool Springs Blvd, Suite 500<br>Franklin, TN 37067 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | First Choice | | | | | | |
| | | 309 New Point Drive | | | | | | |
| | | Suite A | | | | | | |
| | | Ridgeland, MS 39157 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | Humana | | | | | | |
| | | P O Box 14601 | | | | | | |
| | | Lexington, KY 40512-4601 | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Humana Military | | | | | |
| | | P O Box 202147 | | | | | |
| | | Florence, SC 29502-2147 | | | | | |
| | | | | | | | |
| | | Magnolia Health | | | | | |
| | | Centene Plaza | | | | | |
| | | 7700 Forsyth Boulevard | | | | | |
| | | St. Louis, MO 63105 | | | | | |
| | | | | | | | |
| | | Mississippi Physicians Care Network (MPCN) | | | | | |
| | | 309 New Pointe | | | | | |
| | | Suite B | | | | | |
| | | Ridgeland, MS 39157 | | | | | |
| | | | | | | | |
| | | Mississippi State Dept of Health - Breast & Cervical Cancer Program Attn: Kris Adcock, Senior Deputy P.O. Box 1700 Jackson, MS 39215-1700 | | | | | |
| | | | | | | | |
| | | Mississippi Dept of Rehabilitation Services Attn: Chris M. Howard, Executive Director P.O. Box 1698 Jackson, MS 39215-1698 | | | | | |
| | | | | | | | |
| | | Claritev (Multiplan) | | | | | |
| | | 7900 Tysons One Place | | | | | |
| | | Suite 400 | | | | | |
| | | McLean, VA 22102 | | | | | |
| | | | | | | | |
| | | True Care | | | | | |
| | | TrueCare Attn: Office of General Counsel P.O. Box 8738 Dayton, OH 45401-8738 | | | | | |
| | | | | | | | |
| | | United Healthcare Attn:  Network Market VP MN103 6022 Blue Circle Drive Minnetonka, MN 55343 | | | | | |
| | | | | | | | |
| | | Vantage Health Plan | | | | | |
| | | Vantage Health Plan, Inc. Attn: President/CEO 130 DeSiard Street, Suite 300 Monroe, LA 71201 | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | WellCare | | | | | |
| | | Centene Plaza | | | | | |
| | | 7700 Forsyth Boulevard | | | | | |
| | | St. Louis, MO 63105 | | | | | |
| | | | | | | | |
| | | Ambetter | | | | | |
| | | Centene Plaza | | | | | |
| | | 7700 Forsyth Boulevard | | | | | |
| | | St. Louis, MO 63105 | | | | | |
| | | | | | | | |
| | | Mississippi Division of Medicaid | | | | | |
| | | P O Box 2222 | | | | | |
| | | Jackson, MS 39225 | | | | | |
| | | | | | | | |
| | | Medicare | | | | | |
| | | Novitas Solutions | | | | | |
| | | P O Box 3111 | | | | | |
| | | Mechanicsburg, PA 17055-1857 | | | | | |
| | | | | | | | |
| | | FOX EVERETT | | | | | |
| | | P O Box 6006 | | | | | |
| | | Ridgeland, MS 38930 | | | | | |
| | | | | | | | |
| | | MOLINA HEALTHCARE | | | | | |
| | | 1020 Highland Colony Parkway | | | | | |
| | | Suite 602 | | | | | |
| | | Ridgeland, MS 39157 | | | | | |
| | | | | | | | |
| | | MS HEALTH PARTNERS | | | | | |
| | | 1501 Lakeland Dr | | | | | |
| | | Suite 200 | | | | | |
| | | Jackson, MS 39216 | | | | | |
| | | | | | | | |
| | | PPO PLUS | | | | | |
| | | P O Box 533 | | | | | |
| | | North Haven, CT 06473 | | | | | |
| | | | | | | | |
| | | United Medical Resources UMR | | | | | |
| | | P O Box 30541 | | | | | |
| | | Salt Lake City, UT 84130-0546 | | | | | |
| | | | | | | | |
| | | VA OPTUM | | | | | |
| | | CCN | | | | | |
| | | P O Box 202117 | | | | | |
| | | Florence, SC 29502 | | | | | |

## Schedule 9.1

**Executory Contracts and Unexpired Leases Assumed and Assigned to UMMC**

1. The following Lease Contracts, all of which are recorded in the Office of the Chancery Clerk of Leflore County, Mississippi:

    a.  Lease Contract by and between J.P. McGeoy and Leflore County, Mississippi recorded in Book 90 at Page 47.

    b.  Lease Contract by and between J.P. McGeoy and Leflore County, Mississippi recorded in Book 90 at Page 49.

    c.  Lease Contract by and between Mary Sue Futral and Leflore County, Mississippi recorded in Book 91 at Page 101.

    d.  Lease Contract by and between N.G. Colson and Leflore County, Mississippi recorded in Book 89 at Page 533.

2. Medical Assistance Participation Agreement (Medicaid – Title XIX Program) by and between the Mississippi Division of Medicaid and Greenwood Leflore Hospital with an effective date of May 18, 2003.

3. Medicare Provider Agreement as evidenced by Form CMS-1561, CMS Certification Number 25-0099, National Provider Identifier 1699714717, and related Medicare enrollment and certification records maintained in PECOS and CMS/Medicare Administrative Contractor files.